IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   11-cv-02953-WYD-MEH

JAMES NELSON and
ELIZABETH VARNEY,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

---

## ORDER ON SUMMARY JUDGMENT MOTIONS

---

I.    INTRODUCTION

THIS MATTER is before the Court on Defendant's Motion for Summary

Judgment filed February 28, 2013, and Plaintiffs' Motion for Partial Summary Judgment

on Defendant's Colorado Recreational Use Statute Affirmative Defense filed February

27, 2013.  Both motions are fully briefed.

By way of background, this case arose of a biking accident that occurred on an

asphalt paved path ["the asphalt path" or "the path"] on land adjacent to and owned by

the United States Air Force Academy ["Academy"] in Colorado Springs, Colorado.

Plaintiffs claim that James Nelson ["Nelson"] suffered catastrophic injuries as a result of

this accident, and sue the United States under the Colorado Premises Liability Act.

Plaintiffs assert that the United States owed a non-delegable duty to Nelson, as an

"invitee", to protect him from dangerous conditions of which it knew or should have

known on Academy property.  They further contend that the Academy knew people used the asphalt path on its property, knew the path was in a dangerous condition, but failed to protect the public, including Nelson, from that dangerous condition.

Defendant's Motion for Summary Judgment asserts that judgment should be entered on any of three grounds: (1) the United States was not a landowner of the asphalt path where Nelson was injured, and therefore is not liable under the Colorado Premises Liability Act; (2) if the United States is found to be the landowner of the path, a contractor was responsible for the maintenance and repair of all pavements on Academy property, and the United States has not waived its sovereign immunity for the acts or omissions of its contractors under the Federal Tort Claims Act ("FTCA"); (3) the Colorado Recreational Use Statute ("CRUS") bars Plaintiffs from recovery.  Plaintiffs' Motion for Partial Summary Judgment seeks judgment only on the United States' affirmative defense under the CRUS.

II.    FACTS

Before September 3, 2008, an asphalt paved path located on the east side of Colorado Instate 25 ["I-25], paralleling the highway was constructed near the eastern boundary of the Academy.  The path was located within and on Academy property and the United States owned that property.  The United States knew that the path existed on its property prior to September 3, 2008.  It did not intend for the path to be used for recreation or for the public to be invited to use the path for recreation.[1]

---

[1]  I have not cited to the record as to the facts in this paragraph as they were admitted by the United States in response to Plaintiffs' Motion for Partial Summary Judgment.  (*See* Movant's Statement of Material Facts ¶¶ 1-4 and Defendant's Response thereto.)  Henceforth, I will cite to the record only where

On September 3, 2008, at some time after 7:20 p.m., Nelson left his home in Colorado Springs, Colorado, to go for a bicycle ride.  Nelson rode his bike on the asphalt path which ran parallel to I-25.  While riding on the path, Nelson was severely injured when he fell into a sinkhole on the path.  The sinkhole across the path was the result of wash-out/erosion problems in the area.

Nelson testified that he believed he was not prohibited from entering the Academy to use the asphalt path.  (Pls.' Mot. for Partial Summ. J., ["Pls.' Mot."], Ex. 24, Nelson Depo. 95:6-23; 96:2-7.)  Nelson knew that the public entered the Academy property.  (*Id.*)  There is no evidence that Nelson was told not to use the path or that he was aware of anyone who was told not to use the path.  Further, at the time Nelson was injured the north entrance to the path read "Bicycle Path, No Motorized Vehicles".  Nelson does not recall one way or the other as to seeing other people on the path prior to his injury.  (Pls.' Reply in Supp. of Mot. Partial Summ. J. ["Pls.' Reply"], Ex. 33, Nelson Depo. 68:23-69:4.)  However, his wife, Elizabeth Varney, testified that she had seen people on the path.  (Def.'s Mot. Summ. J. ["Def.'s Mot."], Ex. A, Varney Depo. 8:18-23.)

The sinkhole on the path was photographed at least two weeks earlier by Dr. Mihlbachler, Natural Resource Manager at the Academy and a Fed. R. Civ. P.

---

the facts are disputed.  Also, where appropriate, when a dispute existed I have cited to the relevant deposition testimony to clarify the dispute.  I also have cited only to those facts I deem relevant to resolution of the motions.  I have, however, considered all of the facts cited by the parties.  Some of the facts are discussed later in connection with my analysis of the motions.

30(b)(6) representative of the Academy.[2]  Dr. Mihlbachler's job involves going out and surveying areas throughout the Academy and monitoring the landscape.  (Pls.' Reply, Ex. 34, Mihlbachler 30(b)(6) Depo. 13:17-19, 14:10-12.)  Thus, Plaintiffs assert that the United States knew that the sinkhole existed as of that time.   Defendant denies this, asserting that Dr. Mihlbachler took the pictures as a biologist with the United States Fish and Wildlife Service who was observing erosion issues in the area.  (Def.'s Resp. to Pl.'s Mot. Partial Summ. J. ["Def.'s Resp."], Ex. BB, Mihlbachler 30(b)(6) Depo. 9:3-5, 24:15-26:11.)  While this may be true, I note that Dr. Mihlbachler started working at the Academy in 2003 (*id.* 9:10-11), and testified that part of his duties in general assistance with Base safety and security was to be the "eyes on the ground", checking areas that the security forces don't get to that often and reporting to the appropriate party if issues were identified.  (Pls.' Reply, Ex. 34, Mihlbachler 30(b)(6) Depo. 21:21-22:13.)

It appears that Dr. Mihlbachler was the only one at the Academy who knew of the problem.  Dr. Mihlbachler testified that he did not report the issue, and shared the photographs with others at the Academy only after Nelson's accident.  (Def.'s Resp., Ex. BB, Mihlbachler 30(b)(6) Depo. 31:10-32:17, 73:2-5.)

Dr. Mihlbachler's photographs show the washout of the culvert, the sinkhole, and how the sinkhole encompassed the entire width of the asphalt path.  Plaintiffs assert that, despite knowing the danger existed, the sinkhole was not a high priority for the United States.  While the United States denies this, it admits that addressing erosion

---

[2]  The other United States' 30(b)(6) representatives are Greg Long, Chief of Operations at the Academy; Jeffrey Thoma, Plans and Programs Superintendent at the Academy; and Debbie Barrett, the Academy's Realty Officer.

issues in this area was not a high priority.  Dr. Mihlbachler testified that he knew that the asphalt path was not an Academy trail and that the sinkhole was thus not a high maintenance priority for the United States "relative to all the other erosion issues" that he was "dealing with along the eastern boundary."  (Def.'s Resp., Ex. BB, Mihlbachler 30(b)(6) Depo. 14:21-19:13, 73:2-12.)  Moreover, Dr. Mihlbachler testified that the thought that the path had some sort of recreational impact did not cross his mind because it was not designated as such by the Academy.  (*Id.* 90:1-10.)

The United States admits the condition of the asphalt path was dangerous and unsafe for users of the path, and that the path with a sinkhole would not meet Academy safety standards.  Further, it admits that prior to Nelson's accident, the United States did not take any measures to guard against or warn anyone using the path of the dangerous sinkhole condition.

Plaintiffs assert that the United States could have taken measures to guard against or warn of the dangerous condition before Nelson was injured, but did not.  The United States denies this, asserting that the asphalt path was located within an easement granted in 1958 to the Colorado Department of Highways (presently called the Colorado Department of Transportation ("CDOT") for the construction of a highway, now I-25.  (*See* Def.'s Mot., Ex. D, Barrett Depo. 26:20-27:4, Ex. 86.)  The entire length of the asphalt path was located within the easement granted to the State, and was also on Academy property.

Following Nelson's accident, the United States constructed a new fence across the path so that its intent was clear that the public was not invited to use the property.

-5-

The United States also disavowed the "Bicycle Path" sign, and stated that the "Bicycle Path" sign was neither installed nor authorized by the Academy.  Further, it closed off the path, installed barriers at both ends of the path, filled the sinkhole on the path with rip-rap and covered it in gravel, installed warning signs, and removed the sign that said "Bicycle Path, No Motorized Vehicles."  (Pls.' Reply, Ex. 31, Barrett 30(b)(6) Depo. 40: 3-19; Ex. 35.)  After CDOT confirmed it had no interest or involvement with the path, the United States entirely tore up and removed the path.  (*Id.*, Ex. 36, Shay Depo., 57:14-59:16; Ex. 37.)[3]

III.   ANALYSIS

   A.   Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."  *E.E.O.C. v. Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party.  *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1190.  "'Only disputes

---

   [3]  This evidence is admissible to show possession and control, and is therefore not precluded by Fed. R. Evid. 407.

over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  When applying the summary judgment standard, the court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Id.* (quotation omitted).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

When the parties file cross motions for summary judgment, the court is "'entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.'" *Atl. Richfield Co.*, 226 F.3d at 1148 (quotation omitted).  Cross motions for summary judgment must be treated separately – the denial of one does not require the grant of another.  *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

B.     The Merits of the Motions

1.     Whether the United States Was a Landowner Under the Colorado Premises Liability Act

I first address the United States' argument that it is entitled to summary judgment because it was not a landowner of the asphalt path where Plaintiff was injured, and therefore is not liable under Colorado's Premises Liability Act.  Plaintiffs' claim rests entirely on that Act, and is based on the fact that the asphalt path was located on property owned by the Academy.  The United States admits that the Academy held title

to the land on which the asphalt path was located.  It argues, however, that under Colorado law "[t]itle is not dispositive in determining who is a 'landowner'" under the premises liability statute, *Wark v. United States*, 269 F.3d 1185, 1188 (10th Cir. 2001), and that it was not a landowner under the statute because the State had exclusive possession of the land on which the path was located due to the easement granted to it by the United States.

Turning to my analysis, the Colorado "general assembly defined 'landowner' quite broadly to include, without limitation: (i) an authorized agent or person in possession of the land; and (ii) a person legally responsible for the condition of the real property or for the activities conducted or circumstances existing on the property." *Pierson v. Black Canyon Aggregates, Inc.*, 48 P.3d 1215, 1219 (Colo. 2002) (citing C.R.S. § 13-21-115(1)).  The purpose of the Premises Liability Act is to "promot[e] 'a state policy of responsibility by both landowners and those upon the land as well as [assuring] that the ability of an injured party to recover is correlated with his status as a trespasser, licensee, or invitee.'" *Id.* (quoting C.R.S. § 13–21–115(1.5)(a)).

Here, the United States as owner of the land "seeks to shift liability" to another entity—CDOT, *e.g.,* the State of Colorado.  *See Pierson*, 48 P.3d at 1220.  The United States' argument turns on whether it relinquished possession of the asphalt path through the easement granted to CDOT.  It asserts that the Academy relinquished to CDOT each and every right of access it had to the parcel of land subject to the easement, including its right of access over to the State, rather than retaining its own right of access and merely allowing the State to share in its retained right of access.

Specifically, the State was granted "an easement for a right of way for road, street and highway purposes over, across, in and upon lands of the United States of America . . . [t]ogether with each and every right of access of grantor to and from any part of the above described right of way, from and to any part of the real property of grantor abutting upon said right of way excepting, however, such access as may be provided by grantee through public interchanges, intersecting public roads or highways, and such access as may be provided by grantee by local service roads and such further access as may be agreed upon by and between the grantor and grantee." (Def's Mot., Ex. D, Depo. Ex. 86.)

The United States contends that its transfer of possession under the easement is made clear by the easement's delineation of "exceptions" to the State's grant of "each and every right of access", which include (1) "such access as may be provided by grantee through public interchanges, intersecting public roads or highways"; (2) "such access as may be provided by grantee by local service roads"; and (3) "such further access as may be agreed upon by and between the grantor and grantee." (Def.'s Mot., Ex. D, Depo. Ex. 86.) It is argued by the United States that such exceptions would be unnecessary, and indeed would be rendered meaningless, if the State were merely invited to share in the United States' retained right of access. Based on the United States' transfer of each and every right of access to the right of way, the United States argues that it transferred possession of that parcel of land and thus did not have any responsibility for maintaining or repairing the asphalt path.

Turning to my analysis, possession of the property "need not necessarily be to the exclusion of all others." *Pierson*, 48 P.3d at 1220. Thus, more than one party may be a landowner under the Colorado Premises Liability Act. The "person in possession" definition of a landowner "applies to those with title and possession *and* to non-titleholders with exclusive possession, such as tenants or easement holders who have complete possession and control over the property." *Wark,* 269 F.3d at 1188 (emphasis added). However, "when a landowner transfers complete control of the premises" to another, that landowner is no longer a person in possession for purposes of the statute." *Id.* The issue is whether the United States actually transferred complete possession and control of the asphalt path to the State through the easement, and/or whether it was still "legally responsible for the condition of real property or for the activities conducted or circumstances existing on real property." C.R.S. § 13-21-115(1).        I note that "[a]n easement is a right conferred by grant, prescription or necessity authorizing one to do or maintain something on the land of another 'which, although a benefit to the land of the former, may be a burden on the land of the latter.'" *Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1234 (Colo.1998) (quoting *Barnard v. Gaumer,* 361 P.2d 778, 780 (1961)). An easement generally "creates a nonpossessory property right to enter and use land in the possession of another and obligates the possessor [of land] not to interfere with the uses authorized by the easement.'" *Matoush v. Lovingood,* 177 P.3d 1262, 1265 (Colo. 2008) (quoting Restatement (Third) of Property: Servitudes § 1.2(1) (2000)).

Thus, "[a]n easement, regardless of the manner of its creation, does not carry any title to the land over which it is exercised, nor does it serve to dispossess the landowner." *Lazy Dog Ranch*, 965 P.2d at 1334. "The owner of the servient estate enjoys all the rights and benefits of proprietorship consistent with the burden of the easement; while the rights of the owner of the dominant estate are limited to those connected with use of the easement." *Id.* That rule is altered only where the easement "is clearly and unambiguously designated as 'exclusive' (i.e., for the sole enjoyment of the easement holder)." *Id.* at 1334 n. 4; *see also Bijou Irr. Dist. v. Empire Club*, 804 P.2d 175, 183 (Colo. 1991) ("We acknowledge the familiar principle that '[u]nless the grant conveying an easement specifically characterizes the easement as exclusive, the grantor of the easement retains the right to use the property in common with the grantee.'") (quotation omitted).

In the case at hand, the easement at issue does not clearly and unambiguously state that it is exclusive. Thus, it would appear under the general rule that the United States retained the right to use the property in common with the State. At the very least, I find that extrinsic evidence should be admitted on the issue. As stated by the Colorado Supreme Court:

> It is axiomatic that a contract must be construed to ascertain and effectuate the intent of the parties as determined primarily from the language of the contract. *May v. United States,* 756 P.2d 362, 369 (Colo.1988). To this end, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used. . . . However, our courts no longer apply a rigid 'four corners' rule. *Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1236 (Colo.1998). Thus, extrinsic evidence may be conditionally admitted to determine whether the contract is ambiguous. *Id.* at 1235.

*East Ridge of Fort Collins, LLC v. Larimer and Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005) (internal citation omitted).

Here, I look to extrinsic evidence for two reasons.  First, the easement does not say it is exclusive, and is ambiguous as to rights of possession the United States retained as to the asphalt path as well as who was responsible for its maintenance. Second, Colorado law makes clear that extrinsic evidence may be referred to in order to determine whether the easement is ambiguous.  *East Ridge of Fort Collins*, 109 P.3d at 947; *Lazy Dog Ranch*, 965 P.2d at 1236.

Turning to the evidence, Academy representative Greg Long admitted that the easement and Memorandum of Understanding related to same do not refer to the asphalt path or state who possesses or controls the path or is responsible for maintaining the path.  (Pls.' Resp. to Def.'s Mot. Summ. J. [Pls.' Resp."], Ex. 4, Long Depo. 48:12-49:17.)  This was confirmed by Karen Liekem, who further testified that CDOT disclaimed any interest or ownership in the path or in maintaining the path.  (*Id.*, Ex. 7, Liekem Depo. 39:17-40:7, 41:4-25.)  Ms. Barrett, another Academy representative, testified that the easement does not give CDOT exclusive control over the entire area for the easement, and that CDOT confirmed to her that they did not maintain the path.  (*Id.*, Ex. 11, Barrett Depo. 34:10-19, 35:2-9.)  She testified that the easement simply gives CDOT the ability to do work as necessary to support I-25, but that ultimately the Air Force retains control over all of its Real Property.  (*Id.* 35:22-36:8.)

Ms. Barrett's understanding that the easement does not give CDOT exclusive control over the area of the easement is consistent with the evidence.  John Van

Winkle, Deputy Chief of Media Relations at the Academy, acknowledged that the path "is indeed on Air Force Property," and that it was "ultimately on Air Force land and USAFA's responsibility to get it fixed."  (Pls.' Resp., Ex. 16, Van Winkle Depo. 14:11-15:11; 19:1-11.)  Greg Long ("Long") testified that if he had known of a threat or incident on the asphalt path, he would have taken action to correct it.  (Def.'s Resp., Ex. CC, Long 30(b)(6) Depo. 31:16-32:3.)  The United States admits that it may have been within its physical capabilities to take measures to remedy the problems on the path, but argues that taking any such actions would first require discussion with the State.  It cites to the deposition testimony of Long.  However, his testimony does not support this contention.  While Long testified when asked what he would do if the path was on the CDOT easement that he would first ask CDOT about remedying the problem, he also testified he would take action if CDOT did not act immediately.  (*Id*. 32:2-13.)  More importantly, he  acknowledged that there was no reason that the Academy could not have taken action to prevent an accident, such as placing barriers across the path.  (*Id*. 32:20-33:2.)  Karen Leikem testified similarly—that the Academy would not have had to obtain permission to take action with respect to the sinkhole.  (Pls.' Reply, Ex. 39, Leikem Depo. 35:18-37:10.)

Moreover, Loren Wilkinson, a CDOT senior maintenance man responsible for the stretch of I-25 that runs through the Air Force Academy for 18 years, observed on one occasion Air Force personnel engaged in maneuvers on and around the asphalt path and the I-25 easement, driving on the path and tearing up the landscape with their vehicles.  When Mr. Wilkinson questioned Air Force personnel about the damage being

done, he was told that it was "Air Force right of way" and if they wanted to, they could

shut the road/highway down.  (Pls.' Resp., Ex. 26, Wilkinson Depo. 13:8-16:6.)[4]

Perhaps most indicative of the Academy's possession and control over the

asphalt path were its actions after the accident.  The Academy immediately closed off

the path, installed barriers at both ends, filled the sinkhole with rip-rap and covered it in

gravel, installed warning signs, and removed the sign that said "Bicycle Path, No

Motorized Vehicles."  This was done without any involvement of CDOT, and is

consistent with Academy representatives' testimony that these actions could have been

taken by the Academy before the accident regardless of any involvement of CDOT.

Finally, CDOT's representatives testified that it had no responsibility under the

easement to maintain the asphalt path and that it did not maintain the path.  (Pls.'

Resp., Ex. 23,. Shay Depo. 40:19-41:4; Ex. 26, Wilkson Depo. 16:16-17:15.)  A CDOT

representative further testified that the Academy can demolish or remove the path

because it is on its property, and that the Air Force would not need or be required to

receive any CDOT assistance or permission to reclaim that path.  (*Id.*, Ex. 23, Shay

Depo. 58:4-10, 59:13-16.).  Colorado has long recognized the rule that in construing a

contract, the courts will follow the construction placed upon it by the parties

themselves."  *Lobato v. Taylor*, 71 P.3d 938, 947 (Colo. 2002).

Indeed, the United States' efforts to determine who—other than the Air Force—

was supposed to maintain the path, came up empty.  The United States documented its

---

[4]  While the United States asserts that this is hearsay, I note that it is not being offered for the truth of the matter asserted.  It is offered only as relevant to the issue of whether the United States retained possession or control of the property.

efforts, concluding: "Research to identify who built the path was unsuccessful. Contact

was made with personnel from CDOT, El Paso County Trails and Open Space

Coalition, El Paso County Parks and Recreation and Mountain View Electric

Association, none of whom have any records pertaining to the path."  (Pls.' Resp., Ex.

13; *see also* Ex. 11, Barrett 30(b)(6) Depo. 32:6-36:8.)  No person or company or other

governmental entity has claimed any control over the property and path.

From the foregoing, I find that the Academy's actions, when viewed as a whole,

indicate it "exercised a degree of control over the [asphalt path] inconsistent with their

contention that the area was managed [or controlled by the State and that the State was

in exclusive possession of the asphalt path] pursuant to the Easement Agreement.

*Bingaham v. Kansas Power & Light Co.*, 1 F.3d 976, 981 (10th Cir. 1993).  The

evidence creates a factual issue as to whether the United States was a landowner

within the meaning of the Colorado Premises Liability Act.  "These disputes do not lend

themselves to resolution by summary judgment."  *Nordin v. Madden*, 148 P.3d 218, 221

(Colo. App. 2006).  Accordingly, the United States' Motion for Summary Judgment is

denied as to the argument that it is not a landowner of the asphalt path and thus not

liable under the Colorado Premises Liability Act.

2.    Whether A Contractor Was Responsible for Maintenance of the
Path

The United States also argues that even if the Court finds that it is the landowner

of the asphalt path, a contractor was responsible for the maintenance and repair of all

pavements on Academy property.[5] The United States has not waived its sovereign immunity for the acts or omissions of its contractors under the Federal Tort Claims Act ("FTCA"), and it thus argues that this Court would not have subject matter jurisdiction over Plaintiffs' claims.

Turning to my analysis, the FTCA "is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976); 28 U.S.C. § 1346(b) (covering injuries "caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment"). The FTCA defines federal employees as "officers and employees of any federal agency," but explicitly excludes "any contractor with the United States." 28 U.S.C. § 2671. Here, the United States argues that the Academy hired a contractor to do the maintenance work and to repair sinkholes on the property, and that it is thus not liable under the FTCA. The law is settled that "[t]he FTCA does not authorize suits [against the United States] based on the acts of independent contractors" or injuries caused by an independent contractor. *See Logue v. United States*, 412 U.S. 521, 528 (1973); *Curry v. United States*, 97 F.3d

---

[5] In support of that argument, the United States originally attached a Declaration of James A. Anderson, Exhibit F to Defendant's motion. By Order of August 29, 2013, I granted Plaintiffs' motion to strike Mr. Anderson's Declaration as he was not identified in discovery, but allowed the United States to substitute the Declaration of Frederick L. Williams. Thus, I have considered Mr. Williams' Declaration in connection with my ruling, as well as Plaintiffs' Supplemental Response to Defendant's Motion for Summary Judgment to Address Declaration of Fred Williams filed on September 9, 2013.

412, 414 (10th Cir. 1996).[6]  In that situation, the United States' sovereign immunity

under the FTCA has not been waived and the case should be dismissed.  *See id.*

I find that summary judgment should be denied as to the argument that the

independent contractor exception to FTCA liability applies for two reasons.  First, I find

that there are genuine issues of material fact as to whether the contractor at issue,

CH2M Hill Academy Services ["CHAS"] actually was hired or responsible for

maintenance of the asphalt path at issue, despite the evidence relied on by Defendant.

The United States admits that the path was not in the Academy's real property record, it

was not an official trail of the Academy, and it was not a recognized trail by the

Academy or the Contractor.  Indeed, while the United States admits it knew of the path,

there is testimony that many Academy personnel did not know it even existed.  (Pl.'s

Resp., Ex. 4, Long 30(b)(6)Depo. 32:23-24; 41:14-16, Ex. 5, Thoma 30(b)(6) Depo.

23:15-18; 24:6-11.)[7]  If CHAS did not know about the trail, as it was not identified by the

Academy as part of its property subject to maintenance by CHAS, then CHAS could not

---

[6]  In determining whether a person is an independent contractor as compared to a federal employee, the focus is on "'whether the Government supervises the day-to-day operations of the individual.'"  *Curry*, 97 F.3d at 414 (quotation omitted).  Seven factors are considered:  "'(1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses h[is] own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.'"  *Id.* (quotation omitted).


[7]  *See also* Ex. 6, Williams Depo. 49:2-7; Ex. 7, Leikem Depo. 38:5-22; Ex. 8, Umbaugh Depo., 28:7-10; Ex. 11, Barrett Depo. 24:15-20; 27:13-15; Ex. 15, Hickernell Depo., 27:2-10; Ex. 16, Van Winkle Depo., 12:24-13:3; 17:2-18, Ex. 17, Gogan Depo. 48:4-21.  This must be contrasted with the Academy's "official" public paths, to which the Academy allows public access under certain and specific guidelines.  (*Id.*, Ex. 9, Def.'s Resp. to Interrogatory 5.)

have been responsible for its maintenance and thus could not have been responsible for the injuries to Nelson.

Second, even if CHAS was given responsibility for maintenance of the path, I find that there are genuine issues of material fact as to whether the Academy is liable for its own actions or omissions in connection with the path.  "Although the contractor exception shields the government from liability for the actions of its contractors, it does not shield the government from liability for the government's own negligent acts." *Berrien v. United States*, 711 F.3d 654, 659 (6th Cir. 2013); *see also Logue*, 412 U.S. at 533 (vacating judgment to determine whether negligence of government employee, as distinct from and in addition to the negligence of an independent contractor, was a cause of the injuries alleged); *McKay v. United States,* 703 F.2d 464, 472 (10th Cir. 1983) (the United States is not liable under the FTCA for the torts of an independent contractor "[a]bsent negligence on its part").  Thus, while the United States may not be directly or vicariously liable for any negligent or wrongful acts that CHAS committed, it can still be found liable for any tortious conduct of the Academy or its representatives. *Tisdale v. United States*, 62 F.3d 1367, 1371 (11th Cir. 1995); *see also Toole v. United States*, 588 F.2d 403, 407 n. 4 (3rd Cir. 1978) ("By basing liability on the Government's own negligence rather than the independent contractor's, [the plaintiff] avoided the obstacle created by exclusion of vicarious liability under the Federal Tort Claims Act.")

In that regard, the FTCA provides that "'[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances.'"  *Tisdale*, 62 F.3d at

1371 (quoting 28 U.S.C. § 2674).  As the act or omission at issue here occurred in

Colorado, the United States may be liable under Colorado state law for its own

negligent acts or omissions, including under the Colorado Premises Liability Act.  *Id.*;

*see also Berrien* 711 F.3d at 659; *Schmid v. United States*, 273 F.2d 172, 176-77 (7th

Cir. 1959).  The issue under the Premises Liability Act is whether the United State

retained possession or control of the property, even if it was not exclusive, as discussed

in Section III.B.1, *supra*.

I already found in the previous section that there are genuine issues of material

fact as to whether the United States retained possession and control over the asphalt

path.  Indeed, there is testimony by an Academy representative that the path was

"ultimately on Air Force land and USAFA's responsibility to get it fixed."  (Pls.' Reply,

Ex.16, Van Winkle Depo. 14:11-15:11.)  Consistent with this, the United States did

remedy the problem after the accident through installing barriers and filling up the

sinkhole.  (*See id.*, Ex. 25.)  Moreover, there is evidence that the United States was on

notice of the sinkhole through actions of its representative Dr. Mihlbachler and did

nothing to remedy it.  *See Teneyck v. Roller Hockey Colo.*, 10 P.3d 707, 709 (Colo.

App. 2000) (under the premises liability statute, "an invitee may recover for damages

'caused by the landowner's  failure to exercise reasonable care to protect against

danger of which he actually knew or should have known").  Accordingly, I find that

summary judgment must be denied as to the argument that the United States is not

liable under the independent contractor exception to the FTCA, as it may be liable for its

own acts.

I reject, however, Plaintiffs' argument that the United States' duty as a landowner is nondelegable.  It is true that Colorado law holds that a landowner may not delegate to an independent contractor the obligation to exercise reasonable care to protect invitees against dangers within the scope of the premises liability statute.  *Pierson*, 48 P.3d at 1220; *Jules v. Embassy Props., Inc.*, 905 P.2d 13, 15 (Colo. App. 1995).  However, the Supreme Court has held that Congress' intent in passing the FTCA makes clear that the courts cannot use state tort law to abrogate the independent contractor exception. *Logue*, 412 U.S. at 528; *see also Lurch v. United States*, 731 F.2d 333, 338 (10th Cir. 1983) ("Congress did not leave the independent contractor exemption subject to the vagaries of state law departures from the exemption").  "Claimants obtain 'their right to sue [the federal government] from Congress [and they] necessarily take it subject to such restrictions have been imposed."  *Berkman v. United States*, 957 F.2d 108, 112 (4th Cir. 1992).  Thus, substantive tort law, such as from state law or the Restatement, even where it imposes a non-delegable duty such as that at issue here, does not generally abrogate the independent contractor exception.  *Id.* at 113; *see also Alinsky v. United States*, 415 F.3d 639, 645 (7th Cir. 2005); *Roditis v. United States*, 122 F.3d 108, 111-12 (2d Cir. 1997); *Flynn v. United States*, 631 F.2d 678, 681-82 (10th Cir. 1980).

### 3.    The Colorado Recreational Use Statute

Finally, the United States argues that the Colorado Recreational Use Statute ("CRUS") bars Plaintiffs from any recovery in this case.  Plaintiffs, on the other hand,

argue as a matter of law that the CRUS is not applicable and seek summary judgment

to that effect.  The CRUS provides, in relevant part, that:

> (1) . . . an owner of land who either directly or indirectly invites or permits, without charge, any person to use such property for recreational purposes does not thereby:

> (a) Extend any assurance that the premises are safe for any purpose;

> (b) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed;

> (c) Assume responsibility or incur liability for any injury to person or property or for the death of any person caused by an act or omission of such person.

C.R.S. § 33-41-103 (2006).

The United States is "entitled to the protection of state recreational use statutes,

including [the CRUS], when it is sued under the FTCA."  *Kirkland v. United States*, 930

F. Supp. 1443, 1446 (D. Colo. 1996) (citing *Otteson v. United States*, 622 F.2d 516, 519

(10th Cir. 1980) (holding that the United States had no duty to maintain a Forest Service

road or to warn the plaintiff of its hazardous condition, as "the government is entitled to

the protection of the Colorado sightseer statute and is therefore only liable for willful or

malicious failure to guard or warn against a known dangerous condition")); *see also*

*Maldonado v. United States*, 893 F.2d 267, 268-69 (10th Cir. 1990).  Plaintiffs do not

dispute that the United States is entitled to the protection of the CRUS; instead, they

contend that the CRUS is inapplicable to this case.

The CRUS "provides limitations on liability concerning lands made available for

recreational purposes without charge."  *Luenberger v. City of Golden*, 990 P.2d 1145,

1147 (Colo. App. 1999).  The purpose of the CRUS is "'to encourage owners of land

within rural areas to make land and water areas available for recreational purposes by limiting their liability toward persons entering thereon for such purposes.'" *Smith v. Cutty's, Inc.*, 742 P.2d 347, 348 (Colo. App. 1987) (quoting C.R.S. 33-41-101); *see also McIntyre v. Bd. of County Comm'rs*, 86 P.3d 402, 413 (Colo. 2004) ("[t]he General Assembly has encouraged landowners to allow public use of their land; in turn, it has guarded against landowners losing their property rights when allowing such use."). Implicit in the statute "is the legislative recognition of the right of the landowner to close to public access" any part of the land. *People v. Emmert*, 597 P.2d 1025, 1029 (Colo. 1979).

From the foregoing, the issue under the CRUS that I must address is whether the United States invited, encouraged, or permitted people to use the asphalt path for recreational purposes, either directly or indirectly. *See Rankin v. Union Pac. R.R.*, 2005 U.S. Dist. LEXIS 45351, *14-15 (D. Colo. Sept. 15, 2005). I find that there are genuine issues of material fact as to this issue.

I first note that the United States admitted in response to Plaintiff's Motion for Partial Summary Judgment that it did not intend for the asphalt path to be used for recreation or for the public to be invited to use the path for recreation. Thus, it appears that the United States cannot assert for purposes of summary judgment that it directly invited people to use the asphalt path. There is evidence, however, that permits an inference that the United States may have indirectly permitted people to use the path. At the time Nelson was injured, there was a sign at the north entrance to the path which read "Bicycle Path, No Motorized Vehicles". Greg Long, Chief of Operations at the

Academy, testified that he agreed that "individuals who were approaching the path and saw that there was no fence across the path and who saw the sign that said that it's a bicycle path would view that as an invitation to use the path for bicycle riding."  (Pls.' Mot., Ex. 5, Long 30(b)(6) Depo. 24:17-24.)

Further, Plaintiffs admit that the public could access the asphalt path before Nelson's injury because there were no barricades, barriers, or fences to block the entrance to the path.  There is also evidence that the United States knew that members of the public used the path where Nelson was injured (Pls.' Mot., Ex. 4, Resp. to Request for Admission 8), and there is no evidence that individuals who were using the path were told to leave or removed from the path.[8]

On the other hand, there is also evidence that supports a finding that the United States did not, directly or indirectly, invite or permit people to use the asphalt path.  The Academy admits it had a border fence to the east of the asphalt path with a sign that read, "Warning. U.S. Air Force Installation. It is unlawful to enter this area without permission of the Installation Commander. Sec 21, Internal Security Act of 1950; 50 U.S.C. § 797.  While on this installation all personnel and the property under their control are subject to search."  (Def.'s Mot., Ex. D.)  The United States also stated in response to an interrogatory that "Three-strand barbed wire USAFA border fencing was located on the property where Plaintiff was injured both before and after the accident.

---

[8]  The United States also asserted that the asphalt path was open to the public for recreational use, citing to Elizabeth's Varney's deposition testimony.  Ms. Varney testified only, however, that she had seen people on the trial.  (Def.'s Mot., Ex. A, Varney Depo. at 8:18-9:7.)  Her testimony does not and cannot address whether the Academy intended for the asphalt path located on its path to be open to the public or whether it invited the public to use the path for recreational use.

The purpose of this fencing was to keep unauthorized personnel from gaining access to USAFA property."  (Pls.' Resp., Ex. 9, Resp. to Interrogatory No. 1).

Further, Plaintiffs point to Academy representatives' testimony that supports their argument that the United States did not invite or permit people to use the trial. Academy representatives testified that the asphalt path was not an official trail or recreational trial, and that people were not invited to use it for recreational purposes. (Pls.' Resp., Ex. 2, Mihlbachler 30(b)(6) Depo. 87:6-11, 90:6-10; 90:19-24—the path was not a recreational path in the Academy's eyes and it was not trying to maintain it as a recreational trial; it was not an official trail and therefore people were specifically not invited to use it for recreational purposes; and the fact that it was some sort of recreational trail never crossed his mind; Ex. 4, Long 30(b)(6) Depo. 41:4-16; 43:3-20—the path was not recognized as it was not on the Real Property Records of the Academy; Long was not aware of any actions by the Academy prior to September 3, 2008, in which it invited the public to use the path and was not aware of any official publications or literature that invited the public to use the trail or showed the trail as one the public could use; Ex. 5, Thoma 30(b)(6) Depo. 42:3-7—Thoma was not aware of any actions that the Academy took to invite people onto the path; Ex. 6, Williams Depo. 192:9-12—"our intent was this not to be a public trail. There is almost a trespass type of issue that I'm equating this with"; Ex. 7, Leikem Depo., 35:4-11—it was her understanding that the Academy did not intend for the public to use that property without specific authorization; Ex. 8, Umbaugh Depo. 15:8-13—the path was a closed

road, "It's kind of like the incline out there in Colorado, that nobody is supposed to be out on the incline, but people still get onto it, evidently."

Thus, the asphalt path "was not part of the USAFA's official trail system." (Pls.' Resp., Ex. 9, Def.'s Resp. to Interrogatory 5; Ex. 2, Mihlbachler 30(b)(6) Depo. 17:23-18:1).[9] Consistent with this, Academy representatives testified that the Academy viewed people who used the path as "unauthorized" or trespassers. (Pl.'s Mot., Ex. 5, Long 30(b)(6) Depo. 64:13-23; Ex. 12, Williams Depo. 192:9-12; Ex. 13, Leikem Depo., 34:2-14; 35:4-15; Ex. 14, Umbaugh Depo. 15:8-13; 16:17-21.)[10] Further, there is evidence that the United States deemed Nelson an unauthorized person on the land after the accident because the Academy did not give him express permission to enter the property. (Pls.' Mot., Ex. 13, Leikem Depo. 34:2-14; 35:4-15; *see also* Ex. 5, Long 30(b)(6) Depo. 65:13-23.)[11]

Plaintiffs have also cited evidence that could support a finding the Academy conveyed to another government agency that the asphalt path was not open and not

---

[9]   Indeed, as discussed earlier, many Academy representatives testified that they did not know the path existed. To the extent the United States did not know the path existed, it can hardly claim that the public was invited to use it for recreational purposes. Again, this must be contrasted with the Air Force Academy's "official" public paths, to which the Air Force allows public access under certain guidelines.

[10]   The United States disputes Plaintiffs' contention that persons using the path were trespassers, stating that there is conflicting testimony as to this. However, the testimony it cites to from Mr. Thoma does not support its assertion, as he did not agree or disagree as to Plaintiffs' position. Mr. Thoma simply stated that he had never heard that it was unlawful for a person to be on the asphalt path or heard the term "trespasser" used in connection with same. (Def.'s Mot., Ex. E, Thoma 30(b)(6) Depo., 48:23-49:3.) Moreover, the United States represented in response to an interrogatory that "[i]f a civilian did not gain access to the USAFA through the required gates or trail, he would be considered a trespasser and issued a ticket." (*Id.*, Ex. 15, Def.'s Resp. to Interrogatory #5.)

[11]   The United States asserts that there is a dispute as to this issue as well, citing to Mr. Thoma's deposition. (Def.'s Mot., Ex. E, 48:23-49.4) However, again, Mr. Thoma did not directly address the issue. What Mr. Thoma may or may not have "heard" does not contradict the other evidence that the United States considered Nelson to be an unauthorized person.

available for public use.  Plaintiffs cite to an e-mail from a representative from the El Paso County Parks Department to Debbie Barrett and another person at the United States Air Force about the asphalt path which states, "After our meetings and conversation last year, I have been working under the guidance that this was a 'utility maintenance road' and NOT a trail, and discouraging people from trespassing on AFA property." (Pls.' Mot., Ex. 3.)  While Ms. Barrett testified that she does not remember these meetings or conversation (Pls.' Resp., Ex. 6, Barrett 30(b)(6) Depo. 71:12-17), she did not testify that these meetings and conversations did not occur.

Moreover, after the accident the United States constructed a new fence across the path.  Greg Long testified this was done so that "there was absolutely no doubt that this is Air Force property, and this is not a trail of any kind." (Pls.' Resp., Ex. 4, Long 30(b)(6) Depo. 83:25- 84:5).  The United States also "placed jersey barriers and black and yellow barricades on the property . . . to keep people off the path" which read, "Danger, Do Not Enter, Path Closed. . . ." (Id., Ex. 9, Def.'s Resp. to Interrogatory 1). Further, it closed off the path, installed barriers at both ends, filled the sinkhole with rip-rap and gravel, installed warning signs, and removed the "Bicycle Path" sign.  (Pl.'s Reply, Ex. 31, Barrett 30(b)(6) Depo. 40: 3-19; Ex. 35.)  After CDOT confirmed it had no interest or involvement with the path, the United States tore up and removed the path.

Based on the foregoing, I find that a rational trier of fact could resolve the issue either way.  Accordingly, there is a genuine dispute about whether the United States directly or indirectly invited or permitted people to use the asphalt path for recreational purposes.  Summary judgment is thus not appropriate in favor of either the United

Case 1:11-cv-02953-WYD-CBS   Document 79   Filed 09/16/13   USDC Colorado   Page 27 of 29

States or the Plaintiffs. *See Crowe v. ADT Sec. Servs.*, 649 F.3d 1189, 1194 (10th Cir.

2011) ("A dispute is genuine 'if there is sufficient evidence so that a rational trier of fact

could resolve the issue either way.'") (quotation omitted). Both parties' summary

judgment motions are denied on this issue.

I also deny Plaintiffs' Motion for Partial Summary Judgment as to the argument

that the CRUS does not apply because of the United States' willful failure to guard or

warn against a known danger. The CRUS states:

> (1) Nothing in this article limits in any way any liability which would
> otherwise exist:
>
>   (a) For willful or malicious failure to guard or warn against a known
> dangerous condition, use, structure, or activity likely to cause harm . . . .

C.R.S. § 33-41-104(1)(a). While the statute did not define "willful", "willful and wanton"

conduct is defined by Colorado statute as "conduct purposefully committed which the

actor must have realized as dangerous, done heedlessly and recklessly, without regard

to consequences, or of the rights and safety of others, particularly the plaintiff." C.R.S.

§13-21-102. As noted by the Tenth Circuit, "under the law of a number of states, the

term willful in a recreational use statute has been interpreted to include the concept of

wanton or reckless disregard for the safety of others." *Klepper v. City of Milford, KS*,

825 F.2d 1440, 1446 (10th Cir. 1987).[12]

Here, Plaintiffs have presented evidence that Dr. Mihlbachler, an Academy

employee, knew of the sinkhole before the accident. He testified his responsibility in

---

[12] The court found under Kansas law, however, that there was a distinction between willful and
wanton conduct. *Id.* 1446-47. This does not appear to be the case in Colorado.

-27-

assisting with Base safety and security was to be the "eyes on the ground", checking areas that the security forces don't get to that often and reporting to the appropriate party if issues were identified.  From this, a reasonable inference could be drawn that the United States knew or should have known of the sinkhole before Nelson was injured and knew that people used the path.  Yet they did nothing to warn or guard against it.  The United States denies this.  I find that whether the Academy's actions were mere negligence or something more based on its employee's knowledge and failure to act, *i.e.*, willful or malicious conduct, is an issue of fact that should be decided at trial.  There are disputed issues of material fact about this.

Based on the foregoing, I deny both Plaintiffs' and Defendant's motions for summary judgment as to the CRUS.  I also, however, note that Plaintiffs contend that the CRUS cannot apply to insulate the United States from Plaintiffs' claim under the premises liability statute.  They assert that whether Nelson was an invitee on the asphalt path for purposes of the premises liability statute is not governed by the CRUS, but is a separate issue.  I disagree.  The CRUS directly addresses the issue of whether a person is an invitee when it is found to be applicable.  In that circumstance, the CRUS states that the owner of the land does not confer upon the person using its land for recreational purposes "the legal status of an invitee. . . to whom a duty of care is owed." C.R.S. § 33-41-103(1)(b); *see also Kirkland v. United States*, 930 F. Supp. 1443, 1147 (D. Colo. 1996).[13]

---

[13]  The case relied on by Plaintiffs, *Rankin v. Union Pac. R.R.*, No. 04-cv-00372-OES-PAC, 2005 U.S. Dist. LEXIS 45351 (D. Colo. Sep. 15, 2005) is distinguishable.  In that case, unlike here, the CRUS clearly was not applicable because there was no evidence to suggest that the railroad had " invited or

On the other hand, if the jury finds that the CRUS is not applicable, then Nelson will still need to show that he was an invitee on the property under the Colorado Premises Liability Act.  As Plaintiffs note, a person can be an invitee if the landowner gave implied consent to enter the land, *e.g.*, a landowner "may consent to entry, absent express words, by his or her course of conduct."  *Corder v. Folds*, 292 P.2d 1177, 1181 (Colo. App. 2012).  This is a factual issue that will need to be resolved at trial, and I note that neither party moved for summary judgment on that issue.

IV.   CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment filed February 28, 2013 (ECF No. 58) is **DENIED**.  It is

FURTHER ORDERED that Plaintiffs' Motion for Partial Summary Judgment on Defendant's Colorado Recreational Use Statute Affirmative Defense filed February 27, 2013 (ECF No. 57) is **DENIED**.

Dated:  September 16, 2013

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge

---

encouraged people, either directly or indirectly, to use the Clay Street crossing for recreational purposes." *Id.* at *15.