IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No. 11-cv-02953-WYD-MEH

JAMES NELSON and
ELIZABETH VARNEY,

      Plaintiffs,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

---

      This case, arising under the Federal Tort Claims Act ("FTCA"), involves a premises liability claim under the Colorado Premises Liability Act ("CPLA") against the United States. It arises from a bicycle accident of Plaintiff James Nelson on property of the United States Air Force Academy. Plaintiffs claim that Mr. Nelson suffered injuries in that accident when he fell into a large, unmarked sinkhole that bisected the entire width of a bicycle path that he was riding on. Plaintiff Elizabeth Varney, Mr. Nelson's wife, brings a loss of consortium claim.

      By Order of November 12, 2013, I struck the jury trial based on the parties' stipulation that this case must be tried to the court by statute. *See* 28 U.S.C. §§ 2402, 1346(b)(1). I also bifurcated the issues of liability and damages. A bench trial was held on December 2-5, 2013. This trial was on liability only. Plaintiffs James Nelson and Elizabeth Varney appeared and were represented by David P. Hersh and

Steven G. Greenlee of the firm Burg Simpson Eldredge Hersh & Jardine, P.C.

Defendant United States of America was represented by W. Aaron Vandiver and Mark

Pestal of the United States Attorney's Office.

Having heard and considered the evidence, including stipulated facts, live

witness testimony, deposition testimony, admitted exhibits submitted by the parties,

counsel's arguments, and the parties' proposed findings of fact and conclusions of law, I

now enter the following Findings of Fact, Conclusions of Law and Order.

I.    FINDINGS OF FACT

     A.    UNDISPUTED FACTS[1]

          1.   This case arose from a biking accident that occurred on an asphalt paved

path ("the asphalt path" or "the path") on real property owned by the United States Air

Force Academy ("Academy" or "USAFA") in Colorado Springs, Colorado.

          2.   The biking accident occurred on September 3, 2008.

          3.   Before September 3, 2008, an asphalt paved path located on the east side

of Colorado Interstate 25 ("I-25"), paralleling the highway, existed near the eastern

boundary of the Academy.

          4.   The United States is the landowner of the property for purposes of the

CPLA, Colo. Rev. Stat. §13-21-115, and the Colorado Recreational Use Act, Colo. Rev.

Stat. § 33-41-101, *et seq.*

---

[1]  The parties submitted these facts through a document entitled "Undisputed Findings of Fact"
filed on December 13, 2013 (ECF No. 127).

5.   The property where the accident occurred was part of a United States Air Force installation known as the Air Force Academy and is located on the northern edge of Colorado Springs, Colorado.

6.   The Academy encompasses approximately 18,500 acres.

7.   The installation includes an academic campus, airfield, sports stadium, golf course, housing, commercial areas, and designated multi-use recreational trails.

8.   In July 1958, the USAFA granted an easement to the Colorado Department of Highways (now the Colorado Department of Transportation) ("CDOT") for the construction of a highway, designated currently as I-25.

9.   The USAFA also granted Mountain View Electric Association ("MVEA") an easement in this same area to build and maintain an overhead utility line.

10.   The asphalt path was located within the CDOT easement through which I-25 was located.

11.   Mr. Jeffrey Thoma, the head of USAFA security, did not monitor the path.

12.   The USAFA's property had a border fence to the east of the asphalt path with a sign that read, "Warning. U.S. Air Force Installation.  It is unlawful to enter this area without permission of the Installation Commander.  Sec 21, Internal Security Act of 1950; 50 U.S.C. § 797.  While on this installation all personnel and the property under their control are subject to search."

13.   The asphalt path on which the biking accident occurred was not identified on the USAFA's Real Property Record.

14.  The USAFA maintained a series of official recreational and multi-use trails throughout the installation.

15.  The Falcon Trail was located west of I-25 and received hundreds of users per week.

16.  The asphalt path where the accident occurred was not part of the USAFA's official trail system.

17.  The USAFA had a Trails Management Plan that provided guidance about the proper maintenance to be performed on official trails.

18.  The Trails Management Plan did not apply to unofficial trails.

19.  The USAFA did not act to prevent the public from entering its property to use the asphalt path.

20.  At the time Mr. Nelson was injured on September 3, 2008, the north entrance to the asphalt path was marked with a sign that read: "Bicycle Path, No Motorized Vehicles."  The sign was off of the USAFA property.

21.  There was a USAFA "Warning" sign in the area, but it was located about 30 to 45 feet to the east of the "Bicycle Path" sign.

22.  The entrance to the path was a clear opening where the USAFA boundary fence ended.  The fence ends at that location with an engineered/planned corner/ending.

23.  The USAFA boundary fence did not cross the path.

24.  The USAFA did nothing to remove the "Bicycle Path, No Motorized Vehicles" sign prior to September 3, 2008.

25.  CDOT offered to remove the bicycle path sign prior to September 3, 2008, but USAFA did not request that the sign be removed.

26.  Specifically, Debbie Barrett was asked by CDOT in 2007 whether the USAFA wanted to remove the "Bicycle Path" sign.

27.  Before September 3, 2008, the path was used by members of the public for recreational purposes, such as walking, jogging, and bicycling.

28.  James Nelson had ridden his bicycle on the path prior to September 3, 2008.

29.  Mr. Nelson had visited the USAFA on previous occasions.

30.  Mr. Nelson did not pay a charge to anyone to use the path.

31.  Analysis of Mr. Nelson's bicycle by Defendant's expert, Mr. Nicholas Ault, indicates that Mr. Nelson struck the sinkhole with sufficient force to cause substantial damage to various parts of the bicycle.

32.  James Nelson was aware of the "Bicycle Path, No Motorized Vehicles" sign prior to September 3, 2008.

33.  James Nelson knew the property where the path was located was on USAFA property.

34.  Mr. Nelson has no memory of September 3, 2008, or the incident.

35.  Mr. Nelson cannot remember what time he left his house.

36.  Mr. Nelson's wife, Ms. Varney, made a handwritten statement to police on September 3, 2008, stating, *inter alia*, that Mr. Nelson left the house at 8:00 p.m. Ms. Varney signed the statement.

37.  The bicycle Mr. Nelson was riding was not equipped with a headlight.

38.  While riding on the path, James Nelson fell into a sinkhole on the path.

39.  The sinkhole encompassed the entire width of the asphalt path.

40.  From 2000 – 2008, Dr. Mihlbachler was employed by the United States Fish and Wildlife Service as a biologist.

41.  Dr. Mihlbachler was stationed at the Academy as the Natural-Resources Manager.

42.  Dr. Mihlbachler's job at the Academy involved going out and surveying areas throughout the Academy and monitoring the landscape.  He had responsibility for managing the natural resources—including the land, vegetation, and animal life—on the Academy's 18,500 acres.  Dr. Mihlbachler had additional responsibility to determine the impact of erosion on an endangered species, the Preble's Meadow Jumping Mouse.  Dr. Mihlbachler was also managing a number of multi-million dollar erosion remediation projects in the area.

43.  Dr. Mihlbachler was looking at the erosion effects on Academy property located on the east side of I-25.

44.  On August 20, 2008, Dr. Mihlbachler took a number of photographs of erosion problems caused by storm water draining onto the property from residential neighborhoods east of the property.

45.  The sinkhole on the path was photographed on August 20, 2008, by Dr. Mihlbachler.

46.   Dr. Mihlbachler did not consider the sinkhole a high priority relative to all the other erosion issues that he was dealing with along the eastern boundary.

47.   Dr. Mihlbachler did not report the sinkhole or show the photographs to anyone else before September 3, 2008.

48.   Dr. Mihlbachler thought the path was a service road used by CDOT or MVEA.

49.   Dr. Mihlbachler had seen CDOT and MVEA service crews using the path as a service road from 2000 - 2008.

50.   Dr. Mihlbachler did not believe the path was an official recreational trail, or that outside users were invited or permitted to use the path for recreation.

51.   Dr. Mihlbachler did not believe there was an urgent need to have the path repaired because it was on the CDOT and MVEA easement and was present for their use.

52.   Dr. Mihlbachler testified that he had never seen the "Bicycle Path" sign near the north end of the path.

53.   The USAFA had a "work order" review process.

54.   The USAFA had a work-order-request-review board, consisting of a number of officials, such as Mr. Greg Long, the asset manager of the property in 2008.

55.   Sunset on September 3, 2008, was 7:25 p.m.

56.   James Nelson was found by a jogger near the asphalt path on the morning of September 4, 2008.

57. Plaintiffs submitted their claim regarding the biking accident to the USAFA on August 25, 2010.

58. The USAFA denied the claim on September 23, 2011.

59. Plaintiffs filed this lawsuit against the United States under the CPLA on November 14, 2011.

B.      FINDINGS OF ADDITIONAL FACT

1. James Nelson was injured as a result of the bicycle accident on September 3, 2008, on a path owned by the USAFA.

2. Mr. Nelson left his home in Colorado Springs, Colorado, at approximately 7:20 - 7:25 p.m. to go for the bicycle ride.  This finding is based on Ms. Varney's testimony which I find credible that the family started dinner on September 3, 2008, at 7:00 p.m. and finished at 7:10 p.m.  Thereafter, while Ms. Varney and the rest of the family went in to watch television, Mr. Nelson cleaned a bad smell from his truck.  This took about ten minutes, and he was finished at approximately 7:20 p.m.  He then left the house for his bicycle ride.

3. Mr. Nelson told Ms. Varney he was going for a "quick" or "fast" bicycle ride. Ms. Varney understood this to mean that he would be back from his ride in about 15 minutes.

4. Mr. Nelson's habit  was to make his bicycle rides 15 to 20 minutes.

5. Mr. Nelson's habit was not to ride his bicycle if it was dark.

6. Mr. Nelson's habit for bicycle riding was to ride fast to exercise and get his heart rate up.

7.   Mr. Nelson estimated that the average speed for his bicycle rides on the asphalt path was up to 20 to 25 miles per hour.

8.   There is no evidence that Mr. Nelson's speed was unreasonable.

9.   Mr. Nelson rode his bicycle approximately 2 -2.4 miles after leaving his home.

10.   James Nelson rode his bicycle on the asphalt path, which ran parallel to I-25.

11.   The path was not lighted.

12.   Mr. Nelson believed that the USAFA permitted him and other members of the public to use the path for recreational purposes.

13.   Sometime after he left his house, Mr. Nelson encountered the sinkhole on the path, lost control of the bicycle, and sustained injuries.

14.   At the likely speed Mr. Nelson was riding at the time, and based on the likely route he would have taken, it would have taken him approximately 10 to 15 minutes to reach the sinkhole.  Thus, Mr. Nelson would likely have encountered the sinkhole at approximately 7:30 p.m. to 7:40 p.m.

15.   The end of civil twilight was 7:53 p.m.

16.   Taking the times of sunset and civil twilight into account, Defendant's witness Nicholas Ault testified that if it took Mr. Nelson approximately ten minutes to get to the sinkhole after leaving his home at 7:20 p.m., he would have still have had 25 to 40 minutes of light at that time.  He also testified from his observations of the accident scene on July 12, 2012, that there was sufficient light to see for approximately 30

minutes after sundown.  After 30 minutes, it became more and more difficult to see.  45

minutes after sunset, Mr. Ault needed a flashlight to safely navigate the path.[2]

17.  At around 8:00 p.m. or a few minutes thereafter, after the television show

she was watching ended, Ms. Varney realized that Mr. Nelson had not come home from

his bicycle ride.

18.  Ms. Varney went outside to look for Mr. Nelson.  She testified that it was

still light outside, and that she did not need a flashlight.

19.  There is no evidence that a headlight was necessary for Mr. Nelson to

safely ride on the asphalt path on September 3, 2008.  There is no evidence that the

presence or use of a headlight on September 3, 2008 would have made any difference

in preventing the injuries sustained by Mr. Nelson.

20.  Based on the evidence that I have outlined herein, sufficient available

daylight existed such that it was reasonable for Mr. Nelson to ride his bicycle on the

path without a headlight.

21.  When Ms. Varney did not find Mr. Nelson, she knew something was

wrong and called the police.  This occurred about 8:10 p.m. on September 3, 2008.

22.  When the police had not arrived, Ms. Varney called the police again at

approximately 10:00 p.m.  The police arrived at Ms. Varney's and Mr. Nelson's home at

approximately 10:30 p.m.

---

[2]  These findings were based on Mr. Ault's personal observations and were not expert opinions.
Mr. Ault was not certified as an expert in regard to lighting conditions, but I find his testimony credible as to
his personal observations of the lighting conditions at the accident scene.  Even though made at a
different time of year than the accident, they still provide some guidance as to how long it takes after
sunset to get dark.

23.   Witness Jesse Kurtz, who encountered the sinkhole while jogging when the sun was up the morning after Mr. Nelson's accident, thought the sinkhole was water until he was significantly closer to it.

24.   On the other hand, Dr. Mihlbachler testified that the sinkhole was large and readily visible during the day.

25.   The path where the injury occurred was located within and on the USAFA's real property and the USAFA owned that property.

26.   The USAFA, through its representative Johnny Van Winkle, told the public immediately after Mr. Nelson's accident that it was the Academy's responsibility to fix the path.  He also said that upkeep of the property was the Academy's responsibility.  Mr. Van Winkle is the public relations officer at the USAFA serving as a deputy chief of media relations and the public affairs director.  He was authorized as part of his duties to speak to news outlets and provide them information about the USAFA as well as answer questions about events that occurred on the USAFA.

27.   Other than the United States, no person or entity has claimed any ownership or control over the property and path.

28.   The easement granted to CDOT and the Memorandum of Understanding and contractual obligations related to the easement do not discuss who is responsible for maintenance of the path.

29.   CDOT representatives Michael Shay and Russell Bircher testified it was not CDOT's responsibility to maintain the path.  Indeed, Mr. Bircher testified that CDOT does not maintain any bicycle paths.  There is no evidence to the contrary.

30.   Mr. Bircher also testified that if CDOT had wanted to do any work on the asphalt path, it would have had to contact the USAFA for permission since the path was on Academy property.  While Mr. Bircher admitted to performing some minor maintenance on the asphalt path during the 1990s, he was told by his supervisor to stop performing such work as it was not CDOT's responsibility.

31.   CDOT representative Mr. Shay testified that there is no evidence that CDOT constructed the path, as any such construction would have been on a plan set. CDOT has plan sets back to the 1930s, and the path is not on any of those plan sets.

32.   There is no evidence that MVEA was responsible for maintenance of the path under the easement or otherwise.

33.   The USAFA did not need permission from anyone, including CDOT, to take action with respect to the sinkhole because it was on its property.

34.   In 2007, CH2M Hill Academy Services ("CHAS") entered into a contract with the USAFA ("the CHAS Contract").

35.   The CHAS Contract required CHAS to maintain only those paths and trails that were identified on the Academy's Real Property Record.

36.   Because the asphalt path was not identified on the Academy's Real Property Record, maintenance of the path did not fall within the scope of the CHAS contract.

37.   The USAFA knew that the path existed on its property prior to September 3, 2008.

38.  The USAFA does not know when the path was constructed, by whom, or for what purpose.

39.  Aerial photographs (Ex. 13) suggest the path has existed since at least the 1960s.

40.  The asphalt path could be seen from I-25.

41.  There is no evidence that the USAFA used the asphalt path for any official functions, with the minor exception being a training exercise in 1984.  There is also no evidence that the path had any official Academy use.

42.  The path is not and has not been actively maintained by the USAFA.

43.  Before Mr. Nelson's injury, the USAFA knew that members of the public used the path where Mr. Nelson was injured.

44.  Ms. Debbie Barrett received an e-mail from Brian Kay of the El Paso County Parks Department that referred to the asphalt path and attached photos of the path and the bicycle path sign.  (Ex. 4.)  While Ms. Barrett admitted receiving this e-mail, she does not recall seeing the attached photographs.  The e-mail advised that as a result of meetings and conversations last year, Mr. Kay had "been working under the guidance that this was a 'utility maintenance road' and NOT a trail, and discouraging people from trespassing on AFA property."  (*Id.*)  It also stated that Mr. Kay was advised in a meeting with CDOT that a "Bike Path" sign is posed on the northern end of the trail (a photo of which is attached to the e-mail), asks if some research could be done by the USAFA about the path and its easements, and says the Parks Department wanted to give the USAFA the "heads-up in case questions come your way."  (*Id.*)  Ms. Barrett

testified that she did not do anything in reference to this e-mail or try to ascertain what Mr. Kay was taking about; it just kind of fell off her radar.

45.   Ms. Barrett also received an e-mail from a CDOT project engineer responding to Mr. Kay's e-mail and asking her to keep him informed of the trail situation. (Ex. 5.)  The engineer asked Ms. Barrett if she would like CDOT to remove the "Bicycle Path" sign.  Ms. Barrett forwarded the e-mail to Real Property specialist, Karen Leikam, who was employed by CHAS, and asked her to respond to the two       e-mails.  Ms. Barrett took no further action with regard to the e-mails.  She also never received any information back from Ms. Leikam about the e-mails.  There is no evidence in the record that Ms. Leikam took any action with respect to the e-mails or responded to same.

46.   The USAFA's "Warning" signs prohibiting entry to Academy property were posted around the perimeter of the base.  There is no evidence, however, that they were conspicuous to persons entering the property to access the asphalt path.

47.   Three-strand barbed wire USAFA boundary fencing was located on the property near where Mr. Nelson was injured both before and after the accident.  The purpose of this fencing was to keep unauthorized personnel from gaining access to Academy property.  The fence ended before the asphalt path.

48.   The public, including Mr. Nelson, could access the asphalt path before September 3, 2008, because there were no barricades, barriers, or fences to block the entrance to the path.

49.   The path was not a recreational path identified on records of USAFA property and the USAFA did not designate or maintain the path as a recreational trail.

50.   The USAFA understood how to make other parts of its property available for recreational use as it took steps to make trails available to the public, such as the Santa Fe Trail and the La Foret Trail.

51.   All of the official trails were unpaved, and were located west of I-25.

52.   The USAFA did not take any action or steps to make the asphalt path available to the public or James Nelson.

53.   There were no official USAFA publications or literature that invited the public to use the asphalt path or showed the path as one the public could use.

54.   Prior to the accident, the USAFA represented to El Paso County that the path was not open for public use.

55.   The USAFA took no actions prior to September 3, 2008, that invited the public to use the path.

56.   The USAFA did not intend for the path to be a public recreational trail.

57.   The path was not authorized for recreational use by the USAFA prior to September 3, 2008.

58.   The USAFA considered people who used the path as unauthorized and trespassers.

59.   Despite considering the path closed to the public and despite considering public users of the path unauthorized or trespassers, the USAFA took no action prior to September 3, 2008, to prevent the public from entering its property to use the path.

60.   The USAFA also did not did not take any measures to guard against or warn anyone using the path of the sinkhole condition prior to September 3, 2008.

61.   There is no evidence that the USAFA considered any political, social, or economic policies in deciding not to warn or guard against the dangerous sinkhole.

62.   According to Ms. Barrett, the consensus reached after an investigation by the Academy was that Mr. Nelson was unauthorized and was a trespasser on the property when he was injured on September 3, 2008.

63.   The USAFA continues to view Mr. Nelson as a trespasser on the path.

64.   Mr. Greg Long testified that the Academy is an open campus and that officials often refrained from interfering when members of the public used Academy property for recreational purposes.

65.   Mr. Long also testified, however, that prior to September 3, 2008, if people were observed on the asphalt path by Academy personnel, he believed they should have stopped them and asked what they were doing there or, if the people could not be confronted directly, the Academy personnel should have brought the issue back to the squadron for an investigation since it was not an authorized trail.

66.   The "Bicycle Path" sign was posted near the beginning of the north end of the path, about 45 feet outside the USAFA's property line.

67.   The sign was located near an opening in the USAFA's boundary fence, through which access to the path was possible.

68.   There was a similar sign near the south entrance to the path.

69.   The "Bicycle Path" signs are not USAFA signs.  No one knows when the bicycle signs were erected or by whom.

70.   There is nothing about the "Bicycle Path" sign that would tell a member of the general public that it is not a sign of the USAFA.

71.   According to Ms. Barrett, after Mr. Nelson's accident the USAFA determined through an investigation that the "Bicycle Path" signs were unauthorized and had been installed by unknown third persons.

72.   The USAFA did not intend for the "Bicycle Path" signs to be an invitation to the public to use the path.

73.   USAFA representatives, including Ms. Barrett and Mr. Long, testified that because of the existence and placement of the "Bicycle Path, No Motorized Vehicles" sign in relation to the path, third parties would reasonably believe that they were authorized or invited to go on the path and ride their bicycle.

74.   The sinkhole across the path that Mr. Nelson encountered during the accident was the result of wash-out/erosion problems in the area.

75.   More specifically, the sinkhole on the path was the result of off-site water flow onto USAFA property that overwhelmed the culvert running under the path, causing a washout.

76.   Off-site water flow onto USAFA property in the area of the asphalt path was a known condition and problem that USAFA had been investigating, documenting, and addressing for many years before September 3, 2008.

77.   USAFA representatives, including Jeffrey Thoma, testified that the condition of the asphalt path with the sinkhole on September 3, 2008, was dangerous and hazardous for users of the path.

78.   The condition of the asphalt path with a sinkhole did not meet Academy safety standards.

79.   According to Mr. Long, the sinkhole was a dangerous emergency situation that required immediate action and he believed that something had to be done on an emergency basis because of safety considerations.

80.   Dr. Mihlbachler was part of the "eyes on the ground" for the USAFA, checking areas that the security forces did not get to that often and reporting to the appropriate party if issues were identified.

81.   For all intents and purposes, Dr. Mihlbachler functioned as a USAFA employee.

82.   Dr. Mihlbachler's duties included responsibilities related to USAFA safety and security.

83.   Dr. Mihlbachler testified that as part of his duties, he spends a large amount of time in the field and driving into remote areas of the Academy where the security forces and others do not routinely go.   Because he spends a lot of time around boundary fences, back roads and trails, and corners of the USAFA that other people do not often get to, he is another source of information to the security forces and civil engineers that take care of maintenance and infrastructure.

84.   Dr. Mihlbachler had responsibility for investigating the substantial erosion problems and had observed these problems in the area, including the east side of I-25, for many years.

85.   Dr. Mihlbachler viewed the sinkhole on the path as insignificant in relation to the large-scale erosion problem affecting the eastern part of the property.

86.   Dr. Mihlbachler knew of the existence and condition of the path.

87.   Dr. Mihlbachler had seen five to six people use the path for walking, jogging, and biking prior to September 3, 2008.  He saw most of these people before 2005, when Struthers Road was built.  The construction of Struthers Road in 2005 provided an alternate route across Black Forest Creek so that people did not need to use the asphalt path.

88.   Dr. Mihlbachler had never seen anyone using the path at night.

89.   Dr. Mihlbachler was only on the path once every month or so.

90.   Dr. Mihlbachler testified that the condition of the asphalt path with the sinkhole which he observed before Mr. Nelson's accident would be a safety hazard for users of the path if it were an official USAFA trail.  Thus, if it were an official trail, he would have reported the condition of the path to maintenance to get it repaired.

91.   Dr. Mihlbachler testified that to his understanding there was no rule or regulation in the Trails Management Plan or otherwise that would have required fixing a hole on an unofficial path.

92.   He also testified that he did not think the path was being used by pedestrians or bikers.  Thus, the thought never occurred to him that the damage to the path would create a safety hazard.

93.   If Dr. Mihlbachler had been aware, however, of the "Bicycle Path" sign on the path or that it was a recreational trail that was getting used, he would have either

removed the path because it did not fit with the official Trails Management Plan or it would have been incumbent on him to take the proper action to prevent a safety hazard. This would have been required as part of his duties.

94.  Dr. Mihlbachler's decision not to do anything about the sinkhole on the path or report it to anyone was based on his perception that it was on the CDOT and MVEA easement for their use and was not the responsibility of the Academy.  It also was based on the fact that he did not think people were using the path for recreational purposes.

95.  Dr. Mihlbachler did not consider the costs involved in fixing the sinkhole when he decided not to do anything about it.

96.  Dr. Mihlbachler testified that he believes that there is an expectation these days for all government employees to say something if they see something.

97.  The USAFA removed the sign that said "Bicycle Path, No Motorized Vehicles" immediately following James Nelson's accident.  The USAFA also disavowed the "Bicycle Path" sign and stated that the sign was neither installed by nor authorized by the Academy.

98.  Also immediately following James Nelson's accident, the USAFA filled the sinkhole on the path with rip-rap and covered it in gravel.  The USAFA also installed barriers and warning signs at both ends of the path and near the sinkhole.

99.  There is no evidence that the steps taken immediately after the accident to fill the hole and install barriers were done pursuant to a work order.

100.  Thereafter, the USAFA constructed a new fence across the path at its boundary.  According to Mr. Long, this was to make it clear and to make sure there was no misunderstanding that this was USAFA property and was not a public trail.

101.  The USAFA ultimately removed the path.

102.  The removal of the path likely would have involved a work order. USAFA's work-order-request-review board reviewed work order requests to determine which requests should be approved and which requests should receive priority.

II.     CONCLUSIONS OF LAW

A.     Jurisdiction - Exhaustion of Remedies and Timeliness

1.  The FTCA is a limited waiver of the sovereignty of the United States permitting the United States to be sued.  See *United States v. Orleans*, 425 U.S. 807, 813 (1976).  "The FTCA lists many types of claims for which the United States has consented to be sued."  *Sydnes v. United States*, 523 F.3d 1179, 1183 (10th Cir. 2008). "Included among those are claims for certain injuries caused by government employees acting within the scope of their employment."  *Id.*  Thus, the FTCA "waives sovereign immunity for actions against the United States resulting from injuries caused by the negligent acts of governmental employees while acting in the scope of their employment."  *Garcia v. United States Air Force*, 533 F.3d 1170, 1175 (10th Cir. 2008) (citing 28 U.S.C. § 1346(b)(1)).

2.  Under the FTCA, the government can be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C.

-21-

§1346(b).  Thus, the United States is liable "'in the same manner and to the same extent as a private individual under like circumstances.'"  *Tisdale v. United States*, 62 F.3d 1367, 1371 (11th Cir. 1995) (quoting 28 U.S.C. § 2674).

3.  The duty of the United States in a tort action is defined in accordance with the law of the state where the negligence occurred.  *Richards v. United States*, 369 U.S. 1, 11 (1962).  Because the alleged negligence occurred in Colorado, the Court applies Colorado law.  *Levin v. United States*, ___ U.S. ___, 133 S. Ct. 1224, 1228 (2013).

4.  Plaintiffs sue the United States for personal injuries under the Colorado Premises Liability Act, which Act defines the duty that landowners owe to persons on their property and holds landowners responsible for causing injury to persons on their property as specified therein.  *See* Colo. Rev. Stat. § 13-21-115.

5.  Venue is proper in this Court.

6.  A plaintiff suing under the FTCA must first present the tort claim to the appropriate federal agency for possible settlement within two years after the claim accrues.  28 U.S.C. §§ 2401(b), 2675(a).  The United States does not dispute that the Plaintiffs timely presented their claim to the proper federal agency, the United States Air Force, within two years after their claim accrued.

7.  A complaint cannot be filed until the administrative claim has been denied or until six months have passed without the agency acting on the administrative claim.  28 U.S.C. §2675(a).  The United States does not dispute that the Plaintiffs timely filed their Complaint against the United States after it denied the Plaintiffs' claim.

8.  Under the undisputed facts, the Court finds that the Plaintiffs exhausted their remedies and timely brought their claim against the proper parties under the FTCA.

B.    Discretionary Function Exception to the FTCA

9.  Excluded from the FTCA's waiver of immunity "are claims based on the performance of 'a discretionary function or duty on the part of a federal agency or an employee of the Government.'"  *Garcia*, 533 F.3d at 1175 (quotation omitted).  The discretionary function exception states that the liability imposed by the FTCA shall not apply to "(a) [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

10.  The discretionary function exception "poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction."  *Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998).  "If the discretionary function exception applies to the challenged conduct, the United States retains its sovereign immunity and the district court lacks subject matter jurisdiction. . . ."  *Domme v. United States*, 61 F.3d 787, 789 (10th Cir. 1995).

11.  The discretionary function exception applies "whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  Thus, the question of negligence is irrelevant."  *Garcia*, 533 F.3d at 1175-1176.

12.   The purpose of the discretionary function exception is "to protect policymaking by the executive and legislative branches of government from judicial 'second-guessing.'" *Garcia*, 533 F.3d at 1176 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)).  "Thus, it 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Id.* (quoting *Varig Airlines*, 467 U.S. at 808).

13.   To determine whether conduct falls within the discretionary function exception, courts apply the two-part test stated in *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  *See Garcia*, 533 F.3d at 1176.  First, the court must "ascertain the precise governmental conduct at issue and consider whether that conduct was 'discretionary,' meaning whether it was 'a matter of judgment or choice for the acting employee.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536).  "Conduct is not discretionary if 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.  In this event, the employee has no rightful option but to adhere to the directive.'" *Garcia*, 533 F.3d at 1176 (quoting *Berkovitz*, 486 U.S. at 536); *see also Harrell v. United States*, 443 F.3d 1231, 1235 (10th Cir. 2006) ("plaintiffs must show that [the government] 'violated a federal statute, regulation, or policy that is both specific and mandatory'") (quotation omitted).  The burden of presenting "evidence of a discretion-constraining regulation or policy resides with the plaintiffs." *Sydnes*, 523 F.3d at 1185.

14.   If the first element is satisfied, the Court then considers the second *Berkovitz* element:  "whether the decision in question is one requiring the exercise of

-24-

judgment based on considerations of public policy." *Garcia*, 533 F.3d at 1176.

"Decisions that require choice are exempt from suit under the FTCA only if they are 'susceptible to policy judgment' and involve an exercise of 'political, social, [or] economic judgment.'" *Duke v. Dep't of Agric.*, 131 F.3d 1407, 1410 (10th Cir. 1997) (quotations omitted).

15.   In making the analysis regarding the second element, the court does "not consider the employee's 'subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.'" *Garcia*, 533 F.3d at 1176 (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)).  The court also does not ask "'whether policy analysis is the *actual* reason for the decision in question.'" *Sydnes*, 523 F.3d at 1185 (emphasis in original) (quotation omitted).

16.   Applying the first step of the *Berkowitz test*, I first must determine the precise governmental conduct at issue.  Here, I agree with Plaintiffs that the conduct at issue is the USAFA's failure to guard against or warn against a dangerous condition that was known or that should have been known by the USAFA to exist on the asphalt path before Mr. Nelson's injury; namely, the sinkhole.  *See Duke,* 131 F.3d at 1410.

17.   Although there was testimony concerning the decision to remove the path after Mr. Nelson's injury as well as other actions that occurred related to the sinkhole and path after the accident, that is not the conduct at issue.  Whether or not the USAFA should have had a path or whether it should have been removed is not what caused the dangerous condition.  *See Smith v. United States*, 546 F.2d 872, 874 (10th Cir. 1976)

("The decision to develop only certain areas did not create the problem or the need to decide whether warning signs should be erected."). The removal of the path and policies relating thereto are accordingly irrelevant to the application of the discretionary function exception in this case.

18. The United States also references the granting of the easement in 1958 for the property on which the path is located. Again, that is not the governmental conduct at issue. There is no evidence that the easement holders were responsible for maintenance of the path or the failure to warn or guard against the danger on the path at the time of the accident. The fact that the United States may have mistakenly believed they were responsible for the path under the easement does not make the easement relevant to application of the discretionary function exception.

19. I now turn to the main issue under the first element of *Berkovitz*—whether the conduct at issue was discretionary, *i.e.*, whether it was "'a matter of judgment or choice for the acting employee.'" *Garcia*, 533 F.3d at 1176 (quoting *Berkovitz*, 486 U.S. at 536). I find that the conduct was discretionary, and that Plaintiffs failed to show that it was not a matter of judgment or choice. There is no evidence that the USAFA's failure to guard against or warn against a dangerous condition on the path before the accident violated a specific and mandatory federal statute, regulation, or policy. In other words, Plaintiffs did not show that any statute, regulation or policy required the USAFA to repair or maintain the path, post warning signs, barricade, or close the path.

20. While the USAFA had a Trail Management Plan in effect when the accident occurred, Greg Long and Dr. Mihlbachler both testified that nothing in that Plan

required the USAFA to maintain the asphalt path in the same condition as official Academy trails.  Indeed, the Trail Management Plan did not require any particular action with regard to the property or the path at issue.  Thus, the Trail Management Plan was not specific and mandatory within the meaning of the discretionary function exception. *See also Aragon*, 146 F.3d at 824 ("An agency manual, in contrast to a regulation, is not necessarily entitled to the force and effect of law. This is particularly true if the agency did not intend the manual to be mandatory, but rather intended it as a guidance or advisory document.").

21.  Thus, the first prong of the two-part test for application of the discretionary exception is met.  Even though Plaintiffs failed under *Berkovitz*'s first prong, they "may still overcome the discretionary function exception by demonstrating, pursuant to *Berkovitz*'s second prong, that 'the nature of the actions taken' does not 'implicate public policy concerns, or [is not] susceptible to policy analysis.'" *Sydnes*, 523 F.3d at 1185 (quotation omitted).

22.  As to the second element, while the decision not to guard against or warn of the danger may have involved a "decision" involving choice, not all decisions or non-decisions "that involve choice and any hint of policy concerns are discretionary and within the exception." *Duke*, 131 F.3d at 1411.  The Tenth Circuit in *Duke* agreed with the District of Columbia Circuit that to find otherwise would not only eviscerate the second step but "'would allow the exception to swallow the FTCA's sweeping waiver of sovereign immunity.'" *Id.* (quoting *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995)). Indeed, as the *Duke* court recognized, "nearly every governmental action is, to some

extent, subject to policy analysis--to some argument that it was influenced by economics or the like." *Id.* at 1410.  Further, a failure to act can also "be a policy decision; and a failure to think about acting may still be 'susceptible to policy analysis'". *Id.* at 1410.   However, not all actions involving choice or failures to act are within the discretionary function exception.  *Id.* at 1410-11.  As noted in *Cope*, "[t]he mere presence of choice—even if that choice involves whether money should be spent— does not trigger the exception."  45 F.3d at 449.

23.   In the case at hand, I find that the second element required for application of the discretionary function exception is not met because the USAFA's failure to guard against or warn of the danger of the sinkhole or condition of the path on September 3, 2008, did not implicate public policy concerns.  The evidence shows that the USAFA did not maintain the path, repair it, or warn against the dangerous condition when it was found because it believed that CDOT or MVEA were responsible for the path.  This was confirmed by Dr. Mihlbachler, who saw the sinkhole shortly before the accident but thought that nothing needed to be done because it was the responsibility of the easement holders.  Thus, the USAFA's actions or failure to act regarding the asphalt path were based on confusion about or a misunderstanding about who was responsible for maintaining the path, and not because of any social, economic, or policy judgment. *See Zumwalt v. United States*, 928 F.2d 951, 955 (10th Cir. 1991) (recognizing that the discretionary function exception does not apply where the government's failure to warn of hazardous conditions does not involve any social, economic, or policy judgment).

24.   Related to the above, the choice made by Dr. Mihlbachler not to take any action regarding the sinkhole was not based on a policy decision which created the hazard.  *See Zumwalt*, 928 F.2d at 955.  While Dr. Mihlbachler testified that he had discretion regarding how to address erosion issues, his failure to warn or to take steps to guard against the sinkhole was not based on this discretion.  Instead, as stated above, he failed to take action because he thought that CDOT and/or MVEA were responsible for the path under the easement.

25.   My conclusion is also supported by two cases discussed by the *Zumwalt* court in connection with its recognition that the discretionary function exception does not apply where the government's failure to warn does not involve a social, economic, or policy judgment.  *See Zumwalt*, 928 F.2d at 955.  Those two cases are *Boyd v. United States ex rel. United States Army, Corps of Eng'rs*, 881 F.2d 895 (10th Cir. 1989) and *Smith v. United States*, 546 F.2d 872 (10th Cir. 1976).

26.   In *Boyd*, the government argued that because it was a discretionary decision not to zone the swimming area where the accident occurred, "'the regulations in force at the time [ ] also meant that no warning signs or other safety devices would be installed in the area.'"  881 F.2d at 898.  In other words, the government asserted "that a discretionary decision not to zone an area necessarily makes discretionary a decision that *nothing* be done there, regardless of potential hazards."  *Id.* (emphasis in original).  The Tenth Circuit disagreed, stating that "an alleged failure to warn swimmers of dangerous conditions in a popular swimming area does not implicate any social, economic, or political policy judgments with which the discretionary function exception

properly is concerned." *Id.* In other words, "the alleged failure to warn swimmers of dangerous conditions was not shown to be part of the policy decision not to zone a particular area." *Zumwalt*, 928 F.2d at 955. In so finding, the *Boyd* court noted that the claim "is based on an alleged direct omission by the government as landowner." *Id.*

27. In *Smith*, the Tenth Circuit rejected the government's argument that its policy decision to designate certain areas of Yellowstone National Park as "undeveloped", including the area of superheated thermal pools where the accident at issue occurred, made the government's decision not to erect safety devices or warnings a policy decision subject to the discretionary function exception. 546 F.2d at 874. It stated on that issue:

> A policy decision to designate certain areas as "undeveloped" ones may reasonably entail the omission of boardwalks, trails or footpaths and signs marking such ways. However, it does not follow that the Government, as a landowner, is absolved of all duty under state law to erect safety devices or signs cautioning about conditions which have been left undisturbed as a policy matter. *See United States v. White*, 211 F.2d 79, 82 (9th Cir.). If we were to accept the Government's broad interpretation of the discretionary exception, it is difficult to perceive which duties under tort law could not be avoided by a similar policy decision to ignore them. This would run counter to the Supreme Court's admonition that such exceptions to this remedial law be narrowly construed. . . .

*Id.* In other words, in *Smith* "the decision not to post warning signs near [the] thermal pools [where the accident occurred] was not connected to the decision to leave the area undeveloped." *Zumwalt*, 928 F.2d at 955. The *Smith* court accordingly held "that the Government's decision, as a landowner, not to warn of the known dangers or to provide safeguards cannot rationally be deemed the exercise of a discretionary function." *Id.*

28.  As in *Boyd* and *Smith*, the absence of warning signs and the failure to guard against the danger of the sinkhole in this case was not the result of any policy decision by Dr. Mihlbachler or the USAFA.  Instead, it was based on a perception (mistaken or not) that the USAFA need not do anything regarding the path because it was the responsibility of the easement holders.

29.  I also note that Dr. Mihlbachler did not think the path presented a hazard because it was not an official trail of the USAFA and he believed that it was not being used by pedestrians or bikers.  However, "failure to warn resulting only from failure to recognize a potentially dangerous condition does not implicate a policy analysis and does not invoke the discretionary function exception." *Duke*, 131 F.3d at 1414 (Brisco, J., concurring and dissenting) (citing *Smith*, 546 F.2d at 876-77).  Notably, in rejecting the government's discretionary function exception argument, *Smith* found persuasive the testimony from a park ranger that the decision to not place warning signs at a dangerous area of the park was not related to any policy decision "but to lack of need for warnings there." *Smith*, 546 F.2d at 877 n.5.  This is similar to what Dr. Mihlbachler testified to in this case—that his decision was based on his perceived lack of need of the USAFA to repair or warn about the sinkhole.

30.  My finding that the USAFA's failure to act to warn or guard against the danger of the sinkhole is not subject to the discretionary function exception is also supported by other authority.  For example, the analysis and conclusion reached by the court in *Gotha v. United States*, 115 F.3d 176 (3rd Cir. 1997), cited by the Tenth Circuit in *Duke*, is persuasive.  The *Gotha* court held that the "Navy's failure to provide routine

safeguards on a footpath leading to a structure under its control does not implicate the discretionary function exception." *Id.* at 178.  It stated that the "routine safeguard . . . was a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get   . . . .It is difficult to conceive of a case more likely to have been within the contemplation of Congress when it abrogated sovereign immunity than the one before us." *Id.* at 181.

31.  Like *Gotha*, fixing a sinkhole on a path on USAFA property or warning of a hazard on the path is a "mundane, administrative, garden-variety, housekeeping problem" that has not been shown to relate in any way to the USAFA's missions.  *See also O'Toole v. United States*, 295 F.3d 1029, 1035-36 (9th Cir. 2002) ("an agency's decision to forego, for fiscal reasons, the routine maintenance of its property -- maintenance that would be expected of any other landowner -- is not the kind of policy decision that the discretionary function exception protects"); *Cope*, 45 F.3d at 451 ("the discretion regarding where and what type of [warning] signs to post [about a road surface] is not the kind of discretion protected by the discretionary function exception")*; ARA Leisure Servs. v. United States*, 831 F.2d 193, 196 (9th Cir. 1987) ("the government's failure to maintain [t]horoughfare. . . [in a safe condition] falls in the category of 'ordinary garden-variety negligence'") (internal quotation marks omitted).

32.  As noted by the Tenth Circuit in *Duke*, the types of cases in which the courts have applied the discretionary function exception involve decisions involving national forests, wilderness areas, or national parks, where "there are situations in which both known and unknown hazards exist and in which a deliberate decision is

made not to warn against or eliminate the hazard." In those cases "the decision not to erect signs or eliminate a hazardous condition is justified by the policy of preserving the area in its pristine condition to protect the wilderness experience of the visitors." *Duke*, 131 F.3d at 1411 (citing, as examples, *Kiehn v. United States*, 984 F.2d 1100, 1105 (10th Cir. 1993); *Johnson v. United States Dep't of Interior*, 949 F.2d 332, 338 (10th Cir. 1991); and *Zumwalt*, 928 F.2d at 953). This case does not present such a situation.

33. By contrast, the Tenth Circuit and other jurisdictions have found that the discretionary function exception does not apply where there is a failure to warn or guard against a specific known hazard, as here. "In these cases a specific hazard existed, distinct from the multitude of hazards that might exist in, for example, a wilderness trail through a national park or forest . . . ." *Duke*, 131 F.3d at 1411. The discretionary function exception is not applicable in such cases because the purported decision not to warn or guard against the hazard is not "of the kind that the discretionary function exemption was designed to shield." *Id.* This case falls within that category of cases.

34. While there was a suggestion by the United States that the decision regarding the path was an economic decision, Dr. Mihlbachler testified that he did not consider the costs involved to warn or guard against the sinkhole. Further, no request was ever submitted for a work request review board decision, no direct scheduled work request was submitted, and most importantly, there is no evidence that any policy decision was contemplated or even implicated concerning allocation of resources as to the path prior to Mr. Nelson's injury. The testimony of Mr. Long also supports this finding. He described the sinkhole as a dangerous emergency situation which required

immediate action due to safety considerations.  And in fact, the path was immediately

repaired the day after Mr. Nelson's injury with no evidence that any economic or other

policies were implicated or considered in connection with this decision.

35.   In conclusion, I find that the USAFA's decision not to warn or guard

against a specific hazard—a sinkhole of which the USAFA knew or should have known

existed on a path on property under its control—is not a decision that is grounded in

policy considerations.  There was no discretionary decision made concerning the failure

to maintain the path or warn of the sinkhole that involved or implicated political, social,

or economic policy considerations.  There is no discretionary policy decision that this

Court must "second guess."  Accordingly, I find that the discretionary function exception

to the FTCA is inapplicable and the Court has subject matter jurisdiction over the

Plaintiffs' claims against the United States.

B.    Colorado Recreational Use Statute

36.   Legislation intended to encourage private landowners to make their lands

available for public recreational use "has been enacted in nearly all of the fifty states."

*Klepper v. City of Milford, Kansas*, 825 F.2d 1440, 1444 (10th Cir. 1987).  "[T]hese

statutes promote casual recreational use of open space by relieving landowners of the

concern that they will be sued for injuries to strangers who hunt, trek, fish, and

otherwise recreate on their land or water free of charge."  *Id.*

37.   Like these other statutes, the Colorado Recreational Use Statute

["CRUS"] "provides limitations on liability concerning lands made available for

recreational purposes without charge." *Luenberger v. City of Golden*, 990 P.2d 1145, 1147 (Colo. App. 1999).

     38.  The CRUS provides, in relevant part, that:

     (1) . . . an owner of land who either directly or indirectly invites or permits, without charge, any person to use such property for recreational purposes does not thereby:

     (a) Extend any assurance that the premises are safe for any purpose;

     (b) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed;

     (c) Assume responsibility or incur liability for any injury to person or property or for the death of any person caused by an act or omission of such person.

Colo. Rev. Stat. § 33-41-103 (2006).

     39.  The stated purpose of the CRUS "is to encourage owners of land to make land and water areas available for recreational purposes by limiting their liability toward persons entering thereon for such purposes."  Colo. Rev. Stat. § 33-41-101; *Smith v. Cutty's, Inc.*, 742 P.2d 347, 348 (Colo. App. 1987); *see also McIntyre v. Bd. of Cnty. Comm'rs*, 86 P.3d 402, 413 (Colo. 2004) ("[t]he General Assembly has encouraged landowners to allow public use of their land; in turn, it has guarded against landowners losing their property rights when allowing such use.").  Implicit in the statute "is the legislative recognition of the right of the landowner to close to public access" any part of the land. *People v. Emmert*, 597 P.2d 1025, 1029 (Colo. 1979).

     40.  The United States is entitled to the protection of the CRUS when it is sued under the FTCA.  *Evert v. United States*, 535 F. App'x 703, 707 (10th Cir. 2013) (quoting 28 U.S.C. § 2674); *see also Maldonado v. United States*, 893 F.2d 267, 268-69

(10th Cir. 1990); *Kirkland v. United States*, 930 F. Supp. 1443, 1446 (D. Colo. 1996). The issue is whether the CRUS is applicable under the circumstances of this case.

41. It is undisputed from the evidence that Mr. Nelson did not pay a charge for using the path. Further, he was using the path for recreational purposes.

42. However, I find from the evidence that the USAFA did not directly or indirectly invite Mr. Nelson or the public in general to use the asphalt path for recreational (or any purpose). The USAFA took no action that would support such a finding or inference, as it did nothing to make the asphalt path available for recreational use. Instead, the evidence shows that the asphalt path was not an official trail of the USAFA and USAFA representatives testified that the USAFA did not invite people to use the path for any purpose. Indeed, people who used the path were deemed "unauthorized" or trespassers by the USAFA. Consistent with this, Mr. Nelson was and is still deemed by the USAFA to be an unauthorized person and a trespasser in his use of the asphalt path. Also, prior to Mr. Nelson's accident the USAFA conveyed to at least one government agency that the asphalt path was not for public use.

43. By contrast to the facts in the previous paragraph, the evidence shows that the USAFA clearly understood and took action to make its property available for recreational use when it wanted to; for example, through the designation of the Santa Fe and La Foret trails as official USAFA trails for public recreational use.

44. I also find that there is no evidence that the USAFA directly permitted people to use the path. At most, the evidence shows that it did not preclude people from using the path.

45.  Thus, the critical issue is whether the United States indirectly permitted Mr. Nelson to use the asphalt path.  As noted by the Tenth Circuit, "[i]t is the permission granted to use such land for recreational purposes without charge that immunizes the landowner." *Evert*, 535 F. App'x at 708.

46.  The term "permit" is not expressly defined in the statute itself.  I note, however, that the term "permission" has been defined for purposes of the CPLA as "'conduct that justified others in believing that the possessor of property is willing to have them enter if they want to do so.'"  *Corder v. Folds*, 292 P.3d 1177, 1180 (Colo. App. 2012) (quoting *Black's Law Dictionary* at 1255 (9th ed. 2009)).  The question then becomes what type of conduct gives rise to permission.

47.  There is no evidence in this case of any conduct by the USAFA that justified others in believing that it was willing to have it use the path for any reason, including recreational use.  It took no action to allow people to use the path, did not include it as an official trail for use, and did not even maintain the path.[3]  The USAFA relies, however, on the fact that it did not remove people from the path as well as the "Bicycle Path" signs that were posted adjacent to the path by an unknown third party.

48.  I find that the "Bicycle Path" signs justified others in believing that the USAFA was willing to have the path used by the public for recreational purposes.  The

---

[3]  While the USAFA points to the fact that it did not take the "Bicycle Path" signs down after CDOT asked it whether it wanted the signs removed, this was not the result of any actual decision or action by the USAFA.  Instead, the evidence on that issue shows that when Ms. Barrett received CDOT's e-mail about the signs, she did not respond or take any action regarding same, other than to send it on to CHAS representative Karen Liekam.  She testified that it then fell off her radar.  There is also no evidence that Ms. Leikam or CHAS ever took any action or even responded to that e-mail.  Indeed, the evidence shows that CHAS was not responsible for the asphalt path.  Thus, I find that this fact is not relevant to whether the USAFA permitted people to use the path.

fact that the signs were not authorized by or placed by the USAFA could not have been known to the public.  However, that does not answer the question as to whether these signs, as well as the USAFA's inaction in connection with people using the path, are sufficient to allow the United States to invoke the protection of the CRUS.

49.  Ultimately, I find that the issue presented by this case is whether a party is protected under the CRUS when it neither prevents nor affirmatively invites a person to use the land in question.  *See Coursey v. Westvaco Corp.*, 790 S.W.2d 229, 231-23 (Ky. 1990).  Related to that is whether the USAFA itself, as landowner, needs to take some action indicating that it permits people to use the land, as compared to reliance on an act of a third party such as at issue here in connection with the "Bicycle Path" signs. These issues are not addressed by the CRUS and I found no cases interpreting the CRUS that answer the question.  Thus, I look to cases from other states that have similar recreational use statutes.  *See Evert*, 535 F. App'x at 708 (looking to persuasive authority from other jurisdictions to interpret the Wyoming Recreational Use Act).

50.  There appears to be a split of authority in other states as to this issue. *See Cudworth v. Midcontinent Commc'ns*, 380 F.3d 375, 379 and n. 3 (8th Cir. 2004) (citing cases); *Coursey*, 790 S.W.2d at 230.  I find persuasive the Kentucky Supreme Court's analysis of the issue in *Coursey* in connection with the Kentucky recreational use statute, which is similar to the CRUS and has an identical purpose.  *See Coursey*, 790 S.W.2d at 230; K.R.S. 411.190(2).

51.  The *Coursey* court found, and I agree, that "[t]he heart of the controversy is whether this Court should interpret the recreational use statute broadly or narrowly."

790 S.W.2d at 231. As explained in *Coursey*, the plaintiff "claimed that because the statute's purpose is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability, the statute should be interpreted more narrowly so as to accomplish the stated purpose of the statute." *Id.* Thus, he contended that "in order to receive the benefit of limited liability the landowner must make the land available to the public" and that "[i]f the landowner is not required to affirmatively make his land available or at least have an intent to do so, then the legislation is in essence a blanket grant of immunity to landowners without any rational basis." *Id.* On the other hand, the defendant argued that "to give the statute broad effect, the General Assembly chose words to allow the owner to come under the statute by doing nothing" and that "[t]o require the owner to do anything would limit the scope of this statute and withdraw land from recreational use by the public." *Id.*

52. The Kentucky Supreme Court recognized that "[o]ther states with virtually identical recreational use statutes have interpreted their statutes both broadly and narrowly." *Coursey*, 790 S.W.2d at 232. It then stated, "Kentucky will adopt the position that a landowner to come within the protection of the statute must show at a minimum, proof that the landowner knows that the public is making recreational use of his property, and proof of some words, actions or lack of action on his part from which it can be reasonably inferred that he intended to permit such use to be made of his property." *Id.* Thus, it held that "a landowner must show he knew and condoned the public making recreational use of his property, and by the landowner's words, actions or lack of action it must be able to be reasonably inferred the landowner intended to permit such use."

*Id.* Accordingly, it answered "no" to the question of whether a party is protected under the Kentucky recreational use statute when the party neither prevents nor affirmatively invites a person to enter the land in question.  *Id.*[4]

53.  I find that the holding in *Coursey* is consistent with the purpose of the CRUS to encourage landowners to open their land to the public for recreational use.  It is the landowner who has the capacity and ability to invite or permit the public to enter their land in order to take advantage of the immunity afforded by CRUS.  Thus, I find it is the landowner's actions and intent that should be looked at in determining whether it directly or indirectly invited or permitted persons to use its land for recreational purposes.  To find otherwise could mean that unless an owner of land affirmatively prevents all people at all times from entering their land, the public is deemed to be "indirectly" invited or permitted on the property for recreational purposes, despite the owner having no intention to invite or permit them to do so.  I reject that interpretation of CRUS as inconsistent with the law and the stated purpose of CRUS.[5]

54.  My interpretation of the CRUS is supported by other cases as well.  Thus, in *Watters v. Buckbee Mears Co.*, 354 N.W.2d 848, 852 (Minn. App. 1984), the court held that the Minnesota recreational use statute did not apply because there was no

---

[4] The Kentucky Supreme Court also held that the landowner need not make a formal dedication of the land for public use, but that "a landowner must at a minimum show he knew and condoned the public making use of his land for a recreational purpose, and by the landowner's words, actions or lack of action it must be able to be reasonably inferred the landowner intended to put his land to such use." *Id.*

[5] I also reject any suggestion by the United States that the words "indirectly invites or permits" as used in the CRUS are associated with the legal concept of "implied consent" as used in and applied to the CPLA.  Neither the words "permission" nor "invitation" are the same as the legal concept of "implied consent" as that issue arises under the CPLA and which is discussed in the next section.  Not only are "permit" and "consent" different legal concepts, "indirect" and "implied" are two different words implicating different legal concepts.

evidence that the defendants offered the land for public use.  Indeed, the defendants argued that the plaintiffs were trespassers; thus, "they did not directly or indirectly invite or permit people to use the property for recreational purposes".  *Id.* (citing *Hughes v. Quarve & Anderson* Co., 338 N.W.2d 422, 427 (Minn. 1983) ("the Recreational Use Statute has no application where the defendant landowner does not offer the [property] in question for public use and, indeed, claims . . . that it has discouraged the public from using the [property]", even where the landowner knew that the property was being used by the public for swimming)).

55.  Similarly, the Delaware Supreme Court rejected an argument that the Delaware recreational use statute's "protection extends to any land 'available' for putting to recreational use without regard to the intent of the owner that they be so used." *Gibson v. Keith*, 492 A.2d 241, 244 (Del. 1985).  Instead, it held that "the owner's positive efforts to make" its land available for recreational use were determinative of a landowner's right to invoke the statute.  *See also Craig v. Sepulvado*, 709 So.2d 229, 230-31 (La. App. 3d Cir. 1998) (finding that the landowner was not entitled to recreational immunity for allowing her grandchildren to use the land for hunting purposes when there was no evidence that the landowner intended the public to use her land for recreational purposes) (citing *Monteville v. Terrebonne Parish Consol. Government*, 567 So.2d 1097, 1105 (La. 1990) (a landowner "who does not evidence an intent to permit the public to enter without charge for recreational use may not invoke the recreational use statute's protective benefits against liability")).

56.   Finally, I note the decision from this Court in *Rankin v. Union Pac. R.R.*, No. 04-cv-00372-OES-PAC, 2005 U.S. Dist. LEXIS 45351 (D. Colo. Sept. 15, 2005). *Rankin* stated as a basis to deny applicability of the CRUS that "[t]he railroad has pointed to no evidence that suggests that it has invited or encouraged people, either directly or indirectly, to engage in recreational activities" on the land at issue.  *Id.* at *14.

57.   Here, while there is evidence that the USAFA knew that the public used the path and did not actually remove people from the path, I find no evidence from the USAFA's words, actions or lack of action that allow me to reasonably infer that it intended for the asphalt path to be used for recreational purposes or encouraged such use.  Indeed, the undisputed evidence is that the USAFA did not consider or intend for the path to be an authorized public trail, and that it considered people who used the path to be trespassers and unauthorized on its property.  This is consistent with Mr. Long's testimony that if people were observed on the asphalt path by Academy personnel, he believed the personnel should have stopped the people or, if the people could not be confronted directly, the issue should have been brought back to the squadron for an investigation since it was not an authorized trail.

58.   I also find, although not dispositive of my decision, that the extensive actions taken by the USAFA concerning the path (including removing and disclaiming the "Bicycle Path" signs, barricading the path and installing a fence across the path) shortly after Mr. Nelson's accident are persuasive evidence that the USAFA had no intent to directly or indirectly invite or permit the public to use the path.  Mr. Long agreed in his testimony that the reason the fence was placed across the asphalt path was to

make it clear to the public that the path was USAFA property and was not a public trail.

*See Bingaham v. Kansas City Power & Light Co.*, 1 F.3d 976, 982 (10th Cir. 1993) ("a

landowner who bars public access to its property has not directly or indirectly invited or

permitted the public to use that property for recreational activities and thus is not entitled

to immunity" under the Kansas Recreational Use Statute); *Gibson*, 492 A.2d at 244 ("a

landowner who undertakes affirmatively either to warn or bar the public from entry

cannot assert the statute as a bar to a tort claim").

59.   While the United States objects to the admission of the remedial

measures regarding the path and the sinkhole that it took after the accident under Fed.

R. Evid. 407, I found at trial and reiterate herein that it is admissible.  The evidence was

not offered or admitted to show negligence, culpable conduct, a defect in the path's

design or construction or a need for warning, but for another purpose; namely, to show

the United States' intent with regard to use of the path by the public for recreational

purposes.  *See Leprino Foods Co. v. Factory Mut. Ins. Co.*, 653 F.3d 1121, 1125 (10th

Cir. 2011) ("Rule 407 only prohibits the admission of evidence of subsequent remedial

measures for the purposes of 'negligence, culpable conduct, a defect in a product, ... or

a need for a warning or instruction. . . .The rule permits the evidence's admission for

other purposes. . . .) (quotation and internal footnote omitted).

60.   Based on the foregoing, I find that the USAFA did not directly or indirectly

invite or permit the public, including Mr. Nelson, to use the asphalt path for recreational

purposes.  Accordingly, I find that the CRUS does not apply.

C.     Plaintiffs' Premises Liability Claim

61.  I now turn to the merits of Plaintiffs' claim against the United States.  The

Colorado Premises Liability Act ("CPLA") provides the exclusive remedy against a

landowner for physical injuries sustained on the landowner's property.  *Vigil v. Franklin*,

103 P.3d 322, 328 (Colo. 2004).

62.  The purpose of the CPLA is to "promot[e] 'a state policy of responsibility

by both landowners and those upon the land as well as [assuring] that the ability of an

injured party to recover is correlated with his status as a trespasser, licensee, or

invitee.'" *Pierson v. Canyon Aggregates, Inc. Black*, 48 P.3d 1215, 1219 (Colo. 2002)

(quoting Colo. Rev. Stat. § 13-21-115(1.5)(a)).

63.  The definition of landowner is "expansive" under the statute.  *Pierson*, 48

P.3d at 1221.  "Landowners" who are liable under the statute include, "without limitation,

. . . a person in possession of real property and a person legally responsible for the

condition of real property or for the activities conducted or circumstances existing on

real property."  See Colo. Rev. Stat. § 13-21-115(1).

64.  While the United States initially contested its status as a landowner,

arguing in its summary judgment motion that it was not a landowner because it

transferred possession of the property through its easement, this argument was

withdrawn at trial.  The United States now stipulates, and the evidence at trial confirms,

that the United States is the landowner of the property where Mr. Nelson was injured for

purposes of the CPLA.  Therefore, the United States owed the requisite duties under

the CPLA to persons entering its land, including Mr. Nelson.

65.  Under Colorado law, a landowner owes certain non-delegable duties to a person who enters the landowner's property, and the duty owed depends on whether that person is a "trespasser", "licensee", or "invitee", as those terms are defined by the CPLA.  Colo. Rev. Stat. § 13-21-115(3).

66.  The CPLA defines an "invitee" to include "a person . . . who enters or remains on [the land of another] in response to the landowner's express or implied representation that the public is requested, expected, or intended to enter or remain."  Colo. Rev. Stat. § 13-21-115(5).  A "licensee" is "a person who enters or remains on the land of another for the licensee's own convenience or to advance his own interests, pursuant to the landowner's permission or consent."  *Id.*  A "trespasser" is a person who enters or remains on the land of another without the landowner's consent.  *Id.*

67.  An invitee may recover for damages caused by the landowner's unreasonable failure to exercise reasonable care to protect against dangers of which he actually knew or should have known.  A licensee may recover only for damages caused by the landowner's unreasonable failure to exercise reasonable care with respect to dangers created by the landowner of which the landowner actually knew; or by the landowner's unreasonable failure to warn of dangers not created by the landowner which are not ordinarily present on property of the type involved and of which the landowner actually knew.  Finally, a trespasser may recover only for damages willfully or deliberately caused by the landowner.  Colo. Rev. Stat. § 13-21-115(3).

68.  In the case at hand, I find that the evidence supports a finding that Mr. Nelson was an invitee on the USAFA's land at the time of the accident.  While there

-45-

is no evidence that he was on the path in response to the USAFA's express representation that the public was requested, expected, or intended to enter or remain on the property, there is evidence of an implied representation of this through the "Bicycle Path, No Motorized Vehicles" signs.  USAFA representatives admitted that there is no way that members of the public could have known that these signs were not USAFA signs, and I note that the sign on the north end of the path was next to and clearly related to the asphalt path that entered and crossed the Academy property.  Given the close proximity of the "Bicycle Path" signs to Academy property, members of the public could reasonably have believed that the signs were on Academy property or at least authorized by the Academy.

69.  USAFA representatives also admitted that a reasonable person seeing the "Bicycle Path" signs would believe that this meant the path was open to the public for bicycling.  While I do not believe a landowner would be deemed to have invited a person onto its land based on a sign or similar object that it did not know about, in this case the USAFA had been advised of the existence of the sign and even asked whether it wanted it removed.  The USAFA did nothing in response.  Thus, I find that the "Bicycle Path" sign supports a finding of an implied representation by the USAFA that the public was requested, expected, or intended to enter or remain on the asphalt path.

70.  As an invitee, Mr. Nelson may recover for damages caused by the USAFA's unreasonable failure to exercise reasonable care to protect against dangers of which it actually knew or should have known.  Here, I find that Mr. Nelson is entitled to recover damages because the USAFA unreasonably failed to exercise reasonable care

to protect against a danger—the sinkhole on the path caused by erosion—of which it actually knew.  The evidence demonstrates that the USAFA knew there was extensive drainage and erosion problems in the area where the path was located, knew through Dr. Mihlbachler of the actual existence of the sinkhole prior to Mr. Nelson's accident, admitted that the sinkhole was a dangerous condition, and did nothing to protect anyone from the danger that the sinkhole presented to those using the path for biking or other purposes.  I find from the evidence that the USAFA failed to use reasonable care to protect against the danger on the property, and that its unreasonable failure to exercise reasonable care with regard to the sinkhole was the cause of Mr. Nelson's injuries.

71.  In further support of my findings in the previous paragraph, I note that Dr. Mihlbachler was part of the "eyes on the ground" for the USAFA, checking areas that the security forces did not get to that often and reporting to the appropriate party if issues were identified.  For all intents and purposes, Dr. Mihlbachler functioned as a USAFA employee, and had responsibility for reporting safety concerns.  Thus, I find that his knowledge should be imputed to the USAFA.  I also note that Mr. Long admitted that the sinkhole was a dangerous emergency situation that required immediate action because of safety considerations.  Moreover, the parties stipulated that the United States did not take any measures to guard against this danger or warn anyone using the path of the sinkhole condition.

72.  In the alternative, I find that Mr. Nelson was a licensee while on the property of the USAFA at the time of the accident.  As stated previously, a "licensee" is "a person who enters or remains on the land of another for the licensee's own

convenience or to advance his own interests, pursuant to the landowner's permission or consent." Colo. Rev. Stat. § 13-21-115(5). I found in connection with the CRUS that there was no evidence that the United States permitted Mr. Nelson on its property, *i.e,* there was no conduct by the USAFA that justified others in believing that it was willing to have it use the path for any reason, including recreational use.[6] Thus, the issue becomes whether there is evidence of the USAFA's consent to Mr. Nelson's use of the property.

73. While there is no evidence of express consent by the USAFA, a person can be a licensee if the person has implied consent to enter the land. *Corder,* 292 P.3d at 1177 (holding that although the landowner did not give express consent to entry and argued that the injured person was a trespasser, the history and course of conduct allowed the injured party to claim he was not a trespasser because he had implied consent to enter the land); *see also Reid v. Berkowitz,* 315 P.3d 185, 189 (Colo. App. 2013) ("The term 'consent' as used in the statute includes implied consent.") Indeed, the Colorado courts have cited with approval authority holding that consent "'*may be implied from custom, usage, or conduct.*'" *Corder,* 292 P.3d at 1180 (emphasis in original) (quoting 7 S. Speiser, C. Krause & A. Gans, *The American Law of Torts* § 23.32, at 974–75 (2011) and citing 1 F. Harper, F. James, Jr. & O. Gray, *Harper, James & Gray on Torts* § 1. 11, at 47–48 (3d ed.2006)).

---

[6] I agree with the United States that the term "permit" should be applied consistently across both the CRUS and the CPLA.

74.   In this case, there is evidence of a course of conduct and usage in connection with the asphalt path before Mr. Nelson's accident, *i.e.*, the evidence showed that the USAFA knew that people were using the path for recreational purposes, *i.e.*, biking, jogging and walking, and did not affirmatively preclude people from its use.

75.   Moreover, "it is the manifestation of consent which is decisive and not the state of mind which the possessor intends to express."  Restatement (2d) of Torts § 330, cmt. d.  "[T]he decisive factor is the interpretation which a reasonable person would put on the possessor's acts."  *Id.*  I find that the "Bicycle Path" signs on the path, even though not known about or authorized by the USAFA, could be deemed evidence of implied consent of the USAFA for people to use the bath for biking.  A reasonable person would likely believe the Bicycle Path signs were, at the very least, authorized by the USAFA, given that the signs were next to and clearly related to the paved path on USAFA property.  USAFA officials admitted that there is no way the public could have known that the signs were not USAFA signs.  The evidence also supports a finding that the Bicycle Path signs would allow members of the public, including Mr. Nelson, to reasonably believe that the USAFA consented to the public's use of the path for biking. This finding is further supported by the fact that the path was open to and accessible by the public through an engineered entry point/opening in the USAFA's boundary fence. Finally, Mr. Nelson had used the path before and knew that other people entered the property and used the path.

76.  I find that the circumstances outlined above would have led a reasonable member of the public to believe, and in fact led Mr. Nelson to reasonably believe, that he had implied consent to enter the property and use the path at issue for his own convenience or to advance his own interests.  Accordingly, I find that Mr. Nelson meets the definition of a "licensee".

77.  As a licensee on the asphalt path, Mr. Nelson may recover for damages caused by the USAFA's unreasonable failure to warn of dangers not created by the USAFA which are not ordinarily present on property of the type involved and of which the USAFA actually knew.  Here, I find that the USAFA unreasonably failed to warn of a danger—the sinkhole—that was not caused by the USAFA but by erosion.  I further find that a sinkhole of the magnitude in this case (covering the entire width of the path) is not the kind of hazard ordinarily presented on the property of the type involved (asphalt paths used by the public for walking, running or bicycling), and that the USAFA—through Dr. Mihlbachler—knew of the sinkhole approximately two weeks before Mr. Nelson's accident and did nothing to protect people using the path.

78.  In conclusion, I find that the USAFA is liable as a landowner under the CPLA for the injuries, damages, and losses that Mr. Nelson sustained.  I also note as to the injuries, damages and losses claimed by Mr. Nelson's wife that "[a] loss of consortium claim is derivative of the underlying injury claim and therefore subject to the same defenses".  *Schwindt v. Hershey Foods Corp.*, 81 P.3d 1144, 1148 (Colo. App. 2003).  Thus, it appears the United States is also liable to Mrs. Nelson for any damages she sustained.  Since the United States is liable under Colorado state tort law, the

United States is liable to Plaintiffs for their damages under the Federal Tort Claims Act. 28 U.S.C. §§ 1346(b), 2674.  No evidence has yet been presented, however, as to damages.

      D.    <u>Defendant's Comparative Fault Affirmative Defense</u>

      79.   Colorado law provides for assessment of a plaintiff's comparative fault. Colo. Rev. Stat. §§ 13-21-111; 13-21-115(2).   Under the rule of comparative negligence or fault, a plaintiff "'has the duty to act as a reasonably prudent person by avoiding undue risk of harm to himself.'"  *Dillon Cos. v. Hussman Corp.*, 163 F. App'x 749, 753 (10th Cir. 2006) (quoting *Fay v. Kroblin Refrigerated Xpress, Inc.*, 644 P.2d 68, 70 (Colo. App. 1981)).   Thus, a plaintiff may not recover from a defendant when the plaintiff's negligence or fault is equal to or greater than the negligence or fault of the party against whom relief is sought.   Colo. Rev. Stat. § 13-21-111(3).

      80.   Comparative fault is an affirmative defense that is available in connection with claims asserted under the CPLA.  Colo. Rev. Stat. § 13-21-115(2); *Union Pac. R.R. Co. v. Martin*, 209 P.3d 185, 186 (Colo. 2009).   The United States has the burden of proof to establish its affirmative defense of comparative fault by a preponderance of the evidence.  *See Folck v. Haser*, 164 Colo. 11, 15 (Colo. 1967).

      81.   Having considered the evidence, I find no fault or negligence on the part of Mr. Nelson.   Thus, I find that his failure to use a headlight on his bicycle was not negligent; he was not negligent in riding his bicycle on the asphalt path at the time of the accident; and he was not negligent when he rode his bicycle into the sinkhole.

82.   As to the headlight, the United States offered no evidence that a headlight was necessary to safely ride on this path at the time of the accident on September 3, 2008, nor any evidence that the presence or use of a headlight on September 3, 2008, would have made any difference in preventing the accident. Indeed, I find based on the evidence presented that it would have still been light outside when Mr. Nelson was riding his bicycle on the path and when he encountered the sinkhole, and the lighting would be sufficient such that he would not have needed artificial illumination as he rode his bicycle.

83.   Further, there is evidence from a third party witness, Jesse Kurtz, that the sinkhole was difficult to see until he got close to it because it looked like water.  I find this evidence from an unbiased witness credible.  The photographs entered into evidence also support my view that the sinkhole could be reasonably seen as water (particularly because of the location at the creek), or as a shadow cast by the bushes on the sides of the path.  Thus, it appears that the sinkhole would not have been readily apparent to someone biking on the path.

84.   I also note that there is no evidence that Mr. Nelson's speed was unreasonable, that he was not paying attention, or that he should have seen the sinkhole in time to be able to stop or avoid the hole.  "The mere happening of an accident fails to raise a presumption of negligence."  *Kendrick v. Pippin*, 252 P.3d 1052, 1062 (Colo. 2011).

85.   Finally, the USAFA did not offer any evidence that Mr. Nelson knew or should have known that a sinkhole would exist on the path, that a sinkhole was actually

on the path, or that the sinkhole was of such a size as to pose a danger.  There were no warnings, signs, or barricades on or near the path regarding the sinkhole.

86.  Based on the foregoing, I find that the United States has failed to establish its affirmative defense of comparative fault on the part of Mr. Nelson.

III.    CONCLUSION AND ORDER OF THE COURT

In conclusion, it is hereby adjudged and ORDERED:

1.    The Court has jurisdiction over Plaintiffs' claims under the Federal Tort Claims Act.

2.    The discretionary function exception to the Federal Tort Claims Act is not applicable in this case.

3.    The Colorado Recreational Use Statute is not applicable in this case.

4.    Mr. Nelson was an invitee and/or licensee on the USAFA's property at the time of the accident on September 3, 2008.

5.    The United States is liable under the Colorado Premises Liability Act for injuries, losses or damages sustained by Mr. Nelson and Elizabeth Varney in regard to Mr. Nelson's accident on September 3, 2008;

6.    The Plaintiff, James Nelson, was not at fault in causing his own injuries, damages, and losses.

Dated:  February 6, 2014.

BY THE COURT:

/s/ Wiley Y. Daniel
Wiley Y. Daniel,
Senior United States District Judge