IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   11-cv-02953-WYD-MEH

JAMES NELSON and
ELIZABETH VARNEY,

      Plaintiffs,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

THIS MATTER came before the Court on a bench trial held on April 21-25, 2014.

Trial was bifurcated on liability and damages.  This trial was on damages only.  I

previously found in favor of the Plaintiffs on liability at the liability portion of the trial held

in December 2013.

Plaintiffs James Nelson and Elizabeth Varney appeared and were represented by

David P. Hersh and Steven G. Greenlee of the firm Burg Simpson Eldredge Hersh

& Jardine, P.C.  Defendant United States of America was represented by Jacob

Licht-Steenfat and Marcy Cook of the United States Attorney's Office.

Having heard and considered the evidence, including stipulated facts, live

witness testimony, deposition testimony, admitted exhibits submitted by the parties, and

counsel's arguments, the Court now makes the following findings of fact, conclusions of

law and order:

I.      FINDINGS OF FACT

      A.      Prior Findings of Fact from Liability Trial Relevant to Damages

      1.   The Findings of Fact that are set forth in the Court's previous Findings of Fact, Conclusions of Law and Order dated February 6, 2014 ["February 6, 2014 Order"] are incorporated herein.  Most relevant to the damages issues are the following facts previously found by the Court:

      2.   This case arose from a biking accident that occurred on an asphalt paved path ("the asphalt path" or "the path") on real property owned by the United States Air Force Academy ("Academy" or "USAFA") in Colorado Springs, Colorado. (February 6, 2014 Order, Undisputed Finding of Fact #1.)

      3.   The biking accident occurred on September 3, 2008.  (*Id.*, Undisputed Finding of Fact #2.)

      4.   Mr. Nelson left his home in Colorado Springs, Colorado, at approximately 7:20 - 7:25 p.m. to go for the bicycle ride.  (*Id.*, Additional Finding of Fact #2.)

      5.   Sometime after he left his house, Mr. Nelson encountered the sinkhole on the path, lost control of the bicycle, and sustained injuries. (*Id.*, Additional Finding of Fact #13.)

      6.   At the likely speed Mr. Nelson was riding at the time, and based on the likely route he would have taken, it would have taken him approximately 10 to 15 minutes to reach the sinkhole. Thus, Mr. Nelson would likely have encountered the sinkhole at approximately 7:30 p.m. to 7:40 p.m.  (*Id.*, Additional Findings of Fact #14.)

7.  James Nelson was found by a jogger near the asphalt path on the morning of September 4, 2008.  James Nelson sustained severe injuries as a result of the bicycle accident.  (*Id.*, Undisputed Findings of Fact #56.)

B.     Additional Findings of Fact from the Damages Trial

1.  Mr. Nelson was located at approximately 10:30 a.m. on September 4, 2008.  The paramedics transported Mr. Nelson to Penrose Main Hospital by ambulance.

2.  Mr. Nelson received emergency care, intensive critical care treatment, and rehabilitation treatment at Penrose Hospital.

3.  Mr. Nelson remained hospitalized at Penrose Hospital for one month.

4.  Among his many injuries and diagnoses identified at Penrose Hospital were: severe brain injury (with initial extremely low Glasgow Coma Scale scores consistent with a severe traumatic brain injury), severe lacerations throughout his face and eyelid, broken and missing teeth, fractured jaw, fractures on the right side of his face, vision loss, and acute respiratory failure requiring mechanical ventilation support.

5.  Mr. Nelson was diagnosed at Penrose Hospital with a severe traumatic brain injury ["TBI"] with significant cognitive defects.

6.  On October 3, 2008, his discharge diagnosis was: severe TBI (subarachnoid hemorrhage, petechial hemorrhages bilateral hemispheres, left thalamic and basal ganglia injury with smaller arachnoid hemorrhage/diffuse axonal injury), multiple facial fractures and mandibular fracture, diplopia (double vision), cognitive impairment, pain, right upper extremity weakness, constipation, gastrointestinal (GI) and deep vein thrombosis (DVT) risk, hypertension, hypothyroidism, dysphagia,

leukocytosis, urinary tract infection—antibiotic course complete, resolved elevated temperature, PEG tube, facial abrasions, dental trauma and teeth fractures, and aspiration pneumonia (resolved).

7.  Following his discharge from the hospital on October 3, 2008, Mr. Nelson required 24 hour supervision, including close supervision with sit-to-stand transfers, gait, community outings, and all activities of daily living (ADLs) due to safety concerns. While this was temporary, he required ongoing care and supervision by doctors, therapists, and family for months.

8.  Mr. Nelson has received ongoing and continuing medical and rehabilitative treatment since September 4, 2008, by numerous physicians and other health care practitioners, many of whom provided testimony at the damages trial.

9.  Mr. Nelson has suffered and continues to suffer a wide variety of injuries, symptoms, and problems as a result of the bicycle accident.

10.  Mr. Nelson's most severe injuries for which he has received ongoing treatment are as follows:

    a.  Traumatic Brain Injury

    b.  Severe injury to Mr. Nelson's face and right eye-lid, resulting in loss of function and scarring

    c.  Vision Loss

    d.  Broken jaw and dental trauma

    e.  Endocrine system injury

<u>Traumatic Brain Injury</u>

11.   According to the credible testimony presented by Plaintiffs' health care providers, including Dr. House, Dr. Helffenstein, Dr. Hipskind, Dr. Barrick and Dr. Machanic, as well as the testimony of Mr. Nelson and Ms. Varney, Mr. Nelson suffered a severe, permanent, TBI in the bicycle accident.

12.   Mr. Nelson was diagnosed in the hospital with a subarachnoid hemorrhage, multiple areas of petechial hemorrhage in both hemispheres and in the left thalamus and basal ganglia.  An MRI showed diffuse axonal injury, meaning there was nerve injury throughout the entire brain.  The brain stem was also affected.

13.   Mr. Nelson's TBI resulted in permanent organic changes to his brain, as further evidenced by Dr. Hipskind's SPECT scans.  The SPECT scans showed that Mr. Nelson had objective findings of brain hypoperfusion (low blood flow) in the frontal, temporal, occipital, and cerebral lobes.

14.   As a result of the severe TBI, Mr. Nelson has sustained significant and ongoing cognitive deficits and dysfunction.  He has deficits in higher level executive functioning (organizational skills, the ability to abstract, the ability to strategize) and memory due to injury to the frontal lobe and the temporal lobe of the brain.

15.   The neuropsychological testing conducted by Dr. Helffenstein in March 2010 and as updated through August 2013 as well as Dr. Machanic's neurological examination in October 2013 confirm Mr. Nelson's cognitive deficits and dysfunction. Based on the credible testimony of Dr. Helffenstein, Mr. Nelson has permanent deficits in visual sustained attention, and his attention and concentration comes and goes which

Mr. Nelson cannot control.  He also has permanent deficits in the speed of processing (how fast his brain is processing material) and in memory (how well he is able to retain the information he learns).  Dr. Helffenstein testified that there was a good correlation between the deficits he found, which were temporal and frontal lobe issues, and the results of Dr. Hipskind's SPECT testing which showed low blood flow in those areas.  Dr. Helffenstein also testified that Mr. Nelson has behavioral, mood, and personality changes.  Similarly, Dr. Machanic testified that Mr. Nelson is not functioning at the level that is considered to be appropriate for an individual of his age and previous health.

16.   While I recognize that Dr. Kenneally, a neuropsychologist retained by the United States, testified that Mr. Nelson was cognitively intact based on her testing, as she found that his cognition was in the average to above average range, I do not find her testimony particularly credible.  She did not take into account Mr. Nelson's job responsibilities and functioning in a high level executive job prior to the accident in assessing the test results, as Dr. Helffenstein did.  Moreover, she did not talk to Mr. Nelson's prior supervisor, Mr. DeGrasse, or his family and friends as to the level of his cognitive functioning before the accident.  This is significant because Dr. Kenneally admitted that one of the limits of testing is that while it tells the tester how Mr. Nelson compares to others, it does not tell how he compared to himself before his injury.  Dr. Kenneally also employed a much more limited battery of tests than Dr. Helffenstein, and did not administer the tests that he administered where the scores were impaired or below average.  For example, she chose to administer memory tests that only had 30 minute delays.  Dr. Helffenstein administered memory tests that had four hour delays.

17.   Mr. Nelson has received significant and ongoing treatment for his brain injury, including cognitive rehabilitation, therapy, and medications.

18.   According to the credible testimony of Dr. Helffenstein, Mr. Nelson reached maximum improvement from a neuropsychological standpoint approximately 18 months after the accident, or by March 2010.  While there is evidence that recovery from a TBI can occur up to two years after the injury, both Drs. Helffenstein and Machanic testified credibly that there is little to any recovery after 18 months.  No additional recovery is anticipated for Mr. Nelson at this time.

19.   Mr. Nelson's TBI resulted in permanent cognitive deficits and dysfunction.

20.   Mr. Nelson suffered retrograde amnesia to approximately a week before the accident.  Mr. Nelson also suffered post-trauma memory loss, with his first memory occurring while he was in the hospital.

21.   Mr. Nelson also testified that he has a continuing ringing sound in his ear which he believes is attributable to the TBI.  I find this testimony credible.

22.   The past treatment provided to Mr. Nelson and the future treatment recommendations given by his health care providers are all reasonable and necessary as a direct result of the bicycle accident.

<u>Severe Injury to Mr. Nelson's Face and Right Eye-Lid,
Resulting in Loss of Function and Scarring</u>

23.   According to the credible testimony presented by Plaintiffs' health care providers, including Dr. House, Dr. Pelton, Dr. Barrick, as well as the testimony of

Mr. Nelson and Ms. Varney, Mr. Nelson suffered severe, permanent injury and disfigurement, including scarring, to his face and right eye-lid in the bicycle crash.

24. Mr. Nelson was treated for these acute injuries while in the hospital with complex facial laceration debridements and closures. He then received follow-up care by Dr. Pelton, an expert in ophthalmology and oculoplastics. In his first appointment in December 2008, Dr. Pelton found on examination lateral ectropion of the right lower lid and a dense scar lateral to the right lateral canthus, which pulled his lower lid down and caused the eye to not close all the way. Mr. Nelson's right eye did not mach his left eye. Dr. Pelton testified that the injuries were suggestive of trauma to the back of the head.

25. Mr. Nelson's injuries required ongoing treatment and care by Dr. Pelton, including keloid/steroid injections, surgery, and excision of the scar. The surgery was performed in March 2009 to try to get better closure of Mr. Nelson's right eye. Dr. Pelton testified that while the surgery was successful to some extent, Mr. Nelson was not returned to his pre-accident status.

26. Dr. Pelton's diagnosis as of November 2009 was paralytic/cicatricial right lower lid lateral ectropian.

27. The injury to Mr. Nelson's face and eye has caused abnormal functioning of his eye-lid. Dr. Pelton testified that even after the surgery, Mr. Nelson's right eye does not have complete closure because the lower lid does not come up all the way to meet the upper lid when Mr. Nelson blinks. Accordingly, the eye gets dry and irritated and makes tears, which is very uncomfortable. Consistent with this, Mr. Nelson testified

that his right eye always feels irritated because his eye does not close all the way and thus does not get properly lubricated.  When it is cold or windy Mr. Nelson's eye waters and it blurs his vision, impacting the activities he can do in these conditions.

28.  The injury to Mr. Nelson's face and eye has caused an abnormal appearance.

29.  No further treatment is suggested by Dr. Pelton, although he testified that Mr. Nelson will need medical attention for the rest of his life because his right eye is not at 100% capacity and will probably deteriorate over time.  Dr. Pelton testified that at this time further surgery would not make things better, although Mr. Nelson may need additional surgery if things deteriorate.  Dr. Pelton did state, however, in a letter dated December 11, 2009 (Ex. 73) that Mr. Nelson may decide to have surgery in the future to try to improve his lid position.  That surgery would be at the election of Mr. Nelson and, according to Dr. Pelton, could improve the lid position but could not make the eye look like it was prior to the accident.

30.  The credible testimony of Dr. Pelton demonstrates that Mr. Nelson will have permanent functional and appearance abnormalities for the rest of his life, due to the permanent tissue damage in that area.

31.  The past treatment provided to Mr. Nelson and the future treatment given by his health care providers regarding Mr. Nelson's facial and are eye-lid trauma, dysfunction, and disfigurement, including scarring, are all reasonable and necessary as a direct result of the bicycle accident.

Vision Loss

32.   According to the credible testimony presented by Plaintiffs' health care providers, including Dr. House, Dr. Wilson, Dr. Barrick, as well as the testimony of Mr. Nelson and Ms. Varney, Mr. Nelson suffered permanent vision loss as a result of the bicycle crash.

33.   Mr. Nelson suffered and complained of vision problems following the bicycle crash.  He was evaluated by Dr. Wilson, an expert optometrist with a focus/ specialty in neuro-optometric rehabilitation.

34.   Dr. Wilson conducted testing on Mr. Nelson and found that Mr. Nelson sustained severe peripheral vision loss in the upper right-hand quadrant in both eyes as a result of the bicycle crash.

35.   The visual loss in the upper right-hand quadrant in both eyes is significant and was caused by the brain injury Mr. Nelson sustained in the bicycle crash.

36.   The vision loss sustained by Mr. Nelson likely has a detrimental effect on his daily living, including visual processing difficulties.  Among other things, this impacts his ability to read and find words.  This loss may also compromise Mr. Nelson's motor vehicle driving competency based on the testimony from Ms. Varney.

37.   The visual loss in the upper right-hand quadrant in both of Mr. Nelson's eyes is a permanent loss caused by the bicycle crash.

38.   The past treatment provided to Mr. Nelson and the future treatment recommendations by his treating health care providers regarding Mr. Nelson's vision losses are all reasonable and necessary as a direct result of the bicycle accident.

-10-

## Broken Jaw and Dental Trauma

39.  According to the credible testimony presented by Plaintiffs' health care providers, including Dr. House, Dr. Benning, Dr. Robinson, Dr. Barrick, as well as the testimony of Mr. Nelson and Ms. Varney, Mr. Nelson suffered a broken jaw and dental trauma as a result of the bicycle crash.

40.  Mr. Nelson suffered severe facial trauma in the accident that resulted in a fractured jaw (left condylar/subcondylar mandible fracture) and several fractured/ avulsed teeth.

41.  Due to the life-saving measures at Penrose Hospital, treatment for Mr. Nelson's jaw fracture was limited.  Although it was reset in the hospital, it did not optimally heal, causing dysfunction in Mr. Nelson's bite, jaw clicking, and pain.

42.  Mr. Nelson testified that he has trouble chewing because he does not have a proper bite, and that his jaw makes a lot of noise when he is trying to chew.  He has to remove the temporary bridge with false teeth he currently wears in order to eat. He does not want to eat in social situations because he has to pull out his teeth.

43.  In October 2008, Mr. Nelson consulted with Dr. Brian Benning, an expert doctor of dental surgery (D.D.S.), who was Mr. Nelson's dentist before the bicycle crash.  On examination, Dr. Benning found one missing tooth (roots and all) that had been traumatically avulsed, two broken teeth (broken off at the gumline), and an additional tooth that was in a guarded prognosis before the accident.  Dr. Benning further found that Mr. Nelson's bite had changed due to how the broken jaw was set.  In particular, he found that Mr. Nelson at that time was only biting on his back teeth.

44.   Prior to Mr. Nelson's accident, Dr. Benning did not have any concerns with Mr. Nelson's teeth, other with a low grade infection in one tooth for which Dr. Benning provided a guarded prognosis prior to the accident.

45.   Following examination and to provide pain relief, Dr. Benning performed dental work on Mr. Nelson, which included removal of the remaining parts of the broken teeth and roots, removing the infected tooth that had also sustained additional damage in the accident, completing bone grafts, grinding the teeth down in an attempt to correct the bite, and placing crowns on two additional teeth.  Dr. Benning testified that Mr. Nelson lost four teeth total as a result of the accident.

46.   Dr. Benning then referred Mr. Nelson to an orthodontist, Dr. Alan Benning, and also to Dr. Robinson for jaw surgery.

47.   According to Dr. Brian Benning, orthodontist Dr. Alan Benning (father of Dr. Brian Benning) evaluated Mr. Nelson and identified various orthodontic problems including abnormal dental wear from nocturnal bruxing, multiple fractured and missing teeth, retrusive mandibular incisors, slight overjet and minimal overbite, and poor skeletal jaw relationship.  In reporting his findings to dentist Dr. Brian Benning, the orthodontist diagnosed malocclusion in adult dentition and left mandibular condyle fracture.  Dr. Alan Benning did not think braces would suffice to put Mr. Nelson's jaw back into place, and recommended jaw surgery.  After completion of the surgery, Dr. Alan Benning recommended a full-time maxillary orthotic and an orthotic reevaluation.

48.  I find that orthodontic work is reasonable and necessary treatment for the jaw and mouth trauma Mr. Nelson sustained in the bicycle accident and necessary to allow additional restorative dental work to occur.

49.  Dr. Randolph Robinson, an expert medical doctor and dental surgeon, evaluated Mr. Nelson in December 2009 and noted problems with malocclusion, chewing, limited jaw opening and popping and grating of the temporomandibular joints. He diagnosed posttraumatic maxillomandibular deformity with skeletal open bite, maxillary hypoplasia, and right zygomatic deformity with ectropion and lateral canthal dystopia.  He advised that Mr. Nelson would be a candidate for orhtognathic surgery as a reasonable and necessary treatment for the jaw and mouth trauma Mr. Nelson sustained in the bicycle accident.  Dr. Robinson testified that the problems went beyond dental difficulties, as there were problems with the entire facial structure.

50.  Dr. Robinson made the following recommendations.  First, Mr. Nelson will need presurgical orthodontics (12 to 18 months of braces) to center the teeth in the bones and make sure the teeth are stable.  This would be followed by orthognathic surgery (jaw surgery).  Among other things, the surgery would entail a bone cut, breaking the entire mid face free from the base of the skull, moving the bones to the right place and stabilizing them, typically with titanium bones plates and screws, and then grafting the bones into place.  The bone graft is taken from the hip bone.  The jaw surgery is necessary to bring Mr. Nelson's jaw into alignment to avoid future dental problems, and to allow additional future restorative dental work to occur.  After recovery from the surgery, Dr. Robinson testified that Mr. Nelson would then need to wear braces

for about three to six months.  Finally, Mr. Nelson would need the placement of dental implants, followed by a final prosthetic reconstruction performed by a dentist.  The entire process would take up to two and a half years.

51.  There are side effects and risks associated with the surgery and above procedures based on Dr. Robinson's testimony.

52.  Mr. Nelson testified that he has not done these procedures yet because he cannot afford them but that he plans on doing them.

53.  Consistent with Dr. Robinson's testimony, dentist Dr. Brian Benning recommended full mouth restorative dental reconstruction to occur following the orthodontic work and jaw surgery.  While Dr. Benning acknowledged that it was uncertain exactly what work would be needed because he did not know how Mr. Nelson would recover from the surgery, he testified that it was probable that Mr. Nelson would need the restorative dental reconstruction work he recommended.  He also testified that Mr. Nelson's teeth would continue to wear and break down because the enamel cannot stand up to the stress of his bite being off, and that Mr. Nelson may need additional bone grafts in addition to the restorative work.  This dental work would not be necessary but for the jaw and mouth trauma that Mr. Nelson sustained as a result of the bicycle accident.

54.  Without the treatment recommended by the dentist, orthodontist, and jaw surgeon, the injuries and damages to Mr. Nelson's jaw and teeth are permanent.  Even with all of this treatment, Dr. Robinson testified that some patients still have a limited opening, but that Mr. Nelson should hopefully be close to 90 to 95% of capacity.

55.   The past treatment provided to Mr. Nelson and the future treatment recommendations by his medical providers regarding his dental, orthodontic, and surgical needs are reasonable and necessary as a direct result of the bicycle accident.

<u>Endocrine System Injury</u>

56.   According to the credible testimony presented by Plaintiffs' health care providers, including Dr. Munson and Dr. Barrick, as well as the testimony of Mr. Nelson and Ms. Varney, Mr. Nelson has suffered permanent injury to his endocrine system, and has been diagnosed with panhypopituitarism caused by the severe head trauma Mr. Nelson sustained as a result of the bicycle crash.

57.   Panhypopituitarism is a condition of inadequate or absent production of the anterior pituitary hormones.

58.   This condition has required ongoing evaluation and treatment since November 2009 by endocrinologists Dr. Blicharski and Dr. Munson.  Dr. Munson, who took over the endocrine treatment from Dr. Blicharski in June 2013, diagnosed Mr. Nelson with panhypopituitarism, glucorticoid deficiency, and cognitive deficits with history of traumatic brain injury (TBI).

59. Mr. Nelson's primary care physician, Dr. Barrick, also assists in Mr. Nelson's endocrine injury treatment.

60.   Treatment for this injury includes weekly testosterone injections and continual follow up with his doctors.  Drs. Barrick and Munson testified that Mr. Nelson also receives daily replacement therapy for the human growth hormone in the form of injections.  Further, according to Dr. Munson, Mr. Nelson has a partial deficiency of

ACTH, an adrenocorticotropic hormone, and may not have adequate levels of ACTH to provide him with stress levels of cortisol. Thus, he must have cortisol (hydrocortisone) on hand to treat himself should he be in a stressful situation.

61. Mr. Nelson's endocrine system injury, specifically the panhypopituitarism caused by the severe head trauma, is a permanent injury which will require ongoing care and treatment for the balance of Mr. Nelson's life.

62. The past treatment provided to Mr. Nelson and the future treatment recommendations by his treating health care providers regarding his endocrinology needs are all reasonable and necessary as a direct result of the bicycle accident.

<u>Life Expectancy</u>

63. The parties stipulate that at the beginning of this trial, Mr. Nelson was 55 years old. They also stipulate that per the mortality table contained in Colo. Rev. Stat. § 13-25-103, Mr. Nelson's life expectancy at the time of this trial was 25.5 years.

<u>Economic Damages – Past and Future Medical Expenses</u>

64. Mr. Nelson, his treating doctors and other witnesses, including Dr. James Gracey and Dr. Patricia Pacey, provided credible testimony concerning Mr. Nelson's past and future medical and life care expenses.

65. Mr. Nelson's past medical expenses, as stipulated by the parties and as supported by the evidence, are $262,563.59.

66. Mr. Nelson will require continuous care and treatment into the future for his injuries.

67.   The parties stipulate and the evidence supports that Mr. Nelson's future medical/life care expenses are $778,100.  This is the present value of the cost of continuous medical care and treatment into the future.

68.   The care and treatment Mr. Nelson received in the past, and the expenses resulting therefrom, as a result of injuries caused by the bike accident, were reasonable and necessary.

69.   The care and treatment recommended for Mr. Nelson in the future, and the projected expenses thereof, as a result of injuries caused by the bike accident, are reasonable and necessary.  Indeed, the parties stipulate that the future medical/life care costs and expenses contained in Dr. James Gracey's Life Care Plan and charts (Exhibit 81) are reasonable and necessary.

Economic Damages – Past and Future Wage Loss,<br>Lost Earning Capacity, and Lost Home Services

70.   Mr. Nelson, Mr. Robert DeGrasse, Mr. Nelson's treating doctors and other witnesses, including Dr. James Gracey and Dr. Patricia Pacey, provided credible testimony and evidence concerning Mr. Nelson's past and future work, vocational status and outlook, and home services, and the nature and amount of his economic damages and losses relating thereto.

71.   The evidence shows that before his injury, Mr. Nelson was an outgoing and accomplished civil engineer who worked in executive leadership positions for complex operations.  Mr. Nelson was valedictorian of his high school class, attended the

U.S. Coast Guard Academy where he obtained a B.S. in civil engineering, and served as an officer in the Coast Guard.

72.   As an engineer, Mr. Nelson worked as an operations manager, facilities manager, and account manager in various entities.  At his job with AIMCO, Mr. Nelson was vice president of facilities and maintenance services, and had 29 regions that he managed (which were eventually consolidated into 16 regions).  He managed 2300 people who were in various management capacities at the properties throughout his regions.  Mr. DeGrasse, Mr. Nelson's manager while at AIMCO, testified that Mr. Nelson was superb at that job and was an ideal executive (on par with the best within the executive team), with phenomenal attention to detail and multitasking skills and excellent intellectual functioning.

73.   At the time of the bicycle incident, Mr. Nelson was working for Mr. DeGrasse at RD3 Sustainable Solutions in Colorado Springs as the head of facility management services.  Mr. DeGrasse testified that Mr. Nelson was great at this job, and excelled in maintaining and growing existing clients.

74.   Mr. Nelson's pre-injury earnings were approximately $100,000 annually. Mr. DeGrasse testified that Mr. Nelson was also entitled to profit sharing and bonuses.

75.   Following the bicycle accident, Mr. Nelson attempted to return to his old position and did a trial job with Mr. DeGrasse in January 2009.  As a result of the effects of the traumatic brain injury, Mr. Nelson performed poorly and failed to notice obvious deficiencies.  Mr. DeGrasse testified that the trial job was a great failure on Mr. Nelson's part, even though it involved the lower end of sophistication of RD3's work.

Mr. DeGrasse reluctantly concluded that Mr. Nelson could no longer perform his prior job duties, and later recommended that he pursue the job with Pikes Peak Library District that involved a significantly lower level of functioning and responsibility.

76.   Consistent with Mr. DeGrasse's testimony, Dr. Machanic testified that due to Mr. Nelson's permanent cognitive deficits caused by TBI from the accident, Mr. Nelson cannot return to his previous complex job requiring an ability to supervise and multitask.

77.   Dr. Gracey, an expert in the fields of vocational rehabilitation evaluation, counseling, and life care planning, summarized Mr. Nelson's professional vocational prognosis in his testimony.  He testified that Mr. Nelson went from a high level of functional capability in employment down to a fairly simple job doing maintenance for Pikes Peak Library District and supervising two other nontechnical repair people.  He further testified that in the future Mr. Nelson will not be able to hold a more complex or challenging job than the one he currently has, and it is very unlikely that he would be able to return to his former employment.  His cognitive and other problems have interfered with his ability to return to that higher level of functioning.

78.   After the bicycle accident, Mr. Nelson did some insurance work for about three weeks while he worked part-time as a self-employed landscaper.

79.   In March 2010, Mr. Nelson took a job as facilities supervisor for Pikes Peak Library District in Colorado Springs.  According to Dr. Gracey, this job is far below Mr. Nelson's past earnings level and capabilities.

80. Mr. Nelson's starting wage at Pikes Peak Library District was $18.86 hour, approximately $39,229 per year.

81. As the direct result of the bicycle accident, Mr. Nelson suffered substantial lost wages and will suffer from a diminished earning capacity for the rest of his life as the direct result of his injuries.

82. According to Dr. Pacey, an expert in economics and labor economics, Mr. Nelson also further suffered past lost home services and will in the future sustain damages for future lost home services.

83. Dr. Pacey testified that Mr. Nelson's past lost earnings and home services are calculated at $711,100. (*See* Exhibit 83.)  The net present value of future lost earnings is $1,122,400, and the net present value of the lost future home services is future home services is $90,600.  (*Id.*)

<u>Total Economic Losses</u>

84. According to the stipulations of the parties and the evidence presented at trial, Mr. Nelson's total past and future economic damages as a result of the bicycle accident are $2,964,763.59.

<u>Non-Economic Damages</u>

85. Because of the extreme and traumatic nature and extent of his injuries that required a month stay in the hospital, the many years he has continued to suffered from those injuries, the fact that he will suffer into the future as a result of those injuries, and the fact that he has endured significant, painful, and inconvenient treatment and will have to suffer such additional treatment into the future—all as credibly testified to by Mr.

Nelson, Ms. Varney, and witnesses called by Plaintiffs—Mr. Nelson has suffered (and will suffer into the future) significant damages for pain and suffering, loss of enjoyment of life, inconvenience, and mental suffering and anguish.

86.   Based on the clear and convincing evidence presented by Plaintiffs, Mr. Nelson has sustained non-economic damages in an amount over $1 million dollars as a direct and proximate result of the September 3, 2008, bicycle accident.

<u>Permanent Impairment and Disfigurement</u>

87.   As supported by the credible testimony of the witnesses called by the Plaintiffs in this case—in particular, Mr. Nelson's treating physicians, Plaintiffs' retained experts as well as Mrs. Varney and Mr. Nelson, and the documentary evidence presented, Mr. Nelson is permanently physically and mentally impaired and permanently disfigured as a result of the bicycle accident.  This is a compensable injury. Based on the evidence at trial, and in particular the testimony of Ms. Varney, Mr. Nelson's wife, Ken Sparks and Shirley Troyer, Mr. Nelson is a different person than he was before the accident.

88.   At his age, Mr. Nelson can anticipate at least 25.5 more years of living with these permanent impairments, and most significantly, his brain injury causing significant cognitive dysfunction, vision loss, facial/eye-lid dysfunction and disfigurement, and panhypopituitarism.

<u>Loss of Consortium - Elizabeth Varney</u>

89.   Mr. Nelson and Ms. Varney were husband and wife at the time Mr. Nelson was injured on September 3, 2008.  They remain husband and wife today.

90.   The bicycle accident that led to Mr. Nelson's disappearance for approximately 14 hours and the resulting severe injuries to Mr. Nelson was extraordinarily traumatic for Ms. Varney.  Suffering from the shock of seeing her husband at the hospital following the accident (having already been traumatized by having to report Mr. Nelson missing to the police then wondering through the night whether he was dead or alive), Ms. Varney collapsed and passed out.  Because of these physical manifestations of her emotional and mental distress, Ms. Varney incurred her own medical expenses in the amount of $1,425.

91.   According to the credible testimony of Ms. Varney and Mr. Nelson and others, the severe injuries Mr. Nelson sustained, the emergency, intensive critical care, and the rehabilitation treatment he received at the hospital, and the subsequent years of ongoing care and treatment that Ms. Varney has had to endure, has substantially and detrimentally affected her life with Mr. Nelson.  Mr. Nelson is not the same person as he was before the accident.  He is not the same cognitively or emotionally.  The realization that Mr. Nelson's brain injury and other injuries are permanent has been difficult.  Since the accident, Ms. Varney has lost significant care, comfort, and society, from Mr. Nelson.

92.   Ms. Varney had to care for Mr. Nelson for many months after he returned home.  She was required to coordinate James Nelson's medical care, be the primary person dealing with the medical providers, transport him to appointments, and deal with the health insurance companies regarding the payment for his treatment.  She testified that her whole life changed to support Mr. Nelson.

93.   Mr. Nelson's continuing physical and cognitive difficulties following the incident placed significant stress on Ms. Varney, affecting their daily lives.  Ms. Varney has had to endure Mr. Nelson's increased anger, depression. and low self-esteem.  Mr. Nelson has undergone a personality change associated with his brain injury.  Ms. Varney has difficulty having an adult conversation with Mr. Nelson and he is not the leader of the family that he used to be.  Mr. Nelson is often tired and has diminished energy.  He spends more time alone and away from the family, which Ms. Varney testified puts an emotional strain on their marriage.  Physical intimacy and affection in their marriage has diminished as the result of Mr. Nelson's injuries.  The recreational activities and travel that Mr. Nelson and Ms. Varney did before the accident have significantly diminished.

94.   Ms. Varney was also required to take on substantial additional responsibilities in the family and in the home as the result of Mr. Nelson's injuries, and continues to do so today.  Mr. Nelson is not able to help out with household chores like he used to, fix things around the house, or manage the finances without Ms. Varney's help.  He does not initiate spending time with the family, and has trouble with multitasking.  Ms. Varney was required to find employment because Mr. Nelson was unable to work for a significant period of time following his accident and because of Mr. Nelson's substantially reduced earning capacity.  The family is under significant financial strain. Ms. Varney has suffered significant stress following Mr. Nelson's injury and feels overwhelmed.

95.  As a direct and proximate result of Mr. Nelson suffering severe and permanent injuries at the hands of the Defendant, Elizabeth Varney has suffered a compensable loss of consortium.

## Causation

96.  Based on the credible evidence presented at trial, the injuries, damages, and losses claimed by Plaintiffs, as outlined above, were all directly and proximately caused by Mr. Nelson's bicycle accident on September 3, 2008.

97.  The September 3, 2008 bicycle accident and Mr. Nelson's resulting injuries, as previously found by the Court in the liability portion of the bifurcated trial, were directly and proximately caused by the United States' failure to use reasonable care to protect against a dangerous condition on its property.

98.  Based on the credible evidence presented at trial and as found by the Court, the United States' actions and inactions were the direct and proximate cause of James Nelson's and Elizabeth Varney's injuries, damages, and losses outlined in the findings of fact above.

99.  As previously found by the Court in the liability portion of the bifurcated trial, James Nelson was not at fault in causing his own injuries, damages, and losses.

## Administrative Tort Claims

100.  The parties stipulate that James Nelson's administrative tort claim stated on the SF-95 form was for $16,222,642.00.  They also stipulate that Elizabeth Varney's administrative tort claim stated on the SF-95 form was for $501,425.00.

II.    CONCLUSIONS OF LAW

     A.    Relevant Conclusions of Law Set forth in Liability Trial

       1.   The following Conclusions of Law from the Court's February 6, 2014 Findings of Fact, Conclusions of Law, and Order are relevant to the Damages Trial and Findings of Fact:

       2.   The FTCA is a limited waiver of the sovereignty of the United States permitting the United States to be sued.  *See United States v. Orleans*, 425 U.S. 807, 813 (1976).  "The FTCA lists many types of claims for which the United States has consented to be sued."  *Sydnes v. United States*, 523 F.3d 1179, 1183 (10th Cir. 2008).  "Included among those are claims for certain injuries caused by government employees acting within the scope of their employment."  *Id.*  Thus, the FTCA "waives sovereign immunity for actions against the United States resulting from injuries caused by the negligent acts of governmental employees while acting in the scope of their employment."  *Garcia v. United States Air Force*, 533 F.3d 1170, 1175 (10th Cir. 2008) (citing 28 U.S.C. § 1346(b)(1)). (February 6, 2014 Order, Conclusions of Law #1.)

       3.   Under the FTCA, the government can be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  Thus, the United States is liable "'in the same manner and to the same extent as a private individual under like circumstances.'"  *Tisdale v. United States*, 62 F.3d 1367, 1371 (11th Cir. 1995) (quoting 28 U.S.C. § 2674).  (February 6, 2014 Order, Conclusions of Law #2.)

4.   The duty of the United States in a tort action is defined in accordance with the law of the state where the negligence occurred.  *Richards v. United States*, 369 U.S. 1, 11 (1962).  Because the alleged negligence occurred in Colorado, the Court applies Colorado law.  *Levin v. United States*, ___ U.S. ___, 133 S. Ct. 1224, 1228 (2013). (February 6, 2014 Order, Conclusions of Law #3.)

5.   Plaintiffs sue the United States for personal injuries under the Colorado Premises Liability Act ["CPLA"], which Act defines the duty that landowners owe to persons on their property and holds landowners responsible for causing injury to persons on their property as specified therein.  *See* Colo. Rev. Stat. § 13-21-115. (February 6, 2014 Order, Conclusions of Law #4.)

6.   Venue is proper in this Court.  (*Id.*, Conclusions of Law #5.)

7.   In conclusion, I find that the USAFA is liable as a landowner under the CPLA for the injuries, damages, and losses that Mr. Nelson sustained.  I also note as to the injuries, damages and losses claimed by Mr. Nelson's wife that "[a] loss of consortium claim is derivative of the underlying injury claim and therefore subject to the same defenses".  *Schwindt v. Hershey Foods Corp.*, 81 P.3d 1144, 1148 (Colo. App. 2003).  Thus, it appears the United States is also liable to Mrs. Nelson for any damages she sustained.  Since the United States is liable under Colorado state tort law, the United States is liable to Plaintiffs for their damages under the Federal Tort Claims Act. 28 U.S.C. §§ 1346(b), 2674.  No evidence has yet been presented, however, as to damages.  (February 6, 2014 Order, Conclusions of Law #78.)

8.  Based on the foregoing, I find that the United States has failed to establish its affirmative defense of comparative fault on the part of Mr. Nelson.  (*Id.*, Conclusions of Law #86.)

9.  The United States is liable under the CPLA for injuries, losses or damages sustained by Mr. Nelson and Elizabeth Varney in regard to Mr. Nelson's accident on September 3, 2008.  (*Id.*, Conclusion and Order Of The Court #5.)

10.  The Plaintiff, James Nelson, was not at fault in causing his own injuries, damages, and losses.  (*Id.*, Conclusion and Order of The Court #6.)

B.     Additional Conclusions of Law

1.  Under the Federal Tort Claims Act ["FTCA"], damages are determined by the law of the State where the tortious act was committed.  28 U.S.C. §1346(b); *Hatahley v. United States*, 351 U.S. 173, 182 (U.S. 1956); *Moore v. United States Bureau of Prisons*, No. 97-3006, 1997 WL 687692, at *1 (10th Cir. Oct. 30, 1997).

2.  The tortious action in this case was committed in the State of Colorado. Therefore, Colorado state law concerning damages will apply, subject to certain limitations on damages contained in the FTCA.  (No punitive damages or pre-judgment interest may be awarded under the FTCA, 28 U.S.C. § 2674.)

Damages Generally

3.  "Trial courts are vested with broad discretion in awarding damages, and appellate courts do not lightly engage in a review of a trial court's actions."  *Dolenz v. United States*, 443 F.3d 1320, 1321 (10th Cir. 2006).

4.   Under Colorado law, once the fact of damage has been established with the requisite degree of certainty, uncertainty as to the amount of damages will not bar recovery.  *Sonoco Prods. Co. v. Johnson*, 23 P.3d 1287, 1290 (Colo. App. 2001); CJI-Civ 5:6.  The fact finder is to use their best judgment based on the evidence. CJI-Civ 5:6.

### Life Expectancy

5.   "In all civil actions, special proceedings, or other modes of litigation in courts of justice or before magistrates or other persons having power and authority to receive evidence, when it is necessary to establish the expectancy of continued life of any person from any period of such person's life, whether he is living at the time or not, the table set out in section 13-25-103 shall be received as evidence, together with other evidence as to health, constitution, habits, and occupation of such person of such expectancy."  Colo. Rev. Stat. § 13-25-102.

6.   At the beginning of this trial, Mr. Nelson was 55 years old.  The parties stipulate that the mortality table contained in Colo. Rev. Stat. §13-25-103 provides evidence that his life expectancy was 25.5 years.  This expectancy is taken from the tables of life expectancy which are part of Colorado law.  This table of life expectancy is not conclusive but may be considered together with other evidence relating to the plaintiff's health, habits, and occupation.  CJI-Civ 5:5.

### Burden of Proof

7.   James Nelson and Elizabeth Varney have the burden of proving, by a preponderance of the evidence, the nature and extent of their damages.  CJI-Civ. 6:1.

8.   Proof of a fact "by a preponderance of the evidence" means "proof which leads the [trier of fact] to find that the existence of the contested fact is more probable than its nonexistence." *Page v. Clark*, 197 Colo. 306, 317 (Colo. 1979) (citing McCormick, The Law of Evidence, 2d Edition, West 1972 (§ 339)).

9.   The proper test is whether there is a reasonable basis in the evidence from which the finder of fact may compute damages.  *Accutool Precision Machining, Inc. v. Denver Metal Finishing*, 680 P.2d 861, 864 (Colo. App. 1984).

10.   For James Nelson, to recover from the United States on his claim of premises liability, the fact finder must find that he sustained injuries, damages, or losses caused by the Defendant.  The Court has already found that the United States is liable under the CPLA for injuries, losses or damages sustained by Mr. Nelson and Elizabeth Varney in regard to Mr. Nelson's accident on September 3, 2008.  The nature and amount of damages Mr. Nelson sustained that were caused by the Defendant must now be determined.

<u>Categories of Damages</u>

11.   There are three separate categories of loss for which damages may be awarded in a personal injury action in Colorado—economic damages, noneconomic damages, and damages for physical impairment or disfigurement.  *Cooley v. Paraho Dev. Corp.*, 851 P.2d 207, 210 (Colo. App. 1992); CJI-Civ 6:1.

12.   In determining the damages to be awarded to James Nelson in this case, the law requires the Court as fact finder to consider the following:

a.  Any noneconomic losses or injuries which plaintiff has had to the present time or which plaintiff will probably have in the future, including: physical and mental pain and suffering, inconvenience, emotional stress, impairment of the quality of life, and inconvenience.  In considering damages in this category, the fact finder shall not include actual damages for physical impairment or disfigurement, because these damages, if any, are to be included in a separate category.

b.  Any economic losses or injuries which plaintiff has had to the present time or which plaintiff will probably have in the future, including: loss of earnings or damage to his ability to earn money in the future, reasonable and necessary medical, hospital, and other expenses.  In considering damages in this category, the fact finder shall not include actual damages for physical impairment or disfigurement, since these damages, if any, are to be included in a separate category.

c.  Any physical impairment or disfigurement.  In considering damages in this category, the fact finder shall not include damages again for losses or injuries already determined under either numbered paragraph 1 or 2 above.

CJI-Civ 6:1.

13.  Based on the evidence presented at trial and the findings of fact above, Plaintiff James Nelson has met his burden of proof to establish damages under each of the three categories of damages.

<u>Economic Damages</u>

14.  The evidence established at trial by Plaintiffs' credible witnesses establishes by a preponderance of the evidence that James Nelson sustained a loss of

earnings and damage to his ability to earn money in the future, as well as reasonable and necessary medical, hospital, and other expenses, and will continue to sustain these losses into the future. "In tort the injured party may recover such damages as are the natural and probable result of the injury sustained by virtue of the tortious act, including loss of future earnings." *Thompson v. Tartler*, 166 Colo. 247, 255 (Colo. 1968).

15.   Based on the evidence presented at trial and the findings of fact above, and applying Colorado law, I conclude that Plaintiff has incurred and should be awarded $2,964,763.59 in economic damages, which consists of past medical expenses to date totaling $262,563.59 (which is stipulated to by the parties), future medical and life care expenses totaling $778,100 (also stipulated to by the parties), past lost earnings and home services of $711,100, future lost earnings of $1,122,400, and the net present value of the lost future home services of $90,600. I find from the evidence presented at trial that these damages were directly and proximately caused by the acts of the Defendant. The amount and reasonableness of these damages are supported by the credible testimony of the Plaintiffs and Plaintiffs' witnesses and experts, including the testimony of Drs. Gracey and Pacey. Plaintiffs have proven these economic damages by a preponderance of the evidence.

Non-Economic Damages

16.   "Noneconomic loss or injury" is defined as nonpecuniary harm including pain and suffering, inconvenience, emotional stress, and impairment of the quality of life. Colo. Rev. Stat. §13-21-102.5(2)(b).

17.   In any civil action (other than medical malpractice actions) in which damages for noneconomic loss or injury may be awarded, the amount of non-economic damages that can be awarded are capped under Colorado law.  Colo. Rev. Stat. §13-21-102.5(3)(a).  That cap, however, can be exceeded if this Court finds justification by clear and convincing evidence to exceed that cap.  *Id*.

18.   Proof by "clear and convincing evidence" is proof which persuades the trier of fact "that the truth of the contention is 'highly probable.'"  *Page v. Clark*, 197 Colo. 306, 318 (Colo. 1979).

19.   The limitations on damages set forth in Colo. Rev. Stat. §13-21-102.5(3)(a) have been adjusted for inflation as of January 1, 2008.  The adjusted limitation on damages as of January 1, 2008, shall be the limitation applicable to all claims for relief that accrue on and after January 1, 2008.  Colo. Rev. Stat. §13-21-102.5.  The Plaintiffs' claims in this case accrued after January 1, 2008.

20.   The Court takes judicial notice that the current statutory damages cap, as stated on the Colorado Secretary of State's Certificate of adjusted damage amounts, is $468,010, which can be increased by the Court to a maximum of $936,030 on clear and convincing evidence.

21.   Based on the evidence at trial and as outlined in this Order, I find justification by clear and convincing evidence to exceed the statutory cap and to award the maximum amount that can be awarded under Colorado law.  Thus, I find that Mr. Nelson has incurred and should be awarded $936,030 to compensate him for his non-economic damages.  I further find that these damages were directly and

proximately caused by the acts of the Defendant. The amount and reasonableness of these damages are supported by the credible clear and convincing testimony of the Plaintiffs and Plaintiffs' witnesses and experts, who have shown in detail the extreme deleterious nature and extent of Mr. Nelson's injuries, the years of past suffering and the future suffering Mr. Nelson will have to endure for the rest of his life in having to live with his permanent injuries, and the limitations caused and treatment necessitated thereby, all of which has caused Mr. Nelson extensive pain and suffering, loss of enjoyment of life, inconvenience, and mental and emotional suffering and anguish.

### Permanent Impairment and Disfigurement

22.  The court in *Pringle v. Valdez*, 171 P.3d 624 (Colo. 2007), discussed the rationale and necessity of awarding permanent impairment and disfigurement damages:

> "[P]hysical impairment and disfigurement damages are often the most serious and damaging consequences of a defendant's negligence or misconduct.". . . Thus, we noted that a separate category for physical impairment and disfigurement damages is a necessary and important element in making an injured plaintiff whole:

>> If someone tortiously inflicts a permanent injury on an other he or she has taken away something valuable which is independent and different from other recognized elements of damages such as pain and suffering and loss of earning capacity. For this invasion the plaintiff should be awarded a separate sum in addition to the compensation for the other elements and such recovery should be proportional to the severity of the injury.

>         ***

> The principle that a victim is entitled "to have a sound body and mind throughout his or her life" provides the rationale for this distinction. . . . Physical impairment and disfigurement constitute a permanent injury irrespective of any pain or inconvenience. The tortfeasor caused the victim

to have a permanent injury that she did not have before. *See Thompson v. Nat'l R.R. Passenger Corp.*, 621 F.2d 814, 824 (6th Cir. 1980) ("Permanent impairment compensates the victim for the fact of being permanently injured whether or not it causes any pain or inconvenience; pain and suffering compensates the victim for the physical and mental discomfort caused by the injury.").

*Id.* at 531 (internal citations omitted).

23. The non-economic damages cap does not limit the recovery of compensatory damages for physical impairment or disfigurement. Colo. Rev. Stat. § 13-21-102.5(5).

24. Based on the evidence presented at trial and the findings of fact above, and applying Colorado law, I conclude that Plaintiff James Nelson has incurred and should be awarded $3,000,000 to compensate him for his permanent impairment and disfigurement. I find that these damages were directly and proximately caused by the acts of the Defendant. The amount and reasonableness of these damages are supported by the credible testimony of the Plaintiffs and Plaintiffs' witnesses and experts, who have shown by a preponderance of the evidence that Mr. Nelson has suffered significant and life-altering permanent impairments and disfigurement. This includes a severe traumatic brain injury resulting in permanent organic changes in Mr. Nelson's brain and causing significant and permanent cognitive disability and dysfunction, permanent vision loss, permanent disfiguring scarring on Mr. Nelson's face and permanent abnormal function and appearance of Mr. Nelson's right eye-lid, permanent trauma-induced endocrine abnormality, and significant jaw and mouth

trauma which will be permanent unless the extensive jaw surgery, orthodontic work, and dental reconstruction are completed.

Loss of Consortium

25.  "Derivative claims are unique in that they depend entirely upon the right of the injured person to recover."  *Colo. Comp. Auth. v. Jorgensen*, 992 P.2d 1156, 1164 (Colo. 2000).  Generally, loss of consortium is a derivative claim, but it also constitutes a separate injury.  *Lee v. Colo. Dep't of Health*, 718 P.2d 221, 230 (Colo. 1986).

26.  For Elizabeth Varney to recover from the United States on her claim of loss of consortium for injury to her spouse, James Nelson, the fact finder must find the Defendant caused injury to Mr. Nelson, which resulted in a loss of consortium to his spouse, Mrs. Varney.  The Court has already found Defendants liable to the Plaintiffs James Nelson and Elizabeth Varney for their damages.  The Court finds that Mr. Nelson and Mrs. Varney were married at the time Mr. Nelson was injured.  The Court must now determine the nature and amount of Mrs. Varney's damages.

27.  In determining loss of consortium damages, the fact finder must consider the following:

    a.    Any noneconomic damages in the form of loss of affection, society, companionship, and aid and comfort of the injured spouse, and

    b.    Economic damages for loss of household services the injured spouse would have performed and any resulting expenses which plaintiff has had or which plaintiff will have in the future.

CJI-Civ 6:6; *see also Schell v. Navajo Freight Lines, Inc.*, 693 P.2d 382, 385 (Colo. App. 1984).

28.  "Consortium consists of rights arising out of a marital relationship, which by their nature are intangible.  *Schell*, 693 P.2d at 385.  "Therefore, loss of consortium is not subject to exact monetary proof; rather, the amount of the award is assessed by the [trier of fact] based upon 'their own observation, experience, and knowledge, conscientiously applied to the facts and circumstances of the case.'"  *Id.* (quotation omitted).

29.  Based on the evidence presented at trial and the findings of fact above, and applying Colorado law, I conclude that Plaintiff Elizabeth Varney has incurred economic damages of 1,425.  I also find that she should be awarded non-economic damages in the amount of $400,000 to compensate her for her loss of consortium.  The total amount of damages awarded to Ms. Varney on her loss of consortium claim is $401,425.  I find these damages were directly and proximately caused by the acts of the Defendant and the injuries sustained by Mr. Nelson.  The amount and reasonableness of these damages are supported by the credible testimony of the Plaintiffs and Plaintiffs' witnesses and experts, who have shown that Mrs. Varney has lost, and will continue to lose in the future, the affection, society, companionship, and aid and comfort of Mr. Nelson as a result of his injuries and, by clear and convincing evidence, has suffered extensive derivative non-economic losses.  Mrs. Varney has also shown by a preponderance of the evidence that she has incurred direct economic damages as a result of Mr. Nelson's injuries.

ORDER

In conclusion, it is hereby adjudged and ORDERED:

1.  The Court has jurisdiction over Plaintiffs' claims under the Federal Tort Claims Act.

2.  The United States is liable under the Colorado Premises Liability Act for injuries, losses or damages sustained by Mr. Nelson and Elizabeth Varney in regard to Mr. Nelson's accident on September 3, 2008.

3.  Defendant's action and inaction, for which it is liable under the Colorado Premises Liability Act, were the direct and proximate cause of the Plaintiffs' injuries, losses, and damages.

4.  Defendant is 100% liable to the Plaintiffs for their damages.

5.  Plaintiff James Nelson is hereby awarded economic damages in the amount of $2,964,763.59.

6.  Plaintiff James Nelson is hereby awarded noneconomic damages in the amount of $936,030, based on the clear and convincing evidence of these damages.

7.  Plaintiff James Nelson is hereby awarded permanent impairment and disfigurement damages in the amount of $3,000,000.

8.  The total amount of damages awarded to Mr. Nelson is $6,900,793.53.

9.  Plaintiff Elizabeth Varney is hereby awarded $401,425 for her loss of consortium damages.

10.  Plaintiffs are awarded post-judgment interest at the rate allowed by law.

11.  Plaintiffs are awarded their costs incurred in bringing this action.  Plaintiffs shall provide their Bill of Costs to the Court in accordance with the Federal Rules of Procedure.

Dated:  May 14, 2014.

BY THE COURT:


/s/ Wiley Y. Daniel
WILEY Y. DANIEL,
SENIOR UNITED STATES DISTRICT JUDGE