IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   11-cv-02953-WYD-CBS

JAMES NELSON and
ELIZABETH VARNEY,

        Plaintiffs,

v.

UNITED STATES OF AMERICA,

        Defendant.

---

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER AS TO
APPLICABILITY OF EXCEPTION TO COLORADO RECREATIONAL USE STATUTE**

---

I.    <u>INTRODUCTION</u>

        James Nelson was seriously injured in a bicycle accident on September 3, 2008,

when he encountered a sinkhole/washout on a bike path on United States Air Force

Academy ["Academy"] land.  He sued under the Federal Tort Claims Act ["FTCA"] for

damages.

        This case proceeded to a liability trial to the Court on December 2-5, 2013.  In my

Findings of Fact, Conclusions of Law and Order of February 6, 2014 (ECF No. 132)

["February 2014 Order"], I found the United States liable to Plaintiffs under the Colorado

Premises Liability Act for injuries, losses, and damages sustained by Mr. Nelson arising

from his accident.  I found that Mr. Nelson was an invitee and/or a licensee on the

Academy property at the time of the September 3, 2008 accident.  I also found the

United States liable for the injuries, damages, and losses sustained by Mr. Nelson's wife

on her loss of consortium claim.  While the United States argued that it was entitled to immunity under the Colorado Recreational Use Statute ["CRUS"], I found that the CRUS was not applicable because the Academy did not intend either directly or indirectly for the path where the accident occurred to be used for recreational purposes.

A damages trial was held on April 21-25, 2014.  In Findings of Fact and Conclusions of Law issued on May 14, 2014 (ECF No. 180) ["May 2014 Order"], I found that damages had been established in the amount of $6,900,793.53 for James Nelson and $401,425 for his wife Elizabeth Varney.  Judgment was entered for Plaintiffs in the amount of $7,302,218.53, plus post-judgment interest and costs.  (ECF Nos. 181, 191.)

The United States appealed my February 2014 Order as to the ruling that it could not take advantage of the liability limitations under the CRUS because the Academy did not intend to open the path for public recreational use.  The Tenth Circuit reversed my decision on this issue, finding that the CRUS applied and that Mr. Nelson was a permissive user of the path.  Although the Academy did not directly permit use of the path, the Tenth Circuit found that Mr. Nelson was indirectly permitted to use the path.  (Tenth Circuit Opinion of June 25, 2016 ["Tenth Circuit Op."], ECF No. 207, p. 8.)

The Tenth Circuit found on that issue that Academy personnel knew for many years that the public used the path for recreational purposes, and knew the "Bicycle Path" sign was placed near the entrance to the Academy boundaries that gave the impression the path was open for general public use.  (Tenth Circuit Op., p. 8.)  It also noted that "prior to the accident the Colorado Department of Transportation offered to remove the sign, an offer the Academy ignored", and "the Academy never prevented usage of the path or took steps to close it off to the public."  (*Id.*)  It was enough "that

the Academy's purposeful actions implicitly allowed or acquiesced in Mr. Nelson's use of the path." (*Id.*, p. 10.) "Its knowledge that the path was used by the general public, combined with its knowledge of the sign and its refusal to remove it, is enough to demonstrate permission under the Act." (*Id.*) In short, the Academy "knew of the public's use of the path, and declined the opportunity to end that use." (*Id.*, p. 11.)

In so holding, the Tenth Circuit held that the United States was not liable for negligent maintenance of the path. (10th Cir. Op., p. 2.) However, it remanded the case to determine if an exception to the liability limitations of the CRUS applied — whether the United States' actions constituted a "willful or malicious failure to guard or warn against a known dangerous condition, use, structure, or activity likely to cause harm . . . ." (*Id.*, pp. 2, 12.) It found that this issue had not been adjudicated and "that the district court should decide this issue in the first instance." (*Id.*, pp. 11-12.)

Having reviewed the entirety of the record and the evidence, counsel's arguments, the parties' proposed findings of fact and conclusions of law, my Previous Findings of Fact, Conclusions of Law and Orders, and the Tenth Circuit's Order, I now enter the following Findings of Fact, Conclusions of Law, and Order.[1]

II.    FINDINGS OF FACT

A.    Accident Background

1.    This case arose from a biking accident that occurred on an asphalt bicycle paved path ("the asphalt path" or "the path") located on real property owned by the Academy in Colorado Springs, Colorado. (February 2014 Order, Undisputed Facts ¶ 1.)

---

[1] I incorporate by reference my previous Findings of Fact and Conclusions of Law, but restate a number of them herein for ease of reference and for clarity regarding the remanded issue.

2.      The biking accident occurred on September 3, 2008.  (February 2014 Order, Undisputed Facts ¶ 2.)  While riding his bicycle on the asphalt path, Mr. Nelson encountered a sinkhole/washout.  (*Id.*, ¶ 38; Findings of Additional Fact ¶¶ 10, 13.) Mr. Nelson lost control of his bicycle (*id.*, Findings of Additional Fact ¶ 13), and was flung onto the asphalt path.  (*See* Pl.'s Ex. 9.)

3.      Mr. Nelson sustained serious injuries as a result of the bicycle accident. (February 2014 Order, Findings of Additional Fact ¶ 7.)  He was hospitalized for a month, and received ongoing and continuing medical and rehabilitative treatment thereafter.  (*Id.* ¶¶ 3, 8.)

4.      As a result of the crash, Mr. Nelson suffered multi-system permanent injuries, including a brain injury, vision loss, permanent scarring and disfigurement, endocrine system damage, and the need for extensive facial orthopedic reconstructive surgery. He suffered economic damages, non-economic damages, permanent impairment, and disfigurement in the amount of $6,900,793.53.  Mr. Nelson's wife, Ms. Varney, suffered loss of consortium damages in the amount of $401,425.  (See May 2014 Order.)

5.      Mr. Nelson was not at fault in causing his own injuries, damages and losses. (February 2014 Order, Conclusions of Law ¶¶ 81-86.)

        B.      <u>Background Regarding Asphalt Path</u>

6.      The asphalt path was located on the east side of Colorado Interstate 25 ["I-25"], paralleling the highway, near the eastern boundary of the Academy.  (February 2014 Order, Undisputed Facts ¶ 3.)  The Academy encompasses approximately 18,500 acres.  (*Id.* ¶ 6.)

7.      The Academy knew, prior to Mr. Nelson's accident on September 3, 2008, that the path existed on its property.  (February 2014 Order, Findings of Additional Fact ¶ 37.)

8.      The Academy also knew, prior to September 3, 2008, that members of the public used the path where Mr. Nelson was injured.  (February 2014 Order, Findings of Additional Fact ¶ 43; *see also* Pl.'s Trial Ex. 107, Requests for Admission # 8; Tenth Circuit Op., p. 11.)

9.      In July 1958, the Academy granted an easement to the Colorado Department of Highways (now the Colorado Department of Transportation) ["CDOT"] for the construction of a highway, designated currently as I-25.  (February 2014 Order, Undisputed Facts ¶ 8.)  The Academy also granted an easement to Mountain View Electric Association ["MVEA" or "Mountain View Electric"] in this same area to build and maintain an overhead utility line.  (*Id.* ¶ 9.)

10.     The asphalt path was located within the CDOT easement.  (February 2014 Order, Undisputed Facts ¶ 10.)   The easement granted to CDOT and the Memorandum of Understanding and contractual obligations related to that easement do not discuss who is responsible for maintenance of the path.  (*Id.*, Findings of Additional Fact ¶ 28.)

11.     CDOT representatives Michael Shay and Russell Bircher testified that it was not CDOT's responsibility to maintain the path, and no evidence was presented to the contrary.  (February 2014 Order, Findings of Additional Fact ¶ 29.)  Mr. Bircher testified that if CDOT had wanted to do any work on the path, it would have had to contact the Academy for permission since the path was on Academy property.  (*Id.* ¶ 30.)

12.     There is also no evidence that MVEA was responsible for maintenance of the path. (February 2014 Order, Findings of Additional Fact ¶ 32.)

13.     The Academy, through its representative Johnny Van Winkle, told the public immediately after Mr. Nelson's accident that it was the Academy's responsibility to fix the path. (February 2014 Order, Findings of Additional Fact ¶ 21.) He also said that upkeep of the property was the Academy's responsibility. (*Id.*)

14.     Consistent with Mr. Van Winkle's testimony, immediately following Mr. Nelson's accident, the Academy filled the sinkhole/washout on the path with rip-rap, covered it in gravel, and took other action to fix the sinkhole. (February 2014 Order, Findings of Additional Fact ¶ 98; *see also* Pl.'s Ex. 10.)[2]

15.     The Academy maintained a series of official recreational and multi-use trails. (February 2014 Order, Undisputed Facts ¶ 14.) The asphalt path where the accident occurred was not part of the Academy's official trail system. (*Id.* ¶ 16.) All of the official trails were unpaved, and were located west of I-25. (*Id.*, Findings of Additional Fact ¶ 51.) The path was also not identified on the Academy's Real Property Record, and was not designated or maintained as a recreational trail. (*Id.* ¶ 49, Undisputed Facts ¶ 13.)

---

[2] As noted in my February 2014 Order, this evidence was not offered or admitted at trial to show negligence, culpable conduct, a defect in the path's design or construction or a need for warning, but for another purpose. It was offered to show the United States' intent with regard to use of the path by the public for recreational purposes. (February 2014 Order, Conclusions of Law ¶ 59.) Here, I am considering it only for purposes of determining whether the United States could have warned or guarded against the path prior to the accident, not for whether the condition was dangerous or whether there was actually a need for a warning or instruction. *See Leprino Foods Co. v. Factory Mut. Ins. Co.*, 653 F.3d 1121, 1125 (10th Cir. 2011) ("Rule 407 only prohibits the admission of evidence of subsequent remedial measures for the purposes of 'negligence, culpable conduct, a defect in a product, . . .or a need for a warning or instruction. . . .The rule permits the evidence's admission for other purposes. . . .") (quotation and internal footnote omitted).

16.     The Academy had a Trails Management Plan that provided guidance about the proper maintenance to be performed on official trails.  (February 2014 Order, Undisputed Facts ¶ 17.)  The Plan did not apply to unofficial trails.  (*Id.* ¶ 18.)

17.     In 2007, CH2M Hill Academy Services ["CHAS"] entered into a contract with the Academy.  (February 2014 Order, Findings of Additional Fact ¶ 34.)  The CHAS Contract required CHAS to maintain only those paths and trails that were identified on the Academy's Real Property Record.  (*Id.* ¶ 35.)  Since the asphalt path on which the biking accident occurred was not on the Academy's Real Property Record, maintenance of the path did not fall within the scope of the CHAS contract.  (*Id.*, ¶ 36.)

18.     The path has not been actively maintained by the Academy.  (February 2014 Order, Findings of Additional Fact ¶ 42.)

19.     Jeffrey Thoma, the head of Academy security, did not monitor the path. (February 2014 Order, Undisputed Facts ¶ 11.)

> C.     <u>Facts Relevant to CRUS Exception for Willful or Malicious Failure to Guard or Warn Against a Known Dangerous Condition, Use,  Structure, or Activity Likely to Cause Harm</u>
>
>> i.     <u>Dangerous Condition Likely to Cause Harm</u>

20.     The sinkhole that Mr. Nelson encountered during the accident was the result of wash-out/erosion problems in the area.  (February 2014 Order, Findings of Additional Fact ¶ 74.)  More specifically, the sinkhole was the result of off-site water flow onto Academy property that overwhelmed the culvert running under the path, causing a washout.  (*Id.* ¶ 75.)

21.     Off-site water flow onto Academy property in the area of the asphalt path was a known condition and problem that the Academy had been investigating,

documenting, and addressing for many years before September 3, 2008. (February 2014 Order, Findings of Additional Fact ¶ 76.)

22.     The sinkhole/washout encompassed the entire width of the asphalt path. (February 2014 Order, Undisputed Facts ¶ 39; *see also* Pls.' Exs. 8, 9–2.)

23.     The sinkhole/washout was on a path used by the public to walk, jog, and bicycle. (February 2014 Order, Undisputed Facts ¶ 27; Findings of Additional Facts ¶¶ 74, 87.)

24.     Mr. Nelson fell into the sinkhole while riding his bicycle on the path. (February 2014 Order, Undisputed Facts ¶ 38.) He was flung onto the path. (*See* Pl.'s Ex. 9.)

25.     Analysis of Mr. Nelson's bicycle by Defendant's expert, Mr. Nicholas Ault, indicates that Mr. Nelson struck the sinkhole with sufficient force to cause substantial damage to various parts of the bicycle. (February 2014 Order, Undisputed Facts ¶ 31.)

26.     Dr. Brian Mihlbachler, who functioned for all intents and purposes as an Academy employee as explained below, testified that the sinkhole was large and readily visible during the day. However, third party witness Jesse Kurtz, who encountered the sinkhole while jogging the morning after Mr. Nelson's accident, thought the sinkhole was water until he was significantly closer to it. (February 2014 Order, Findings of Additional Fact ¶¶ 23, 24.) I previously found, and reaffirm, that Mr. Kurtz's testimony was credible. (*Id.*, Conclusions of Law ¶ 83; *see also* Pl.'s Ex. 8.) Moreover, photographs of the site indicated the washout/sinkhole was located in low area near bushes and other vegetation that created shadows. (*See* Pl.'s Exs. 8-1, 8-2, 8-4, 8-5.) Accordingly, I find that the evidence shows that the nature of the sinkhole/washout was difficult to ascertain by users of the path.

27.     Academy representative Jeffrey Thoma testified that the condition of the asphalt path with the sinkhole on September 3, 2008, was dangerous and hazardous for users of the path.  (February 2014 Order, Findings of Additional Fact ¶ 77.)  The Academy's Rule 30(b)(6) representative Greg Long testified that the sinkhole was a dangerous emergency situation that required immediate action and he believed that something had to be done on an emergency basis because of safety considerations.  (*Id.*, ¶ 79.)

28.     The condition of the asphalt path with a sinkhole/washout did not meet Academy safety standards.  (February 2014 Order, Findings of Additional Fact, ¶ 78.)

29.     Dr. Mihlbachler testified that the condition of the path with the sinkhole would be a safety hazard for users of the path if it were an official Academy trail.  Thus, if it were an official trail, he would have reported the condition of the path to maintenance to get it repaired.  (February 2014 Order, Findings of Additional Fact, ¶¶ 90, 93.)

ii.     The Academy's Knowledge

a.     Knowledge of the Path and Its Recreational Use

30.     The path was located within the boundaries of the Academy property, and could be seen from I-25.  (February 2014 Order, Undisputed Facts ¶¶ 25, 40.)  It was located within and on the Academy's real property.  (*Id.*, Findings of Additional Fact ¶ 25.) Aerial photographs (Ex. 13) suggest the path has existed on Air Force Property since at least the 1960s.  (*Id.* ¶ 39.)

31.     Before Mr. Nelson's injury, the Academy knew that members of the public used the path where Mr. Nelson was injured.  (February 2014 Order, Findings of Additional Fact ¶ 37.)  The path was used by members of the public for recreational purposes, such as walking, jogging, and bicycling.  (*Id.*, Undisputed Facts ¶ 27.)

32.     There is evidence of a course of conduct and usage in connection with the asphalt path before Mr. Nelson's accident, *i.e.*, the evidence showed that the Academy knew that people were using the path for recreational purposes and did not affirmatively preclude people from its use.  (February 2014 Order, Conclusions of Law ¶ 74; Tenth Cir. Op., p. 8.)

33.     Dr. Brian Mihlbachler knew of the existence and condition of the path.  (February 2014 Order, Findings of Additional Fact ¶ 86.)

34.     Dr. Mihlbachler had seen five to six people use the path for walking, jogging, and biking prior to September 3, 2008.  (February 2014 Order, Findings of Additional Fact ¶ 87.)

35.     The public, including Mr. Nelson, could access the asphalt path before September 3, 2008, because there were no barricades, barriers, or fences to block the entrance to the path.  (February 2014 Order, Findings of Additional Fact ¶ 48.)

36.     Mr. Nelson had used the path before his accident, and knew that other people used the path.  (February 2014 Order, Conclusions of Law ¶ 75.)  He believed that the Academy permitted him and other members of the public to use the path for recreational purposes.  (*Id.*, Findings of Additional Fact ¶ 12.)

37.     The Academy did not designate or maintain the path as a recreational trail.  (February 2014 Order, Findings of Additional Fact ¶ 49.)  It also did not take any affirmative action or steps to make the asphalt path available to the public or James Nelson.  (*See id.* ¶¶ 52, 53, 55, 56.)  It did not intend for the path to be a recreational trail, and it was not authorized for recreational use.  (*Id.* ¶¶ 56, 57.)

38.     Despite considering the path closed to the public and considering public users of the path to be unauthorized or trespassers, the Academy took no action prior to September 3, 2008, to prevent the public from entering its property to use the asphalt path.  (*Id.*, Undisputed Facts ¶ 19; Findings of Additional Fact ¶ 59.)  The Academy also never prevented usage of the path or took steps to close it off to the public.  (Tenth Circuit Op., p. 8; *see also* February 2014 Order, Findings of Additional Fact ¶ 64.)

39.     While there were "Warning" signs prohibiting entry to Academy property posted around the perimeter of the base, there is no evidence that they were conspicuous to persons entering the property to access the asphalt path.  (February 2014 Order, Findings of Additional Fact ¶ 46.)

40.     At the time Mr. Nelson was injured on September 3, 2008, the north entrance to the asphalt path was marked with a sign that read: "Bicycle Path, No Motorized Vehicles."  (February 2014 Order, Undisputed Facts ¶ 20.)  The United States knew the "Bicycle Path" sign was placed near the entrance to Academy boundaries, which gave the impression the path was open for general public use.  (Tenth Circuit Op., p. 8.)  The sign was located near an opening in the Academy's boundary fence, through which access to the path was possible.  (February 2014 Order, Findings of Additional Fact ¶ 67.)  There was a similar sign near the south entrance to the path.  (*Id.* ¶ 68.)

41.     Academy representatives Debbie Barrett and Greg Long testified that because of the existence and placement of the "Bicycle Path, No Motorized Vehicles" signs, third parties would reasonably believe that they were authorized or invited to go on the path and ride their bicycle.  (February 2014 Order, Findings of Additional Fact ¶ 73.)

42.     A reasonable person would likely believe the Bicycle Path signs were, at the very least, authorized by the Academy, given that the signs were next to and clearly related to the paved path on Academy property.  (February 2014 Order, Conclusions of Law ¶ 75.)  Academy officials admitted that there is no way the public could have known that the signs were not Academy signs.  (*Id.*)

43.     The evidence supports a finding that the Bicycle Path signs would allow members of the public, including Mr. Nelson, to reasonably believe that the Academy consented to the public's use of the path for biking.  (February 2014 Order, Conclusions of Law ¶ 75.)   This is also supported by the fact that the path was open to and accessible by the public through an engineered entry point/opening in the Academy's boundary fence.  (*Id.*)   Moreover, the "Bicycle Path" supports a finding of an implied representation by the Academy that the public was requested, expected, or intended to enter or remain on the asphalt path.  (*Id.* ¶ 69.)

44.     The Academy did not remove the "Bicycle Path, No Motorized Vehicles" signs prior to September 3, 2008, though it had the opportunity to do so, and could have done so at any time without the need for a work order.  (February 2014 Order, Undisputed Facts, ¶¶ 21-26, Findings of Additional Fact ¶¶ 97-99; Tenth Circuit Op., p. 8.)

45.     Prior to Mr. Nelson's injury, CDOT "offered to remove the sign, but the Academy ignored that offer."  (Tenth Circuit Op., p. 8.)

### b.     Knowledge of the Condition at Issue

46.     Dr. Mihlbachler was employed from 2000 - 2008 by the United States Fish and Wildlife Service as a biologist.  (February 2014 Order, Undisputed Facts ¶ 40.)  He was stationed at the Academy as a Natural-Resources Manager (*id.* ¶ 41) pursuant to the

Sikes Act, which tasks federal agencies with the development and implementation of natural resource management plans. (*See* United States' Proposed Findings of Fact and Conclusions of Law and Br. in Support, Ex. A [hereinafter "Def.'s Ex. A"], Trial testimony of Dr. Mihlbachler ["Mihlbachler Testimony"], 47:4-24). His job was to implement the Academy's natural resources management plan. (*Id.* 47:21-24.)

47.     Dr. Mihlbachler's job at the Academy involved going out and surveying areas throughout the Academy and monitoring the landscape. (February 2014 Order, Undisputed Facts ¶ 42.) He had responsibility for managing the natural resources on the Academy's 18,500 acres. (*Id.*) Dr. Mihlbachler had additional responsibility to determine the impact of erosion on an endangered species, the Preble's Meadow Jumping Mouse. (*Id.*) He was managing a number of multi-million dollar erosion remediation projects in the area. (*Id.*)

48.     Dr. Mihlbachler was part of a monitoring program around the Academy Installation, monitoring "some pretty serious erosion and sedimentation issues, loss of habitat along some of the major drainages coming into the installation." (Def.'s Ex. A, Mihlbachler Testimony, 50:3-10.) Consistent with this, on August 20, 2008, when Dr. Mihlbachler encountered and photographed the sinkhole, his "purpose out there on that day" was photo-documenting, "eyes on the ground, looking at what's happening along our boundary and downstream from there." (*Id.* 50:11-14.)

49.     Thus, Dr. Mihlbachler also was looking at the erosion effects on Academy property located on the east side of I-25. (February 2014 Order, Undisputed Facts ¶ 43.) He had responsibility for investigating the erosion problems and had observed these problems in the area, including the east side of I-25, for many years. (*Id.*,

Findings of Additional Fact ¶ 84; see also Am. Ex. 2 to Pl.'s Proposed Findings of Fact and Conclusions of Law, With Argument, ECF No. 216-1 ["Am. Ex. 2"], Mihlbachler Testimony 6:15-25—testifying that part of his job duties have "included keeping watch on those eastern areas" of the Academy "to see how off-campus water flows might be impacting the property", as "[t]he academy, since the mid-1990s, identified that they were having serious erosion and -- issues along the eastern boundary, in particular due to the expansion of development along the boundary, which resulted in a lot of new impervious surface, which contributes to more frequent flows in those drainages, as well as higher volumes and rates of flow"; *see also* Def.'s Ex. A, Mihlbachler Testimony, 13:17-21—"[A]s a person with natural resource responsibilities that encompass virtually all the landscape within the boundaries of the academy, [Dr. Mihlbachler] had "ample opportunity to survey areas such as the areas east of I-25".)

50.     Dr. Mihlbachler testified that as part of his duties, he spends a large amount of time in the field and driving into remote areas of the Academy where the security forces and others do not routinely go.  As a result of this, he is another source of information regarding maintenance and infrastructure.  (February 2014 Order, Findings of Additional Fact ¶ 83).  Dr. Mihlbachler was part of the "eyes on the ground" for the Academy, checking areas that the security forces did not get to that often and reporting to the appropriate party if issues were identified.  (*Id.*, ¶ 80.)

51.     On August 20, 2008, as part of his work for the Academy, Dr. Mihlbachler took a number of photographs of erosion problems caused by storm water draining onto the Academy property from residential neighborhoods east of the Academy.  (February 2014 Order, Undisputed Facts ¶¶ 43, 44.)

52.     Dr. Mihlbachler photographed the sinkhole on the path on August 20, 2008, two weeks before Mr. Nelson was injured by that sinkhole. (February 2014 Order, Undisputed Facts ¶ 45.) Dr. Mihlbachler was the only Academy employee who was actually aware of the sinkhole before the September 3, 2008, accident. (*Id.*)

53.     Dr. Mihlbachler did not report the sinkhole or show the photographs to anyone else before Mr. Nelson was injured on September 3, 2008. (February 2014 Order, Undisputed Facts ¶ 47.)

54.     He testified that the trail management plan did not reference any asphalt surface trails. (Def.'s Ex. A, Mihlbachler Testimony, 55:9-16.) He further testified that to his understanding there was no rule or regulation in the trail management plan or otherwise that would have required fixing a hole on an unofficial path such as the asphalt path. (February 2014 Order, Findings of Additional Fact, ¶ 91; Def.'s Ex. A, Mihlbachler Testimony, 55:4-5.)

55.     However, Dr. Mihlbachler also testified that the Academy's trail management plan contains guidelines about what constitutes a safe trail for the users, and that "criteria would have applied in this situation [to the asphalt path] had I known that it was designed – . . . as a trail, yes." (Def.'s Ex. A, Mihlbachler Testimony, 75:10-17).

56.     Moreover, while Dr. Mihlbachler had never seen the bicycle path sign near the north end of the path (February 6, 2014 Order, Undisputed Facts ¶ 52), he testified that if he been aware of the sign or aware that the path was a recreational trail that was getting used, he would have either removed the path because it did not fit with the official Trails Management Plan or it would have been incumbent on him to take the proper action to prevent a safety hazard. This would have been required as part of his

duties.  (*Id.*, Findings of Additional Fact ¶ 93.)  He would have thought that the Academy was sanctioning the use of that trail for recreational purposes and, as Trails Manager, it would have been incumbent upon him "to take the appropriate action to keep the users of that trail safe."  (Def.'s Ex. A, Mihlbachler Testimony, 75:6-9.)

57.     Dr. Mihlbachler testified that he believes that there is an expectation these days for all government employees to say something if they see something.  (February 2014 Order, Findings of Additional Fact ¶ 96.)

58.     I previously found, and now reaffirm, that for all intents and purposes, Dr. Mihlbachler functioned as an Academy employee, and had responsibilities related to Academy safety and security and reporting safety concerns.  (February 2014 Order, Findings of Additional Fact ¶¶ 81, 82; Conclusions of Law ¶ 71.)

59.     Dr. Mihlbachler chose not to do anything about the sinkhole when he encountered it and photographed it.  His decision not to do anything about the sinkhole or report it to anyone was based on his perception that it was on the CDOT and MVEA easement for their use and was not the Academy's responsibility.  (February 2014 Order, Findings of Additional Fact ¶ 94.)  He "didn't see any sense of urgency to have the hole repaired by them or the Academy."  (Def.'s Ex. A, Mihlbachler Testimony, 55:22-56:5; *see also* February 2014 Order, Undisputed Facts ¶ 51.)

60.     Thus, "in terms of the significance of the damage relative to other areas" that he was working on, Dr. Mihlbachler "didn't see a need for the academy necessarily to take action on the damage that had occurred on the trail."  (Am. Ex. 2, Mihlbachler Testimony 61:9-13.)  He "would look more to Mountain View Electric and CDOT to

identify the damage and make a determination about how they needed to proceed on any sort of maintenance or repair to maintain their easement." (*Id.* 61:14-17.)

61.     Dr. Mihlbachler had seen CDOT and MVEA service crews using the path as a service road from 2000-2008. (February 6, 2014 Order, Undisputed Facts ¶ 49.)

62.     Dr. Mihlbachler's decision not to do anything about the sinkhole on the path also was based on the fact that he did not think people were using the path for recreational purposes. (February 2014 Order, Undisputed Fact ¶¶ 50; Findings of Additional Fact ¶¶ 92, 94). In his mind at that time, he "didn't feel the Air Force Academy considered it to be a trail of any sort." (Def.'s Ex. A, Mihlbachler Testimony, 44:8-9.) When he photographed the path, "at that time I wasn't looking at this as a bike path. Again, I was looking at this as a service path either for" MVEA or CDOT. (*Id.*, 24:21-24).

63.     As he did not think the path was being used by pedestrians or bikers, the thought never occurred to Dr. Mihlbachler that the damage to the path would create a safety hazard. (February 6, 2014 Order, Findings of Additional Fact ¶ 92.) He did not think that the hole was likely to cause anyone harm. (Def.'s Ex. A, Mihlbachler Testimony, 56:21-23; 57:25-58:3.)

64.     Dr. Mihlbachler also did not believe the path was an official recreational trail, or that outside users were invited or permitted to use the path for recreation. (February 2014 Order, Undisputed facts, ¶ 50).

65.     When he saw the sinkhole on August 20, 2008, Dr. Mihlbachler did not see any members of the public on the path. (Def.'s Ex. A, Mihlbachler Testimony, 26:19-21).

66.     Dr. Mihlbachler had been stationed at the Academy for over eight years before the accident. (Def.'s Ex. A, Mihlbachler Testimony, 26:22-24), and he had lived in the

Colorado Springs area for ten to eleven years. (*Id.* 12:22-13:1). During this period, he only saw members of the public use the path on five or six occasions, despite the fact that he traveled on the path once a month or so. (February 2014 Order, Findings of Additional Fact ¶¶ 87, 89.) He saw most of these people before 2005, when Struthers Road was built. (*Id.*, ¶ 87; Def.'s Ex. A, Mihlbachler Testimony, 27:7-10.) The construction of Struthers Road provided an alternate route across Black Forest Creek so that Dr. Mihlbachler thought the traffic probably moved off the path. (February 2014 Order, Findings of Additional Fact ¶ 87; Def.'s Ex. A, Mihlbachler Testimony, 27:4-16.)

67.     Dr. Mihlbachler only saw people using the path when he was off-duty, driving along I-25. (Defs.' Ex. A, Mihlbachler Testimony, 58:12-19.) He never saw anyone using the path at night. (February 2014 Order, Findings of Additional Fact ¶ 88).

68.     Dr. Mihlbachler understood at the time he saw the sinkhole that he had discretion for making decisions about whether to fix eroded areas he encountered on an unofficial path. (Def.'s Ex. A, Mihlbachler Testimony 55:17-21.)

69.     Dr. Mihlbachler did not consider the sinkhole a high priority relative to all the other erosion issues that he was dealing with along the eastern boundary. He considered the sinkhole insignificant in relation to the large-scale erosion problems in the area. (February 2014 Order, Undisputed Facts ¶ 46; Findings of Additional Fact ¶ 85).

### iii.    Failure to Guard or Warn Against the Dangerous Condition

70.     I previously found, and now reaffirm herein, that the Academy did not take any measures to guard against or warn of the sinkhole condition prior to September 3, 2008. (February 6, 2014 Order, Findings of Additional Fact ¶ 60; *see also* Conclusions of Law

¶ 23—"the evidence shows that the [Academy] did not maintain the path, repair it, or warn against the dangerous condition when it was found because it believed that CDOT or MVEA were responsible for the path", ¶¶ 28, 33, 35.)  Indeed, this was stipulated to by the parties.  (*Id.*, Conclusions of Law ¶ 71.)

71.     I also previously found, and reaffirm herein, that the Academy unreasonably failed to exercise reasonable care to protect against a danger—the sinkhole on the path caused by erosion—of which it actually knew.  (February 6, 2014 Order, Conclusions of Law ¶ 70.)  The evidence demonstrates that the Academy knew there was extensive drainage and erosion problems in the area where the path was located, knew through Dr. Mihlbachler of the actual existence of the sinkhole prior to Mr. Nelson's accident, admitted that the sinkhole was a dangerous condition, and did nothing to protect anyone from the danger that the sinkhole presented to those using the path for biking or other purposes.  (*Id.*)  I found from the evidence that the Academy failed to use reasonable care to protect against the danger on the property, and that its unreasonable failure to exercise reasonable care with regard to the sinkhole was the cause of Mr. Nelson's injuries.  (*Id.*)

72.     It is undisputed that the path was located within the boundaries of the Academy property.  (*Id.*, Undisputed Facts, ¶¶ 1, 3, 5.)

III.    CONCLUSIONS OF LAW

        A.    The CRUS Exception and Statutory Construction Principles

1.      The CRUS places the risk of injury for recreational activity upon the recreational user rather than the landowner, *see* Colo. Rev. Stat. § 33-41-103, subject to certain specifically enumerated exceptions to its limitations on landowner liability.  One of these

exceptions to liability is a landowner's "willful or malicious failure to guard or warn against a known dangerous condition, use, structure, or activity likely to cause harm." Colo. Rev. Stat. § 33-41-104(1): ("Nothing in this article limits in any way any liability which would otherwise exist: (a) For willful or malicious failure to guard or warn against a known dangerous condition, use, structure, or activity likely to cause harm".)

2.      Colo. Rev. Stat. § 33-41-105 also recognizes landowner liability for such conduct, stating "[n]othing in this article shall be construed to . . . affect in any manner any liability for willful or malicious failure to guard or warn against a known dangerous condition, use, structure, or activity likely to cause harm . . .")

3.      I previously found that Mr. Nelson was an invitee or licensee under the Colorado Premises Liability Act. (February 2014 Order, Conclusions of Law, ¶¶ 68, 72.) The Tenth Circuit confirmed that the Academy knowingly permitted Mr. Nelson to use the bike path; thus he was a licensee or invitee. Although the Academy could not be liable for negligence under CRUS, the Tenth Circuit found that the Academy would be liable despite the limitations on liability in the CRUS if it willfully or maliciously failed to guard or warned against a known dangerous condition. (Tenth Circuit Op., pp. 11-12.)

4.      The Colorado appellate courts have not specifically construed this section of the CRUS. "When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule." *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002). "'If there be no decision by that court then federal authorities must apply what they find to be the state law after giving proper regard to relevant

rulings of other courts of the State.'"  *Folks v. State Farm Mut. Automobile Ins. Co.*, 299

F. App'x 748, 757 (10th Cir. 2007) (quotations and internal quotation marks omitted).

5.      The objective of a court interpreting a state statute is to effectuate the intent and

purpose of the legislature.  *Roup v. Commercial Research, LLC*, 349 P.3d 273, 275

(Colo. 2015); *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo. 1991).

Statutory interpretation is a question of law.  *W. Fire Truck, Inc. v. Emergency One, Inc.*,

134 P.3d 570, 573 (Colo. App. 2006).

6.      The court should look to the statutory language and give words and phrases their

"plain and ordinary meaning".  *Climax Molybdenum Co. v. Walter*, 812 P.2d 1168, 1173

(Colo. 1991).  The statute should, where possible, be construed "as a whole, giving

meaning to all its parts."  *Folks*, 299 F. App'x at 757; *see also Reno v. Marks*, 349 P.3d

248, 253 (Colo. 2015) (the court must "examine the statutory language in the context of

the statute as a whole and strive to give 'consistent, harmonious, and sensible effect to

all parts'") (quotation omitted).  "[I]f the language of the statute is clear and the intent of

the General Assembly may be discerned with certainty, [the court] need not resort to

other rules of statutory interpretation."  *W. Fire Truck, Inc.*, 134 P.3d at 573.

7.      I now turn to the pertinent provision of the CRUS, Colo. Rev. Stat. § 33-41-

104(1)(a), examining each section of the statute to determine its applicability.

        B.      Whether the Washout/Sinkhole Was A Dangerous Condition Likely To
                Cause Harm

8.      "Dangerous condition" is not defined in the CRUS, but a plain meaning can be

ascribed to that term.  The dictionary defines "dangerous" as "exposing to or involving

danger; able or likely to inflict injury or harm."  https://www.merriam-webster.com/

dictionary/dangerous.  "Danger" is defined as "exposure or liability to injury, pain, harm, or loss."  *Id.*  The Colorado courts have confirmed this meaning of "danger."  *See Fleury v. IntraWest Winter Park Operations Corp.*, No. 13CA0517, 2014 WL 554237, at *3 (Coo. App. Feb. 13, 2014) (the common meaning of danger is a "[p]eril; exposure to harm, loss, pain, or other negative result") (quoting *Black's Law Dictionary* 450 (9th ed. 2009)).

9.      Also, the Colorado legislature defined "[d]angerous condition" in the Colorado Governmental Immunity Act as "a physical condition of a facility or the use thereof that constitutes an unreasonable risk to the health or safety of the public. . . ."  Colo. Rev. Stat. § 24-10-103(1.3).   I adopt these definitions of the word "dangerous".

10.      I previously found in my  February 2014 Order that the sinkhole/washout was a dangerous condition.  (February 6, 2014, Order, Conclusions of Law, ¶¶ 70, 71, 77).  I found that the sinkhole on the path caused by erosion was a danger that the Academy unreasonably failed to exercise reasonable care to protect against.  (February 6, 2014 Order, Conclusions of Law ¶ 70; *see also* Conclusions of Law ¶¶ 33, 35—noting that the sinkhole was a "specific known hazard.")  I adopt and incorporate my prior findings that the sinkhole/washout that existed on the Academy property was a dangerous condition.

11.      I also find that the sinkhole was a dangerous condition "likely to cause harm" to users of the path, and make the following additional conclusions concerning this issue.

12.      The evidence shows that the path was an asphalt path, designated for bicycle use as indicated by Bicycle signs near the path.  As such, any reasonable person, including the Academy, would understand that people would be riding bicycles on the path, and the Academy in fact knew that people used the path for bicycle riding.

13.     The sinkhole that Mr. Nelson encountered during the accident was the result of wash-out/erosion problems in the area, and was caused by off-site water flow onto Academy property that overwhelmed the culvert running under the path.

14.     This off-site water flow onto Academy property in the area of the asphalt path was a known condition and problem that the Academy had been investigating, documenting, and addressing for many years before Mr. Nelson's accident on September 3, 2008.

15.     The sinkhole/washout condition was substantial.  It encompassed the entire width of the asphalt path, and photographs presented at trial showed the depth and magnitude of the sinkhole.  (Pl.'s Exs. 8-1, 8-3, 8-6, 9-2.)

16.     Evidence presented at trial also established that the sinkhole was difficult to see. Photographs of the site indicate the washout/sinkhole was located in a low area near bushes and other vegetation that created shadows.  Further, witness Jesse Kurtz, who was jogging on the path the morning after Mr. Nelson's accident, thought the sinkhole was water until he was significantly closer to it.  I previously found and continue to find Mr. Kurtz' testimony on this issue to be credible.  I also find that his testimony is substantiated by photographs presented at trial as exhibits.  (Pl.'s Ex. 8-2, 8-4, 9-1.)

17.     Accepting the United States' argument that the term "likely" means a high probability of occurring, or "in all probability", and requires more than a potential hazard, I find that a sinkhole on a recreational path with significant size and depth, that covers the entire width of the path and is hard to see, and is on a path that the Academy knew was used by bicyclers, would have a high probability of causing harm to a person riding their bicycle on the path.  As I noted in the February 2014 Order, "a sinkhole of the

magnitude in this case (covering the width of the path) is not the kind of hazard ordinarily presented on the property of the type involved." (*Id.*, Conclusions of Law ¶ 77.)  Indeed, the sinkhole/washout was in fact dangerous and did in fact cause harm. When Mr. Nelson encountered the sinkhole/washout on his bicycle, he was flung off his bicycle onto the asphalt, causing him to suffer serious injuries and his bicycle to have substantial damage.

18.     My finding that the sinkhole was a dangerous condition likely to cause harm is supported by admissions of Academy representatives at trial.  Greg Long testified that the sinkhole was a dangerous emergency situation that required immediate action, and he believed that something had to be done on an emergency basis because of safety considerations.  Jeffrey Thoma testified that the condition of the path with the sinkhole/ washout was dangerous and hazardous for users of the path.  Dr. Mihlbachler testified that the condition of the asphalt path with the sinkhole, which he observed before Mr. Nelson's accident, would be a safety hazard for users of the path—if it were an official Academy trail.  The fact that the path was not an official Academy trail, however, does not make it any less of a dangerous condition to the people using it for recreational purposes.  Indeed, the evidence established that the condition of the asphalt path with a sinkhole did not meet Academy safety standards.  Similarly, Dr. Mihlbachler's subjective belief that it was not a hazard based on his belief that the path was not being used for recreational purposes or was a service road used by CDOT or the MVEA is not relevant to whether the path was, in fact, dangerous and likely to cause harm.

19.     The United States argues, however, that in assessing whether a "known dangerous condition" is "likely to cause harm," it is assumed that recreational users will

act with reasonable care.  Here, however, I found in my February 2014 Order, and

reaffirm herein, that Mr. Nelson was not at fault or negligent.  (February 2014 Order,

Conclusions of Law ¶ 81-86.)  Thus, there is no evidence that he failed to act with

reasonable care.  While the United States noted in its proposed Findings of Fact and

Conclusions of Law that Dr. Mihlbachler never saw anyone use the path at night (ECF

No. 223, at p. 28 ¶ 33), I found that it was still light outside when Mr. Nelson

encountered the sinkhole, and that he would not have needed artificial illumination while

riding his bicycle on the path.  (February 2014 Order, Conclusions of Law ¶ 82; *see also*

Findings of Additional Fact, ¶¶ 16, 19, 20.)

20.　　In conclusion, I find that the evidence establishes that the sinkhole on the path on

Academy property constituted a dangerous condition likely to cause harm.

　　　　C.　　<u>Whether the United States Knew of the Path and the Dangerous Condition</u>

21.　　The Academy knew the path existed for decades prior to September 3, 2008.

There is evidence that the asphalt path could be seen from I-25.  The Academy further

knew of the significant erosion problems in the immediate area of the path.  The

evidence showed that significant off-site water flow onto Academy property in the area

of the asphalt path was a known condition and problem that the Academy had been

addressing for many years before September 3, 2008.

22.　　The United States admitted that, before Mr. Nelson's accident, it knew members

of the public used the path where Mr. Nelson was injured.  (Pl.'s Ex. 107, Requests for

Admission, #8).  Furthermore, as part of the law of the case as established by the Tenth

Circuit, the Academy knew the public was using the bike path for recreational

purposes—a necessary finding for the Tenth Circuit's conclusion that the CRUS applied.

(Tenth Circuit Op., p. 11—"The Academy knew of the public's use of the path and declined the opportunity to end that use.")

23.     The United States argues, however, that the court cannot consider the collective knowledge or collective intent of the Academy regarding the sinkhole.  It asserts that, in the context of a claim under the FTCA and based on the text and legislative intent of the CRUS exception, the Plaintiffs must show that *a particular federal employee* acted in a manner that constitutes a "willful or malicious failure to guard or warn against a known dangerous condition . . . likely to cause harm."  Colo. Rev. Stat. § 33-41-104.  I find that this argument is not supported by the text of the statute, and the United States has not cited any authority that this is the legislative intent of the statute.  Thus, I turn to whether the United States' position is supported by the fact that this case is brought under the FTCA.

24.     The FTCA provides a limited waiver of sovereign immunity such that the United States can be held liable for injuries or losses "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  Thus, as the United States acknowledges, its liability essentially arises under a theory of *respondeat superior.  Fowler v. United States*, 647 F.3d 1232, 1237-38 (10th Cir. 2011).  "[T]he Government's liability under the FTCA is limited to that of a private employer under like circumstances."  *Haceesa v. United States*, 309 F.3d 722, 728-29 (10th Cir. 2002).

25.     Under the *respondeat superior* doctrine, "an employer or principal is liable for acts that its employee or agent commits on behalf of the employer or principal within the scope of the employment or agency." *Smith v. Multi-Fin. Sec. Corp.*, 171 P.3d 1267, 1271 (Colo. App. 2007).  It is "'based on the theory that the employee acts on behalf of the employer when the employee is acting within the scope of his authority.'" *Fowler*, 647 F.3d at 1238 (quotation omitted).  The liability of the employee is imputed to the employer in that situation.  *See McCall v. Roper*, 685 P.3d 230, 232 (Colo. App. 1984).

26.     While the United States argues that the collective knowledge of its employees or agents is not imputed to the United States in an FTCA case, I find that this is not supported by any case under the FTCA that has analyzed the "willful or malicious" exception to liability under the recreational use statutes.  Instead, those cases looked at the collective knowledge of the United States agency in deciding whether its conduct was willful or malicious, and did not focus on whether any particular employee's conduct met that standard.  *See, e.g., Rost v. United States*, 803 F.2d 448, 451-452 (9th Cir. 1986) (looking at the knowledge of service employees who knew of the condition for at least a year before the accident and finding as a result that "the Service consciously failed to act because it had other priorities") (emphasis added); *Mandel v. United States*, 719 F.2d 963, 967 (8th Cir. 1983) (looking at recommendation of a ranger "*together with the knowledge of the National Park Service* of the existence and hazard of submerged rocks" and its failure to know or warn of submerged rocks to determine whether the Service was liable under the willful or malicious exception) (emphasis added); *Sulzen v. United States*, 54 F. Supp. 2d 1212, 1218 (D. Utah 1999) (looking at knowledge and testimony of a park ranger and a Forest Supervisor as well as a Forest Service

memoranda indicating that "*the task force . . . was concerned* "that unrecorded near misses have occurred at Hanging Rock" to determine if the Forest Service knew of the falling rocks" before the accident") (emphasis added); *Soto v. United States*, 748 F. Supp. 727, 729-730 (C.D. Cal. 1990) (finding actual knowledge that a peril existed based on evidence that Forest Service personnel assisted in recovery of the body, a recommendation by a district employee about a warning sign, and fact "District personnel" had observed diving at the pools).[3]  I find these cases persuasive, and they convince me that I may look at the collective knowledge of the Academy in regard to the willful and malicious exception to the CRUS.

27.     Looking at what the various employees knew collectively to determine the United States' knowledge makes sense in the context of a large organization such as a federal agency where information is often compartmentalized amongst different departments. In that situation, an organization should, in my opinion, be charged with the collective knowledge of its employees, particularly where the United States is seeking to avoid liability under a narrow exception to a state recreational use statute.  As explained by one court in finding that a corporation may be charged with the collective knowledge of its employees:

> Corporations often compartmentalize information, whether for efficiency, practicality, or both.  But such compartmentalization does not shield a company from knowledge maintained by employees in such a structure.

---

[3] *See also Termini v. United States*, 963 F.2d 1264, 1267-1268 (9th Cir. 1992); *Umpleby v. United States*, 806 F.2d 812, 815-16 (8th Cir. 1986); *Ware v. United States*, No. C-92-1744 EFL, 1994 WL 46739, at *3-7 (N.D. Cal. Feb. 4, 1994); *Stephens v. United States*, 472 F. Supp. 998, 1003, 1016 (C.D. Ill. 1979).

*New York v. United Parcel Serv.*, 15-cv-01136 (KBF), 2017 WL 1135257, at *65

(S.D.N.Y. March 24, 2017) (quotation omitted).

28.     Section 5.03 of the Restatement (Third) of Agency also supports this concept.  It

notes that "[o]rganizations generally function by subdividing work or activities into

specific functions that are assigned to different people.  *Id.*  "An organization's large size

does not in itself defeat imputation, nor does the fact that an organization has structured

itself internally into separate departments or divisions."  *Id.*  "Organizations are treated

as possessing the collective knowledge of their employees and other agents, when that

knowledge is material to the agents' duties. . .").[4]

29.     My finding that the collective knowledge of the Academy may be considered is

also supported by the Colorado Court of Appeals' decision in *Jacobs v. Commonwealth*

*Highland Theatres, Inc.*, 738 P.2d 6 (Colo. App. 1986).  In assessing whether exemplary

damages was appropriate in a personal injury action brought against the theatre owner,

the court looked collectively at the fact that the "defendants' agents knew of the danger"

and took no steps to correct it.  *Id.* at 10.  It then concluded "[o]n the basis of evidence

presented concerning defendant's awareness of the hazard and its repeated failure to

remedy it . . . that plaintiff presented a *prima facie* case of wanton and reckless

disregard which would support an award of exemplary damages."  *Id.*

30.     While the United States has cited cases declining to consider the collective

knowledge of the corporation's agents, these cases involved a different situation;

---

[4] *See also United States v. Bank of New England*, 821 F.2d 844, 856 (1st Cir. 1987); *SEC v. Tropikgadget FZE*, 146 F. Supp. 3d 270, 280 (D. Mass. 2015); *Dixie Bonded Warehouse and Grain Co., Inc. v. Allstate Fin. Corp.*, 755 F. Supp. 1543, 1553 (M.D. Ga. 1991); *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 894 (D.D.C. 2006); *Commonwealth v. Springfield Terminal Ry. Co.*, 951 N.E.2d 696, 706 (Mass. App. 2011).

namely, an intentional tort.  Thus, in *Helf v. Chevron U.S.A., Inc.*, 361 P.3d 63 (Utah 2015), a former employee who was injured as a result of exposure to toxic gases sued the employer under the intentional injuries exception to the exclusive remedies provision of the Workers' Compensation Act.  To prevail in her suit she had to show that an agent of the employer intentionally caused her injury.  *Id.* at 69.  The court found in that situation that "the collective knowledge of multiple employees cannot 'establish the state of mind requisite to the commission of an intentional tort of a corporation.'"  *Id.* (quotation omitted).  Similarly, in *Woodmont, Inc. v. Daniels*, 274 F.2d 132, 137 (10th Cir. 1959), the Tenth Circuit acknowledged that it would allow in some cases a corporation to be "held constructively liable for the composite knowledge of all its agents, whether acting in unison or not", but was unwilling to do so where an intentional tort was alleged—in that case fraud.  These cases do not, in my opinion, impact this case that does not involve an intentional tort.  Instead, this case is more akin to the *Jacobs* case where the court was assessing whether the theatre's conduct was willful and reckless in determining whether an award of exemplary damages was appropriate.

31.     Even if I were to disregard the collective knowledge of the Academy, however, the evidence shows that Dr. Mihlbachler knew of the significant erosion problems in the immediate area of the path and its condition prior to Mr. Nelson's accident.  Indeed, Dr. Mihlbachler's work included responsibility for investigating those substantial erosion and drainage problems.  As part of his duties he was in the area of the path about once a month.  Dr. Mihlbachler also had seen people use the path for walking, jogging, and biking prior to September 3, 2008.

32.     On August 20, 2008, as part of his work for the United States, Dr. Mihlbachler took a number of photographs of erosion problems caused by storm water draining onto the property from residential neighborhoods east of the property.  The photographs Dr. Mihlbachler took on that day included photographs specifically documenting the sinkhole/washout of the asphalt path.  The photographs show the sinkhole/washout of the path in the same condition as it was when Mr. Nelson encountered it two weeks later on September 3, 2008.  (*Cf.* Pl.'s Ex. 2—taken by Dr. Mihlbachler—with Pl.'s Exs. 8, 9.)

33.     The sinkhole/washout on the path that Mr. Nelson encountered during the accident was the result of the erosion caused by the off-site water flows onto Academy property—the very problem that the Academy knew of and was investigating through Mr. Mihlbachler on the day he discovered this dangerous condition on the path.  Indeed, Dr. Mihlbachler was in that area specifically for the purpose of evaluating the erosion effects of groundwater flow.  Thus, the United States, through Dr. Mihlbachler, was investigating erosion problems and specifically found on August 20, 2008, an erosion problem that created a dangerous condition on the asphalt path; namely, the sinkhole/washout.

34.     Dr. Mihlbachler believed himself to function essentially as an Academy employee and I previously concluded that, for all intents and purposes, Dr. Mihlbachler functioned as an Academy employee and had responsibility for reporting safety concerns. (February 2014 Order, Findings of Additional Fact ¶ 81; Conclusions of Law ¶ 71). These findings and conclusions are reaffirmed.

35.     I conclude, as I previously did, that Dr. Mihlbachler was an agent of the

Academy, and his knowledge of the sinkhole/ washout is imputed to the Academy by

operation of law.  (February 2014 Order, Conclusions of Law ¶ 71).  *See People v.*

*Morrow*, 682 P.2d 1201, 1206-1207 (Colo. App 1983) ("'[T]he rule, established in this as

well as other jurisdictions, is that the knowledge of the agent is knowledge of the

principal, when the agent acts within the scope of his authority'") (quoting *Weghorst v.*

*Cnty. Fire Ins. Co.*, 45 P.2d 624 (1935)); *Hummel v. First Nat'l Bank*, 32 P. 72, 75 (Colo.

App. 1892) (principal is chargeable with information acquired by agent).

36.     Accordingly, I conclude that the United States, including its representative

Dr. Mihlbachler, knew that the path existed, knew significant erosion problems existed in

that area, and specifically knew on August 20, 2008, two weeks before Mr. Nelson was

injured, of the existence of the dangerous condition on the path caused by erosion.

>    D.    <u>Whether the Academy Guarded or Warned Against The Known
>          Dangerous Condition</u>.

37.     The parties stipulated and the evidence is undisputed that the United States did

not take any measures to guard against the dangerous condition or warn anyone using

the path of the sinkhole/washout condition before Mr. Nelson was injured.  That is

dispositive on this issue.

38.     The Academy also took no action to warn about the significant erosion and

washout conditions caused by off-site water flow onto Academy property in the area of

the asphalt path, which was a known condition, or to guard users of the asphalt path in

regard to this condition.

39.     Moreover, despite knowing of the significant erosion issues and the fact that the

public was using the asphalt path for recreational purposes, the Academy did not

monitor the trail (per the testimony of Mr. Thoma) or maintain it.  It also did not identify

the path on its Real Property Record or its official trail system so that it would be

maintained.  The Academy instead appeared to mistakenly believe that CDOT and/or

MVEA was responsible for maintenance of the path.  However, it is undisputed that the

sinkhole was on its property and it did not need permission from CDOT or anyone to

take action with respect to the sinkhole.  (February 2014 Order, Findings of Additional

Fact ¶¶ 33, 27.)  I find the same would be true as to other erosion issues.  The

Academy thus had the ability to maintain the path and fix the sinkhole.  This is also

supported by the testimony of Dr. Mihlbachler that he had discretion to fix the hole but

did not do so because it was not a high priority, the testimony of Mr. Van Winkle that it

was the Academy's responsibility to fix the path and to upkeep the property, and the fact

that the sinkhole was in fact fixed by the Academy after the accident.

40.     Further, it is undisputed that the Academy took no action prior to September 3,

2008, to prevent the public from entering its property to use the path, despite knowing

that there were significant erosion issues in the area and despite knowing of the

sinkhole/washout approximately two weeks prior to Mr. Nelson's accident.  The

Academy also did nothing to remove the "Bicycle Path, No Motorized Vehicles" signs

prior to September 3, 2008, even though CDOT offered to remove one of the signs, and

even though the Academy knew that the signs gave the impression that the path was

open for general public use.  It did nothing to block the path, to close off the engineered

fence opening, or to remove the path prior to September 3, 2008.

41.     There is no evidence that the Academy could not have taken actions to warn or guard against the danger before September 3, 2008.  In fact, it took immediate action to guard and warn against the dangerous condition *after* Mr. Nelson was injured.

42.     In short, as I previously found and now reaffirm, the evidence demonstrates that the Academy knew there was extensive drainage and erosion problems in the area where the path was located, knew through Dr. Mihlbachler of the actual existence of the sinkhole prior to Mr. Nelson's accident, admitted that the sinkhole was a dangerous condition, and did nothing to protect anyone from the danger that the sinkhole presented to those using the path for biking or other purposes.  (February 2014 Order, Conclusions of Law ¶ 70.)

   E. <u>Whether the United States' Failure To Warn Or Guard Against The Known Dangerous Condition Likely to Cause Harm Was Willful</u>

43.     Under the CRUS, no immunity is granted to a landowner for a "willful or malicious" failure to guard or warn against a known dangerous condition, use, structure, or activity likely to cause harm . . . ."  The Ninth Circuit has held that because recreational use statutes are in derogation of common law rules of tort liability, they must be narrowly construed and the "courts must take care to avoid an overbroad interpretation of the statute that would afford immunity that was not intended."  *Ducey v. United States*, 713 F.2d 504, 510 (9th Cir. 1983).  Furthermore, "*exceptions* to the statute . . . must be given the broadest reading that is within the fair intendment of the language used."  *Id.* (emphasis in original).  This appears to be consistent with Colorado law, which narrowly construes exceptions to immunity that are in derogation of Colorado's common law, and broadly construes exceptions.  *See St. Vrain Valley Sch.*

*Dist. RE-1J v. A.R.L.,* 325 P.3d 1014, 1019 (Colo. 2014) ("Because governmental immunity under the Colorado Governmental Immunity Act ["CGIA"] derogates Colorado's common law, we narrowly construe the CGIA's immunity provisions, and as a logical corollary, we broadly construe the CGIA's waiver provisions"); *Young v. Brighton Sch. Dist.* 27J, 325 P.3d 571, 576 (Colo. 2014). Here, also, the CRUS and its limitation on liability would appear to be in derogation of Colorado law and would need to be narrowly construed, while the exception at issue would need to be broadly construed.

44. The CRUS does not define the terms "willful" or "malicious". I first find that the plain language of the statute does not require a willful *and* malicious failure to warn or guard against a dangerous condition. The legislature used the disjunctive "or" to create two avenues for imposing liability on a landowner: either "willfully" failing to guard or warn, *or* "maliciously" failing to guard or warn. *See Armintrout v. People*, 864 P.2d 576, 581 (Colo. 1993) ("[W]hen the word "or" is used in a statute, it is presumed to be used in the disjunctive sense, unless legislative intent is clearly to the contrary.") There is no indication, clearly or otherwise, that the legislature intended the "or" to be anything but disjunctive. Indeed, the United States does not dispute this. Moreover, this is consistent with how the words "willful or malicious" are interpreted in other states in connection with their recreational use statutes. *See, e.g., McGruder v. Ga. Power Co.*, 191 S.E.2d 305, 307 (Ga. App. 1972), *rev'd on other grounds*, 194 S.E.2d 440 (Ga. 1972); *Rivero v. Lovington Country Club, Inc.*, 949 P.2d 287, 290 (N.M. App. 1997) (quoting *Huddleston By and Through Lynch v. Hughes*, 843 S.W.2d 901, 908 (Ky. App. 1992), Gudgel, J., concurring)).

45.     Because of the disjunctive "or," the terms "willful" and "malicious" have different

meanings.  All the words in a statute are presumed to have meaning and significance,

and the courts must interpret statutes in such a way as to give meaning to each word in

the statute.  *Young*, 325 P.3d at 579 ("We presume that the legislature 'understands the

legal import of the words it uses and does not use language idly, but rather intends that

meaning should be given to each word.'") (quotation omitted).

46.     Based on the foregoing, I find that the United States can be found liable if it *either*

willfully *or* maliciously failed to warn or guard against a known dangerous condition likely

to cause harm.   Plaintiffs do not contend that the United States acted maliciously in

connection with its failure to warn or guard against the sinkhole condition.  Under

Colorado law, the term "malicious" means an action taken with intent to do harm.  *See*

*e.g., Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry*, *P.C.*, 232 P.3d 277, 286 (Colo.

App. 2010) ("malice" is defined as "an intention or desire to harm another [usually]

seriously through doing something unlawful or otherwise unjustified" or "revengeful or

unfriendly feelings") (citing *Webster's Third New Int'l Dictionary* 1367 (2002)).  I find no

evidence that the United States or any of its representative's acts or failure to act (by

failing to warn or guard against the sinkhole) were done with actual intent to cause

harm.  Thus, I concur with the parties that the United States did not act maliciously in

failing to warn or guard against the sinkhole condition.

47.     Under Colorado law, however, "willful" conduct is not the same as "malicious"

conduct.  *Hohn v. Morrison*, 870 P.2d 513, 517 (Colo. App. 1993) ("Malicious intent is

not required for willfulness.").  Nor under Colorado law does malice equate to "willful

and wanton" conduct.  *See* Colo. Rev. Stat. § 13-21-102(1)(a) (separating concepts of "malice" and "willful and wanton" conduct.)

48.     Thus, I must determine if the Academy's conduct was willful in regard to failing to warn or guard against the dangerous sinkhole condition.  Both parties cite the Colorado Supreme Court's decision in *Pettingell v. Moede*, 271 P.2d 1038, 1042 (Colo 1954), holding that the term "willful" means "voluntary; by choice, intentional, purposeful."  It is more than negligence.  *Id.*[5]  As the *Pettingell* court held: "A failure to act in prevention of accident is but simple negligence; a mentally active restraint from such action is willful." *Id.* at 1043.  Omitting to weigh consequences is simple negligence; refusing to weigh them is willful."  *Id.*; *see also Hohn*, 870 P.2d at 517 (a willful act means an act "'done intentionally, knowingly, and purposefully, without justifiable excuse, as distinguished from an act done carelessly, thoughtlessly, heedlessly, or inadvertently'") (quoting *Black's Law Dictionary* 1434 (5th ed. 1979)).

49.     The United States argues, however, that by using the word "willful" in the CRUS exception, the legislature intended to impose liability upon a landowner only if he consciously and intentionally ignored his responsibility to protect recreational users from known dangerous conditions likely to cause harm.  It asserts that "willful" conduct requires a heightened intent to act purposefully and intentionally in disregard of knowledge of a substantially certain danger, and that this is supported by consideration of how Colorado courts have defined "willful and wanton."

---

[5] "Negligence consists of failure to exercise for the protection of others that degree of care and caution that would, under the prevailing circumstances, be exercised by an ordinarily prudent person."  *Id.* "It consists in doing something which, under the circumstances, should not have been done, or in omitting to do that which should have been done.  *Id.*

50.     I find that the term "willful" is not the same as the term "willful and wanton", a term of art that has a specific meaning in Colorado law.  The Colorado legislature chose not to use the term "willful and wanton" in the CRUS, even though it has used that term in other statutes, such as the exemplary damages statute.  *See* Colo. Rev. Stat. § 13-21-102(1)(a) (exemplary damages may be awarded where "injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct").  Again, the legislature is presumed to understand the legal import of the words it uses, and "'does not use language idly.'"  *Young*, 325 P.3d at 579 (quotation omitted).  "'[E]very word excluded from a statute must be presumed to have been excluded for a reason.'"  *Dubois v. People*, 211 P.3d 41, 45 (Colo. 2009) (quotation omitted); *see also Specialty Restaurants Corp. v. Nelson*, 231 P.3d 393, 397 (Colo. 2010) ("we will not construe a statute in a manner that assumes the General Assembly made an omission; rather, the General Assembly's failure to include particular language is a statement of legislative intent").

51.     There is a distinction between "willful" and "willful and wanton" conduct, as recognized by *Pettingell*, a case relied on by both parties.  Thus, while willful action "means voluntary; by choice; intentional; purposeful", "[w]antoness requires an even higher degree of culpability in that it is wholly disregardful of the rights, feelings, and safety of others."  *Pettingell*, 271 P.2d at 1042.   "One may be said to be guilty of 'wilful and wanton disregard' when he is conscious of his misconduct, and although having no intent to injure any one, from his knowledge of surrounding circumstances and existing conditions is aware that his conduct in the natural sequence of events will probably

result in injury to his guest, and is unconcerned over the possibility of such result. . . ."

*Id.* The Colorado Supreme Court further stated:

> The word wanton is defined in Webster's New International Dictionary (2d ed.) as "Marked by or manifesting arrogant recklessness of justice, of the rights or feelings of others, or the like. . . . To be "wilful and wanton" there must be some affirmative act purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others. . . . The demarcation between ordinary negligence and willful and wanton disregard is that in the latter the actor was fully aware of the danger and should have realized its probable consequences, yet deliberately avoided all precaution to prevent disaster.

*Id.* at 1042-43.

52.     Similarly, Colo. Rev. Stat. § 13-21-102(1)(b) defines "willful and wanton" conduct for purposes of exemplary damages as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *See also Gray v. Univ. of Colo. Hosp. Auth.*, 284 P.3d 191, 198 (Colo. App. 2012) ("to be willful and wanton, public employees must be consciously aware that their acts or omissions create danger or risk to the safety of others, and they then act, or fail to act, without regard to the danger or risk"); *Terror Min. Co. v. Roter*, 866 P.2d 929, 934-35 (Colo. 1994) (in order to fall within the scope of the willful and wanton misconduct exception to the parental immunity doctrine, it would need to be alleged that a person acted "consciously, knowingly, with reckless disregard of, or intentionally having considered that the tragic consequences which occurred were 'highly probable.'"). Thus, the term wanton adds in the requirement that the actor be conscious of his misconduct—that he

know that his conduct will probably result in injury and be unconcerned over the possibility of such result. *Pettingell*, 271 P.2d at 1042-43.

53.     The legislature's decision to use the term "willful" as compared to the term "willful and wanton" and its higher intent requirement must be presumed to be purposeful. Accordingly, I find that the legislature meant to use the term "willful" as compared to "willful and wanton", and find that since it did not define the term willful in the CRUS,  it meant for "willful" to have its plain and ordinary meaning.  I find that this requires that an action be taken "voluntarily, purposefully and with a conscious disregard for the consequences of the act".  *Hohn*, 870 P.2d at 517; *Pettingell*, 271 P.2d at 1042. Willfulness does not, however, require that a government employee be consciously aware that his acts or omissions create danger or risk to the safety of others, or that he intended to harm another.

54.     I note that this result was reached by the New Mexico Court of Appeals in construing language taken from that state's recreational use statute.  *Rivero*, 949 P.2d at 290 ("willful" conduct does not require a plaintiff "to prove deliberate intention or purpose to harm in order to rebut a defendant's claim of immunity" under the Off-Highway Motor Vehicle Act, which follows the 1965 Model Recreational Use Act; the term "willful" as defined in *Black's Law Dictionary* includes acts done "'with indifference to the natural consequences'") (quoting *Huddleston*, 843 S.W.2d at 905-06).

55.     This result was also reached by the court in *Stephens v. United States*, 472 F. Supp. 998, 1016 (C.D. Ill. 1979).  Similar to this case, the government argued there that for the court to find a willful failure to warn of a dangerous condition, it must find affirmative evidence from which an inference of conscious indifference to the

consequences might be drawn. *Id.* The court disagreed, finding that "no spirit of ill will or intentional misconduct is essential to prove wilfulness." *Id.* "Rather, it is conduct which takes on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Id.* If such conduct is found, the plaintiff is entitled to recovery even though certain defenses would have prevented his recovery for ordinary negligence. *See also Rost v. United States*, 803 F.2d 448, 451 (9th Cir. 1986) (in finding that willful exception to recreational use statute applied, court found that government actor was not protected because he personally failed to recognize the precise peril posed stating, "[i]t is enough that he knows or has reason to know of the circumstances which would bring home to the realization of the ordinary, reasonable man the highly dangerous character of his conduct of his conduct").

56.     I recognize, however, that the United States has cited cases where the Colorado state courts have considered the meaning of "willful" by referring to or using the definition for "willful and wanton". *See Safehouse Progressive Alliance for Nonviolence, Inc. v. Qwest Corp.*, 174 P.3d 821, 829 (Colo. App. 2007); *United Blood Servs. v. Quintana*, 827 P.2d 509, 523 n. 10 (Colo. 1992); *see also Crum v. Groce*, 556 P.2d 1223, 1225 (Colo. 1976). Those cases did not, however, reference or analyze the distinction between the two terms as discussed in *Pettingell*.[6]

---

[6] Moreover, *Crum* is distinguishable as the definition of willful was made "in the context of the statute", entitled "Damages for Destruction or Property Injury Caused by Minors". This statute held parents strictly liable when their child "maliciously or willfully damage[d] or destroy[ed] property. 556 P.2d at 1224 (citing Colo. Rev. Stat. § 13-21-107).
.

57. The United States also cites two Tenth Circuit cases that essentially interpreted the term "willful" in recreational use statutes to mean "willful and wanton" and required an intent to cause injury. *See Bingaman v. Kansas City Power & Light Co.*, 1 F.3d 976, 982 (10th Cir. 1993); *Klepper v. Milford*, 825 F.2d 1440, 1446-47 (10th Cir. 1987). Those cases, however, were interpreting Kansas law, not Colorado law, as to the definition of willful. Indeed, the Tenth Circuit made clear in those cases that in interpreting a state's recreational use statute, it is the law of that state that controls, regardless of how other states had interpreted a particular term. *Klepper*, 825 F.2d at 1446. It found Kansas law "overwhelmingly favors a definition of willfulness as intentionally causing an injury or doing wrong rather than intentionally acting or failing to act in a way that merely allows a wrong to occur." *Id.* at 1446. Thus, the Tenth Circuit found that the defendants' conduct was not willful unless they "intended to injure the plaintiff or otherwise had a designed purpose or intent to do wrong". *Id.* at 1447.

58. Here, however, Colorado courts, including *Pettingell* and *Hohn*, have specifically acknowledged the distinction between "willful" and "willful and wanton" conduct. I find that their definition of "willful" is controlling.

59. With that backdrop, I must now determine whether the Academy willfully failed "to guard or warn against a known dangerous condition . . . likely to cause harm." Colo. Rev. Stat. § 33-41-104. I find that the Academy's conduct in failing to guard or warn users of the path against the dangerous condition it knew existed on its property was willful. My conclusion is supported by the evidence presented in the record, Colorado law, and cases from other jurisdictions construing the willful and malicious exception to immunity in the recreational use statutes.

60.     First, the Academy knew that the asphalt path existed on its property and knew

that persons used the path for recreational purposes, including bicycling, by invitation or

with permission, as the Tenth Circuit found.  Dr. Mihlbachler also knew, prior to

September 2008, that people had used the path for recreational purposes.

61.     The Academy knew that signs which read "Bicycle Path, No Motorized Vehicles"

were placed next to the path, and Academy representatives acknowledged that the

existence and placement of the signs in relation to the path would cause members of

the public, including Mr. Nelson, to reasonably believe that they were authorized or

invited to go on the path and ride their bicycles.  The Academy did nothing to remove

the "Bicycle Path, No Motorized Vehicles" signs prior to September 3, 2008, though it

had the opportunity to do so.  Thus, prior to Mr. Nelson's injury, CDOT "offered to

remove one of the signs, but the Academy ignored that offer."  (Tenth Circuit Op., p. 8.)

The United States also did nothing to close access to the path.

62.     Despite the Academy's knowledge of the path and its recreational use, it did not

put the asphalt path on its Real Property Records or identify it on its official trail system.

Thus, the path was not subject to the Trails Management Plan or the CHAS contract

which required that maintenance be performed.  This meant that the path was not

actively maintained as a recreational trail or otherwise.  Further, Mr. Thoma, the head of

security, admitted that he did not monitor the path.

63.     The United States argues, however, that because the path was not on the

Academy's official trail system map or official real property records, it was

undocumented and therefore *unknown* for purposes of monitoring and maintenance.

(United States' Proposed Findings of Fact and Conclusions of Law, and Br. in Supp., at

15).  This argument is specious.  The evidence shows conclusively that the United

States knew of the path and knew that it was being used for recreational purposes.

That was the very basis for the United States' appeal to the Tenth Circuit arguing that it

was entitled to the benefit of the CRUS and the Tenth Circuit's decision agreeing with

the government.  The United States' seeking of immunity under the CRUS while

disclaiming any responsibility for the path or its maintenance is disingenuous.

Ultimately, regardless of the fact that the path was not on its official records, the United

States is liable to Mr. Nelson if it willfully failed to warn or guard against a known

dangerous condition likely to cause harm.

64.     Also, off-site water flow onto Academy property in the area of the asphalt path

was a known condition and problem that the Academy had been investigating and

addressing for many years.  This is the very problem that caused the sinkhole/washout.

Despite this knowledge and despite knowing of the path's use for recreational purposes,

the United States did not monitor the path or do anything to make sure the path was

safe from erosion and washouts caused by the off-site water flow.

65.     Given the Academy's knowledge of the path and its recreational use, the bicycle

signs that allowed people to infer that the path was open to public use, the Academy's

failure to act when CDOT offered to remove at least one of these signs, and the erosion

issues occurring in that area, I find that the Academy must be deemed to have refused

to weigh the consequences of the recreational use of the path and whether someone

could be injured on it.  This was not a situation, as the United States argues, where the

Academy simply omitted to consider the path.  *See Pettingell*, 271 P.2d at 1043

("Omitting to weigh consequences is simple negligence; refusing to weigh them is

willful.")  Further, given its knowledge, it must be deemed to have acted voluntarily, by choice, intentionally and purposefully in not maintaining the path or in not closing off the path or doing anything to alert people that it was not to be used for recreational purposes.  The Academy has given no justifiable excuse for this.  While it may have believed that the path was on the CDOT and/or MVEA easement, there is undisputed evidence that the path was located on Academy land and it was the Academy's responsibility to upkeep the land and fix any problems.  Indeed, this is demonstrated by the fact that immediately after Mr. Nelson's accident, it fixed the hole and then ultimately removed the path.

66.     The Academy's knowledge and failure to act regarding the path must be considered in conjunction with Dr. Mihlbachler's actions or failure to act.  The problems with off-site water flow were also being investigated and documented by Dr. Mihlbachler.  He had responsibility for investigating the substantial erosion problems.  Consistent with this, on August 20, 2008, when Dr. Mihlbachler encountered and photographed the sinkhole, his "purpose out there on that day" was photo-documenting, "eyes on the ground, looking at what's happening along our boundary and downstream from there."  (Def.'s Ex. A, Mihlbachler Testimony at 50:11-14.)

67.     As part of the "eyes on the ground" for the Academy, Dr. Mihlbachler checked areas that the security forces did not get to that often and reported to the appropriate party if issues were identified.  For all intents and purposes, Dr. Mihlbachler functioned as an Academy employee, and had responsibilities related to Academy safety and security and reporting safety concerns.

68.     Two weeks prior to Mr. Nelson's accident, Dr. Mihlbachler learned of and documented the sinkhole/washout.  This knowledge, as I have previously stated, is imputed to the Academy.  Thus, the Academy *actually knew* through its agent two weeks prior to Mr. Nelson's accident of the existence of the sinkhole/washout on the asphalt path.  Dr. Mihlbachler and the Academy did nothing, however, to warn the public of the sinkhole/washout or to guard against the danger posed by the sinkhole/washout.  They also did nothing to guard against the danger of erosion that caused the sinkhole.

69.     Dr. Mihlbachler also did not report the sinkhole to anyone, show anyone the photographs he had taken of the sinkhole, or take any action to fix, warn about, or guard against the danger of the sinkhole.  This is despite his testimony that, if he had known the Academy was sanctioning the use of that path, it would have been "incumbent" on him as the Academy's Trail Manager to take the appropriate action to keep the users of that trail safe.  (Def.'s Ex. A, Mihlbachler Testimony, 75:4-9.)  This is also despite his belief that there is an expectation for government employees to say something if they see something.

70.     Dr. Mihlbachler acknowledged that if the path had been an official Academy trail, the condition of the asphalt path that he observed would be a safety hazard for users of the path and he would have reported the condition of the path immediately to maintenance to get it repaired.  The fact that the Academy had not officially designated it as an official trail does not, however, make it less dangerous to the public.  Similarly, the fact that Dr. Mihlbachler thought the trail was to be maintained by CDOT or MVEA does not make it less dangerous.  Indeed, Academy representative Mr. Thoma, testified that the condition of the asphalt path with the sinkhole was dangerous and hazardous

for users of the path.  Academy representative Greg Long testified that the sinkhole was a dangerous emergency situation and he believed that something had to be done on an emergency basis because of safety considerations.  The condition of the path with a sinkhole/washout did not meet Academy safety standards.  Yet Dr. Mihlbachler consciously chose not to do anything or tell anyone about the sinkhole because he felt it was not a high priority relative to all the other erosion issues that he was dealing with along the eastern boundary.

71.     Moreover, the Academy knew that people were using the path for recreational purposes, yet chose not to communicate that to its agents such as Dr. Mihlbachler even though he played a safety role at the Academy in connection with his role as Trail Manager and in respect to his monitoring of erosion issues.  This is particularly troubling given that the Academy had been notified by CDOT of at least one of the bicycle path signs which gave the impression that the path was open for general use to the public, and it did not accept CDOT's offer to remove or do anything further regarding the sign.

72.     I find from the foregoing that Dr. Mihlbachler acted "voluntarily, intentionally, and with a conscious disregard for the consequences of the act" when he chose not to make the sinkhole a priority or to do anything to warn about it or guard against its danger. *Hohn*, 870 P.2d at 517.  It also can be said that Dr. Mihlbachler acted  "heedlessly," i.e., without justification, in disregard of the rights of others", in choosing not to make the sinkhole a priority or do anything to warn about it or guard against its danger, which created a higher-than-normal risk of harm.  *See* Colo. Jury Instr., Civil 9:30 (noting that the definition of "Willful and Wanton Conduct or Willful and Reckless Disregard – Defined" for purposes of Colo. Rev. Stat. § 13-21-102(1)(b) was a codification of "three

basic ideas common to 'willful,' 'wanton,' or 'reckless' conduct that run through the cases: (1) the conduct must have created a higher-than-normal risk of harm; (2) the defendant must have been aware of the risk (i.e., acted purposefully); and (3) the defendant must have acted heedlessly," i.e., without justification, in disregard of the rights of others").

73. The United States argues, however, that Dr. Mihlbachler did not actually "know" that the sinkhole posed a danger, *i.e.,* he was not aware of the risk as he did not believe that anyone was still using the path for recreational purposes and he believed that CDOT and/or MVEA were responsible for the path. The circumstances, as he understood them, did not indicate a high probability of harm. This is not dispositive. As noted earlier, willfulness as defined under Colorado law does not require that a government employee be consciously aware that their acts or omissions create danger or risk to the safety of others. Such conscious awareness is required for the conduct to be wanton, as discussed earlier. Willful conduct also does not require that the employee intended to harm another through their actions or inaction.

74. Here, Dr. Mihlbachler had seen people using the path in the past for recreational purposes, and there is no evidence that he thought something had been done to subsequently preclude its use. The evidence showed that Dr. Mihlbachler only observed the path about once a month or 12 times per year, leaving about 353 days each year where he did *not* observe the use of the path. The fact that he had observed public use of the path in the past put him—and the United States—on notice that the path may still be used by the public for recreational purposes, even when he did not observe that use during the limited time he was in the area. Coupled with

Dr. Mihlbachler's knowledge that the sinkhole would create a dangerous condition if the path were an official trial, it stands to reason that a reasonable person would believe the sinkhole would be dangerous to anyone using that path for recreational purposes, and specifically, bicycling—where a person may not be able to see the sinkhole in time to stop. *See Termini v. United States*, 963 F.2d 1264, 1268 (9th Cir. 1992) ("a reasonable person standing in the shoes of the United States would have recognized the probability of an accident eventually occurring on the spur"); *Jacobs v. Commonwealth Highland Theatres, Inc.*, 738 P.2d 6, 10 (Colo. App. 1986) ("mere negligence" can be converted into "wanton and reckless disregard . . . if the defendant, while conscious of its conduct and cognizant of existing conditions, knew *or should have known* that injury would probably result from its omissions") (emphasis added).

75.     Dr. Mihlbachler's testimony that he did not do anything about the sinkhole based on his perception that it was on the CDOT and MVEA easement and was not the responsibility of the Academy is inconsistent with his testimony that he took no action because it was not a high priority relative to all the other erosion issues that he was dealing with.  He testified that he understood he had discretion for making decisions about whether to fix eroded areas that he may encounter on an unofficial path.  (Def.'s Ex. A, Mihlbachler Testimony 55:17-21.)  He also acknowledged that he was working on behalf of the Academy when he took the photographs of the sinkhole on August 20, 2008, and that this was to document the erosion occurring on Academy property.  While Dr. Mihlbachler stated that he thought the path was a service path belonging to MVEA or CDOT, he testified that he "didn't see any sense of urgency to have the hole repaired by them *or by the Air Force Academy.*"  (*Id.* at 55:22-56:5; *see also* Am. Ex. 2,

Mihlbachler Testimony 61:9-13—"in terms of the significance of the damage relative to other areas" that he was working on, Dr. Mihlbachler "didn't see a need for *the academy* necessarily to take action on the damage that had occurred on the trail") (emphasis added). Thus, it is clear from his testimony that Dr. Mihlbachler know that he had discretion as an Academy agent to have the sinkhole fixed but consciously chose not to as it was not a high priority to him.

76. Dr. Mihlbachler's testimony that he did not do anything about the sinkhole based on his perception that it was the responsibility of CDOT and/or MVEA is also inconsistent with his testimony that if he had been aware of the "Bicycle Path" sign on the path or that it was a recreational trail that was getting used, he would have either removed the path because it did not fit with the official Trails Management Plan or it would have been incumbent on him to take the proper action to prevent a safety hazard; that this would have been part of his duties. He testified that he would have thought that the Academy was sanctioning the use of that trail for recreational purposes and, as the Trail Manager for the Academy, he would have needed to take the appropriate action to make it safe for users of the path. Again, this shows that Dr. Mihlbachler knew that he, as an Academy agent, could take action to fix the sinkhole or make it safe, regardless of whether the sinkhole was on CDOT or MVEA easement. There is also no reason that he could not have contacted CDOT or MVEA once he learned of the sinkhole for it to take action to repair the sinkhole. Deliberately not prioritizing safety in the face of a known dangerous condition is a willful failure to guard or warn. *See Rost*, 803 F.2d at 449 (where horizontal extension of a steel road closure gate impaled a national forest visitor, the United States was found to have acted willfully because it

knew of the condition of this gate before the accident, had actual or constructive knowledge that injury was probable as a result of its failure to guard or warn against the dangerous condition, and consciously failed to guard or warn against the peril because it "had other priorities"). I find from the foregoing that Dr. Mihlbachler's testimony that he took no action in regard to the sinkhole because he thought it was CDOT's and/or MVEA's responsibility is thus not entirely credible.

77.     Given all of the above, I find that the Academy and Dr. Mihlbachler, its agent, willfully ignored the dangerous condition on the path and chose not to take any steps to warn or guard users like Mr. Nelson against that danger. Even if I were not to consider the Academy's actions collectively, I find that Dr. Mihlbachler acted willfully in failing to warn or guard against a known dangerous condition likely to cause harm.

78.     There is no reason that action could not have been taken to warn or guard against the danger of the sinkhole. Indeed, after Mr. Nelson suffered the serious injuries from his bicycle crashing into the sinkhole, the Academy moved unhindered and with tremendous speed to warn users of the dangers in using the path and to guard against the sinkhole/washout danger. Without even having to obtain a work order, the Academy immediately filled in the sinkhole, barricaded the entrances to the bike path, barricaded the sinkhole location itself, placed warning signs on the path that specifically warned of the "danger," and removed the "Bike Path – No Motorized Vehicles" signs at either end of the bike path. It took these immediate steps to ensure that no one would use the path to bicycle and, if they did, that they would be warned of the danger and not be injured by it. Later, it removed the asphalt path.

79.     My finding that the United States' actions were willful in regard to failure to warn or guard against a known dangerous condition likely to cause harm is supported by cases construing recreational use statutes in other states.

80.     In addition to the *Rost* case cited previously, the Ninth Circuit found that the Forest Service engaged in willful and malicious behavior that was not protected under a recreational use statute when it construed and maintained a spur along a canyon road that ended at a cliff without warning of the hazard, even though the chances of someone driving over it were small.  *Termini*, 963 F.2d at 1267-69.  The court stated that "[t]he likelihood of an individual actually driving over the cliff speaks to the probability of injury because of the cliff's unmarked presence, not to the inherently dangerous nature of the cliff in the first instance. . . . Common sense dictates that a precipice at the end of a road constitutes a peril to be apprehended."  *Id.*  Similarly, the court stated that the fact the road was used infrequently "seems to us much less important to the court than the fact that it abruptly terminates a cliff", and rejected an argument that the United States lacked constructive knowledge of the probability of an injury on the spur because no accidents had occurred there.  *Id.*

81.     In *Soto v. United States*, 748 F. Supp. 727 (C.D. Cal. 1990), a person was injured when they dove into a pool on Forest Service grounds.  The court found that the Forest Service's failure to warn against diving into the pool was willful even though the Service had classified the pool as an undeveloped site and even though the pool was not open to swimming or diving.  *Id.* at 728-31.  The court found that the government could not "mask reality with words".  The pool was "a *de facto* 'developed' area", regardless of its official classification, and it "should have been recognized and treated

as such by the District Ranger." *Id.* at 729. The *Soto* court also found that the United States was not immune under the state's recreational use statute based on its willful misconduct. *Id.* at 731. There was actual knowledge that a peril existed, and constructive knowledge "that injury was a probable, as opposed to a possible, consequence of any danger" as the area was heavily used. *Id.* There was also a conscious failure to act to avoid the peril; thus, the court found that the District Ranger's failure to act was, "to put it charitably", "in callous disregard of the safety of the national forest-using public." *Id.* There was no systematic procedure for reporting accidents, none of the government personnel were trained in safety, there was no training program, and "no one would acknowledge that he or she had *any* responsibility for the safety of the using public." *Id.* (emphasis in original).

82.    The United States was also found liable under the state's recreational use statute for its willful or malicious failure to guard or warn against a known danger when the plaintiff fell through a hole caused by erosion in an observation deck at a national recreational area. *Ware v. United States*, No. C-92-1744 EFL, 1994 WL 46739, at *2-3 (N.D. Cal. Feb. 4, 1994). The court found that the government knew about the condition, failed to inspect the area as required or establish a safety plan, failed to warn the public of the danger even though it allowed people to use the area, and failed to repair the problem. *Id.* at *2-3, 5-7. It further found that "a reasonable person standing in the shoes of the defendant would have recognized that it was probable that an accident would occur in the very deck area itself from all the outward signs of deterioration unless it was inspected and fixed" and that "a reasonable person would know, seeing the outward signs, that an injury was probable as opposed to just being

possible." *Id.* at *7. While the United States argued that it was not aware of this hole as it "developed suddenly", the court found that "[t]his really begs the question":

> It seems obvious that the hole had to have been repaired over time, and the Court finds the reason it reopened suddenly before plaintiff's accident was a total lack of structural and foundation support below it. It also seems clear that if the deck had been allowed to remain in the same condition after the plaintiff's accident that other problems with the decking would have manifested themselves because of the total lack of any support for the deck.

*Id.* at *6.

83.     Other cases that have found summary judgment inappropriate on the willful and malicious failure to warn exception also provide some support for my ruling. *See Umpleby v. United States*, 806 F.2d 812, 815-16 (8th Cir. 1986) (reversing the finding of the trial court as a matter of law that the conduct of the United States did not constitute a willful or malicious failure to guard or warn against a dangerous condition where the evidence showed that the Army Corps of Engineers knew that the road upon which plaintiff was injured had a curve of 90 degrees at the point of the accident, had control of the road, knew of the safety and design requirements for the road, including posting of signs, and knew that no warning signs were posted); *Mandel v. United States*, 719 F.2d 963, 967-68 (8th Cir. 1983) (grant of summary judgment was improper in case where the plaintiff was injured when he dove into a swimming area and hit a submerged rock; evidence showed the park service was aware of the danger of submerged rocks, even though it did not know of the particular rock that the plaintiff struck, and did not post any type of warning, and a ranger who spoke to the plaintiff before he went swimming recommended the swimming hole without indicating any possible dangers); *Sulzen v. United States*, 54 F. Supp. 2d 1212, 1217-18 (D. Utah 1999) (summary

judgment was not appropriate where woman was killed by falling rock at picnic site as there was evidence by which a fact finder could find that the United States knew of the falling rock hazard and failed to take any action); *Stokka v. Cass Cty. Elec. Coop.*, 373 N.W.2d 911, 912 (N.D. 1985) (finding evidence from which a jury could infer that defendant CCEC willfully failed to guard or warn against a dangerous condition where it "knew that unmarked guy wires posed a risk to snowmobilers; that the guy wire struck by [plaintiff] was known by [defendant] to pose a risk to snowmobilers"; that a guy guard was previously installed but was not present at the time of the accident; "that CCEC could avert harm to snowmobilers by installing guy guards"; and that CCEC did not have an effective policy for determining where to install guy guards or to assure their continued presence if once installed).

84.     The government's actions and inactions here that led to Mr. Nelson's catastrophic injuries fall neatly within the continuum of cases wherein the courts have found a willful failure to warn or guard against a known dangerous condition (or found the evidence sufficient to allow the finder of fact to conclude there was a willful failure to warn or guard against a known dangerous condition.)  The known dangerous condition here—the sinkhole/washout—is not unlike the known dangerous conditions (stumps, rocks, cliff, *etc.*) existing in the above cited cases.  And the United States' willful decision not to warn or guard against the known dangerous sinkhole/washout condition on the path it knew was being used by recreational users is not unlike the willful decisions not to warn or guard the known dangerous conditions in the cited cases.

85.     As in *Termini*, common sense dictates that a large, deep sinkhole that covers the entire width of a bicycling path is perilous, regardless of how often the path may be

used.  A reasonable person standing in the shoes of the United States would have recognized the probability of an accident eventually occurring on that path given the United States' knowledge of recreational use of the path, the significant erosion and washout issues that were occurring on the path, and ultimately the sinkhole that was discovered by Dr. Mihlbachler.  As in *Soto*, the path upon which Mr. Nelson was injured was a *de facto* recreational trial, regardless of the fact it was not an official trail or on the Academy's Real Property records, and it should have been recognized and treated as such by the Academy.  As in *Ware*, the Academy knew about the erosion occurring on the path and knew of the actual sinkhole, failed to inspect or maintain the path or establish a safety plan for the path, failed to warn the public of the danger even though it allowed people to use the path, and failed to repair the problem after it learned of the sinkhole and before Mr. Nelson's accident.  Moreover, the United States has not cited any cases construing recreational uses statutes which support its position that its actions and the actions of its agent(s) do not rise to the level of willful conduct.[7]

86.     I recognize, however, that there are some distinctions between this case and the cases cited above.  For example, in some of the cases the government had more substantial prior knowledge of the danger at issue, there was heavier recreational use of

---

[7] The United States cites *Marquez v. United States*, No. 95-S-346, 1996 WL 588918 (D. Colo. Sept. 17, 1996), but I find that case distinguishable.  While no evidence of willful or malicious conduct was found by the court on the part of the Forest Service, the plaintiff presented only generalized knowledge of avalanche danger.  1996 WL 588918, at *7.  That is not the situation here where there was actual knowledge of the sinkhole.  Similarly, in *Otteson v. United States*, 622 F.2d 516 (10th Cir. 1980), claims that the Forest Service failed to maintain a road free from ice, warn of hazards, or close the road were "plainly couched in terms of negligence by the government".  *Id.* at 520.  While the plaintiff argued that the government was aware of the condition of the road, no evidence was presented on this issue, and the court thus found that the plaintiff did not adequately allege "willful" conduct under Colorado's sightseer statute.  *Id.*

the area at issue, or the government had even recommended use of the activity that was found to be dangerous. Nonetheless, these cases are still instructive. While the United States' actions and failure to act may arguably not fall on the most egregious end of the willful or malicious conduct spectrum, they show in my opinion that they are above the minimum level of culpability for establishing a willful failure to warn or guard against a known dangerous condition likely to cause harm. Further, the fact that there is no evidence that anyone was previously injured on the path due to erosion/washout issues is also a non-issue in my opinion, as this means that it simply took "years for the inevitable to happen." *Stephens,* 472 F. Supp. at 1017.

87.     The United States also points out that many of these cases are based on California law which finds willful misconduct where there was constructive knowledge of the danger, unlike the CRUS which requires actual knowledge. That is a distinction without a difference, however, as here there was actual knowledge of the sinkhole.

88.     Based on the foregoing, I find that there was a willful failure to guard or warn against a known dangerous condition, use, structure, or activity likely to cause harm by the United States. Colo. Rev. Stat. § 33-41-104(1). Accordingly, I find that the United States is not immune from liability under the CRUS. My finding that the United States is liable to Plaintiffs as a landowner under the Colorado Premises Liability Act is reaffirmed. (February 2014 Order, Conclusions of Law ¶¶ 61-78.)

IV.     <u>ORDER OF THE COURT</u>

        It is hereby adjudged and ORDERED:

1.      The Court has jurisdiction over Plaintiffs' claims under the Federal Tort Claims Act.

2.      The United States' liability for the damages sustained by the Plaintiffs James

Nelson and Elizabeth Varney is not limited by the Colorado Recreational Use Statute

because of the United States' willful failure to warn or guard against a known dangerous

condition on its property likely to cause harm.

3.      The United States is liable for injuries, losses or damages sustained by

Mr. Nelson and Elizabeth Varney in regard to Mr. Nelson's accident on September 3,

2008.

4.      Defendant's willful action and inaction, for which it is liable, were the direct and

proximate cause of the Plaintiffs' injuries, losses, and damages.

5.      Defendant is 100% liable to the Plaintiffs for their damages.

6.      Plaintiff James Nelson is hereby awarded his damages as I previously

determined in my May 14, 2014, Order in the total amount of $6,900,793.53

7.      Plaintiff Elizabeth Varney is hereby awarded her damages as I previously

determined in my May 14, 2014, Order in the total amount of $401,425.

8.      Plaintiffs are awarded post-judgment interest at the rate allowed by law.

9.       Plaintiffs are awarded their costs and attorneys' fees incurred in bringing this

action pursuant to Colo. Rev. Stat. § 33-41-105.5.  Plaintiffs shall provide their Bill of

Attorneys' Fees and Bill of Costs to the Court in accordance with the Federal Rules of

Procedure.

        Dated:  June 9, 2017

                                        BY THE COURT:

                                        s/ Wiley Y. Daniel
                                        Wiley Y. Daniel
                                        Senior United States District Judge